IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| OXFORD CASINO HOTEL, <br> 777 Casino Way, Oxford, ME 04270, <br><br> BB DEVELOPMENT, LLC, <br> 777 Casino Way, Oxford, ME 04270, <br><br> CHURCHILL DOWNS INCORPORATED, <br> 600 N. Hurstbourne Parkway, Suite 400, <br> Louisville, KY 40222, <br><br>               Plaintiffs, <br><br>     v. <br><br> MILTON F. CHAMPION, in his official capacity as Executive Director of the Maine Gambling Control Unit, <br><br> 45 Commerce Drive, Suite 5, Augusta, ME 04333, <br><br>               Defendant. | Civil Action No. _____ |

**COMPLAINT**

Plaintiffs Oxford Casino Hotel ("Oxford Casino"), BB Development, LLC, and Churchill Downs Incorporated (together, "Plaintiffs") allege as follows:

**PRELIMINARY STATEMENT**

1. This lawsuit challenges Maine's unlawful efforts to grant a monopoly on online casino-style gambling ("iGaming") to four specially selected Indian Tribes. On January 11, 2026, despite widespread opposition from the majority of Mainers, the State adopted An Act to Create Economic Opportunity for the Wabanaki Nations Through Internet Gaming, 8 M.R.S.A. § 1205 *et seq*. (the "Monopoly Law"). That Act allows four Tribes, acting in a business capacity—and *only* those four Tribes—to offer iGaming within the State. *See* 8 M.R.S.A. § 1406(2) ("To be eligible

to receive an Internet gaming license, an applicant must be a federally recognized Indian nation, tribe or band in this State."); *see id.* (noting that licenses may be "transferred or assigned" only to a "business entity with a principal place of business in the State that is wholly owned by that federally recognized Indian nation, tribe or band"). Creating a race-based monopoly for in-state businesses violates equal protection, flouts constitutional restrictions on economic protectionism, and fails scrutiny under both the United States and Maine Constitutions.

2. Maine has for decades provided careful limits on gaming to protect its citizens. But now, the Legislature has blessed a race-based monopoly that will allow Maine Tribes alone to offer iGaming in every square inch of Maine.

3. Promoting iGaming through race-based preferences deals a gut-wrenching blow to Maine businesses like Oxford Casino that have heavily invested in the State and its people. A recent industry study commissioned by The Innovation Group, *Economic Impacts of iGaming Expansion*, shows that land-based casino revenue drops by 16% on average after iGaming is introduced, causing substantial job losses, hundreds of millions of dollars in lost economic output, and reduced tax contributions that fund public services. As for Maine, that same study projects that on average the introduction of iGaming into the State will lead to approximately 378 lost jobs, $22 million in lost labor income, and $60 million in lost value added throughout the economy.

4. All these harms are the direct consequence of a race-and-geography-based monopoly. If the Maine Legislature has made the choice to allow iGaming within the State, it should give everyone a fair chance to compete, without regard to race or citizenship, as both the United States and Maine Constitutions require.

5. The "core purpose" of the Equal Protection Clauses of both the United States and Maine Constitutions is to do "away with all governmentally imposed discrimination based on

race." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (citation omitted); *Friends of Lincoln Lakes v. Bd. of Env't Prot.*, 989 A.2d 1128, 1136 (Me. 2010) (state Equal Protection Clause is treated as coterminous with federal Equal Protection Clause). "Any exception to the Constitution's demand for equal protection must survive a daunting two-step examination known in our cases as 'strict scrutiny,'" in which the government must establish that it is furthering a "compelling governmental interest" and that its law is "narrowly tailored" to that end. *Students for Fair Admissions*, 600 U.S. at 206-07 (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995)).

6.  Although the *federal* government may sometimes grant preferences to Tribes based on their political status, strict scrutiny applies "to preferential *state* classifications based on tribal status." *KG Urb. Enters., LLC v. Patrick*, 693 F.3d 1, 19 (1st Cir. 2012) (suggesting that state preference given to Native American tribes for the location of gaming establishments is race-based discrimination); *Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997) ("we seriously doubt that Congress could give Indians a complete monopoly on the [gaming] industry"); *West Flagler Assocs., Ltd. v. Haaland*, 144 S. Ct. 10 (2023) (statement of Justice Kavanaugh respecting denial of the application for stay) ("To the extent that a separate Florida statute (as distinct from the compact) authorizes the Seminole Tribe—and only the Seminole Tribe—to conduct certain off-reservation gaming operations in Florida, the state law raises serious equal protection issues.").

7.  The Monopoly Law comes nowhere close to passing strict scrutiny. There is no compelling government interest in privileging the economic interests of the Wabanaki Nations over the interests of all other persons and businesses within the state. And even if promoting tribal welfare were the goal, granting an iGaming monopoly to the Tribes is not tailored to promoting that interest.

8. The Monopoly Law also impermissibly discriminates against out-of-state businesses in violation of the dormant Commerce Clause. Laws that "confe[r] a competitive advantage" on in-state entities cannot stand unless the State establishes that the laws further "a legitimate local purpose that cannot be attained through reasonable non-discriminatory alternatives." *Fam. Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 13, 17 (1st Cir. 2010); *see Oregon Waste Sys., Inc. v. Dep't of Env't. Quality of State of Ore.*, 511 U.S. 93, 99 (1994). The Monopoly Law not only confers a competitive advantage on the Wabanaki Nations—it takes every other potential player out of the game. By blocking out-of-state entities from participating in iGaming, the State subjects itself to, and fails, strict scrutiny. Economic protectionism is not a legitimate purpose. And any concern for tribal welfare could be accomplished through narrower means.

9. The Maine Constitution disfavors "special or private legislation." Me. Const. art. IV, pt. 3, § 13. So the Legislature may not "gran[t] a privilege to an individual or individuals not enjoyed by other similarly situated persons" or engage in "ad hoc legislative attempts to single out certain" individuals out of "favoritism and arbitrariness." *Nadeau v. State*, 395 A.2d 107, 112-13 (Me. 1978). The Monopoly Law singles out the Tribes for special treatment: "To be eligible to receive an Internet gaming license, an applicant *must* be a federally recognized Indian nation, tribe or band in this State." 8 M.R.S.A. § 1406(2) (emphasis added). There are four federally recognized Indian Tribes within the State—so there are exactly four available licenses. The State has no reason to single out these four tribal businesses over any other businesses for online gaming licenses in the State, especially given that the State has many other tools to assist Tribes, including use of state tax dollars. This is an impermissible monopoly.

10. The Monopoly Law injures Plaintiffs. Plaintiffs believe that no entities should be allowed to offer iGaming in the State of Maine. But since Maine has decided to allow iGaming,

Plaintiffs, too, are interested in and would apply for an iGaming license. However, they are unable to do so because they are not federally recognized Maine Indian Tribes. Nor are they able to acquire a license from the Tribes because they are not themselves federally recognized Indian Tribes in Maine.

11. But the harm doesn't stop there. Plaintiffs stand to lose substantial revenue and competitive market share if forced to compete against the Tribes' online gaming platforms. Customers will be less likely to choose a brick-and-mortar casino if they have more readily accessible options, thereby damaging Oxford Casino's business reputation and operations within the State. This concern is especially acute given that Oxford Casino employs 364 Maine citizens, who depend on the casino's operation for their livelihood.

12. Oxford Casino is invested in Maine—it has spent millions reinvesting in the property; it provides millions of dollars of tax revenue to support Maine programs; it employs numerous Maine citizens; it gives back to the community through myriad fundraising efforts; and it brings in out-of-state tourists to enjoy all that Maine has to offer. If forced to compete on an uneven playing field with the Tribes' online gaming operations, Oxford Casino stands to lose its place in the Maine market and its opportunity to invest in the Maine community.

13. This Court should enjoin the enforcement of the Monopoly Law and declare that it is unconstitutional under both the United States and Maine Constitutions.

**PARTIES**

14. Oxford Casino is one of Maine's two licensed casinos and it has offered gaming opportunities to Mainers since 2012.

15. BB Development, LLC, doing business as Oxford Casino Hotel, is a Maine corporation. It is a subsidiary of Churchill Downs Incorporated.

16. Churchill Downs Incorporated is a Kentucky corporation, dedicated to offering extraordinary entertainment experiences for more than 150 years. It is the parent corporation of Oxford Casino.

17. Milton F. Champion is sued in his official capacity as Executive Director of the Maine Gambling Control Unit. He is charged with "administering and enforcing" the Monopoly Law under 8 M.R.S.A. § 1403, including deciding whether to issue online gaming licenses to applicants under 8 M.R.S.A. §§ 1405, 1406.

## JURISDICTION AND VENUE

18. This action arises under 42 U.S.C. § 1983, the Declaratory Judgment Act, *Ex parte Young*, 209 U.S. 123, 157 (1908), and the United States Constitution. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1367(a) (supplemental jurisdiction).

19. Venue is proper in this Court as to Defendant under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this district.

## FACTUAL ALLEGATIONS

### I.  Oxford Casino's Operation

20. Located at the foot of Maine's western mountains, Oxford Casino is set on a beautiful 97-acre property. Oxford Casino is one of Maine's two licensed casinos and has offered Mainers a safe and fun gambling experience for more than a decade.

21. Oxford Casino offers 970 slot-machine options, including video slots, reel slots, and video poker. Customers may play in denominations from one penny to five dollars or more.

22. Oxford Casino also offers 23 classic table games, including blackjack, craps, baccarat, roulette, Texas hold'em, and Mississippi stud, among others. With varying table minimums and maximums, customers can enjoy a variety of table games with different stakes.

23. Oxford recently started offering retail sports betting pursuant to a 2023 Maine law permitting retail sports betting for casinos. *See* 8 M.R.S.A. § 1206(2).

24. Oxford Casino promotes a safe and fun environment, which includes a 107-room hotel and restaurant with views of the scenic Maine landscape, attracting visitors from all over New England.

25. Oxford Casino is committed to the community of Oxford and the State of Maine. Churchill Downs acquired Oxford Casino in 2013 and welcomed the existing Oxford staff of over 400 employees into the Churchill Downs family. Through its casino and hotel operations, Oxford Casino employs 364 Mainers, who depend on the casino for their livelihood.

26. Central to Oxford Casino's identity is its mission to "Give for Change," to support organizations that provide resources to underserved populations in Maine. For instance, in 2024 alone, Oxford Casino raised over $225,000 for local charities and non-profits like the Animal Refuge League of Greater Portland, Community Concepts Diaper Drive, and Maine Cancer Foundation.

27. As a licensed casino operator, Oxford Casino raises substantial tax revenues for the State. With slot revenue taxed at 46% and table games taxed at 16%, Oxford Casino pays millions every year in state taxes. In 2025 alone, Oxford Casino paid more than $40 million in Maine taxes.

28. Those tax dollars support a variety of vital Maine institutions and programs, including the Department of Education, the University of Maine system, Maine Maritime Academy, Maine Community College System, gambling-addiction funds, the municipality of

Oxford, Oxford County, the Agricultural Fair Support Fund, harness-racing purses, the Sires Stakes Fund, the Dairy Improvement Fund, the Maine Milk Pool, and the Penobscot and Passamaquoddy Tribes.

## II. Tribal Status in Maine

29. Maine's Indian Tribes are uniquely situated from Tribes in other States because federal law benefitting federally recognized Indian Tribes does not generally apply within the State of Maine. *See* Pub. L. No. 96-420, 94 Stat. 1788 § 5 (1980); 94 Stat. 1797 § 16; Pub. L. No. 102-171, 105 Stat. 1148 § 6(b) (1991).

30. Maine's federally recognized Indian Tribes are the Houlton Band of Maliseet Indians, the Mi'kmaq Nation, the Passamaquoddy Tribe, and the Penobscot Nation. Collectively, these Tribes are known as the Wabanaki Nations.

31. After years of land disputes, Congress enacted the Maine Indian Claims Settlement Act of 1980 "[t]o provide for the settlement of land claims" for the "Passamaquoddy Tribe, the Penobscot Nation, and the Houton Band of Maliseet Indians." 94 Stat. 1785. Similarly, in 1991, Congress passed into law the Aroostook Band of Micmacs Settlement Act "[t]o settle all claims of the Aroostook Band of Micmacs," *i.e.*, the Mi'kmaq Nation, noting that the Tribe would have "the same status as other Tribes and their lands accorded Federal recognition under the terms of the Maine Indian Claims Settlement Act of 1980." 105 Stat. 1143.

32. These laws accomplished two key objectives. First, they settled claims to territorial land and established federal funds for each Tribe. *See* 94 Stat. 1787 § 4; 94 Stat. 1788 § 5; 105 Stat. 1148 § 9. Second, they limited the Tribes' ability to benefit from generally applicable federal laws that would "preempt the application of the laws of the State of Maine." 94 Stat. 1788 § 5; 94 Stat. 1797 § 16; 105 Stat. 1148 § 6(b). Specifically, when a federal law is enacted "for the benefit

of Indians, Indian nations, or Tribes or bands of Indians" and would otherwise preempt Maine law, the federal law does *not* apply to Maine Tribes unless it is "specifically made applicable within the State of Maine." 94 Stat. 1797 § 16.

33. In 1980, the Maine Legislature implemented the federal Settlement Act and cemented its relationship with the Wabanaki Nations. *See* 30 M.R.S.A. § 6201 *et seq.* Under the Maine Implementing Act, the Tribes generally agreed to be subject to the laws of the State of Maine. *Id.* § 6202; *see also* 105 Stat. 1143, 30 M.R.S.A. § 7201 *et seq.* (Micmac Settlement Act).

34. In 1988, Congress enacted the Indian Gaming Regulatory Act of 1988 ("IGRA"). *See* 25 U.S.C. § 2701 *et seq.* IGRA provides a comprehensive scheme for regulating gambling on Indian lands. Because IGRA has not been made "applicable within the State of Maine," 94 Stat. 1797 § 16, it does not apply to the Wabanaki Nations.

35. Thus, unlike in other states, Maine's laws governing gambling operations treat Maine's Indian Tribes as businesses, not as sovereigns. *See* 30 M.R.S.A. § 6208(3).

### III. Maine's Monopoly Law

36. In June 2025, the Maine Legislature passed LD 1164, An Act to Create Economic Opportunity for the Wabanaki Nations Through Internet Gaming. The Legislature then adjourned. After the Legislature reconvened in January 2026, Maine Governor Janet Mills had three days to either sign or veto LD 1164 or it would become law automatically. Governor Mills took no action on LD 1164 and, accordingly, An Act to Create Economic Opportunity for the Wabanaki Nations Through Internet Gaming, 8 M.R.S.A. § 1205 *et seq.* (the "Monopoly Law") was enacted on January 11, 2026.

37. For the first time in Maine, the Monopoly Law legalizes "the operation of Internet gaming" by licensed entities. 8 M.R.S.A. § 1401.

38. Internet gaming refers to "a card game, dice game or other game of chance approved by the director, including but not limited to blackjack, poker, dice, craps, roulette or baccarat, offered through an approved mobile application or other digital platform that involves, at least in part, the use of the Internet." 8 M.R.S.A. § 1402(5). In simple terms, the Monopoly Law allows licensed entities to offer traditional table games of chance through websites or mobile applications.

39. The law requires the Director of the Gambling Control Unit to "adopt rules governing the conduct of Internet gaming in the State," 8 M.R.S.A. § 1403(2), and to "issue an Internet gaming license upon finding that the applicant meets all requirements" of the statute, *id*. § 1406(1).

40. The law further provides that "[t]o be eligible to receive an Internet gaming license, an applicant must be a federally recognized Indian nation, tribe or band in this State." 8 M.R.S.A. § 1406(2). Each Tribe "may receive only one Internet gaming license," and the license "may not be transferred" outside the tribal community. *Id.* So while "a federally recognized Indian nation, tribe or band in this State may transfer its Internet gaming license to a business entity with a principal place of business in the State that is wholly owned by that federally recognized Indian nation, tribe or band," it may *not* transfer the license to a business not "wholly owned by that federally recognized Indian nation, tribe or band." *Id.*

41. In short, there is one license available for each of Maine's Indian Tribes, and only Maine's Indian Tribes may become licensed as online gaming operators.

42. And that is by design. As the Governor's website explains, the Monopoly Law "is the latest example of progress Governor Mills has made with the Wabanaki Nations during her time in office." Governor Mills explained that she met with the "elected Chiefs of the Wabanaki

10

Nations, who each spoke passionately about the importance of this bill" for tribal "revenue." She explained that her hope was "to improve the lives and livelihoods of the Wabanaki Nations" through the "new revenue" from the Monopoly Law.

43. The representative who introduced the bill similarly asserted that the Monopoly Law was for the "Wabanaki people" and would "ensure that gaming revenues stay here in Maine and benefit Maine communities—not out-of-state corporations."

IV. **The Monopoly Law Injures Plaintiffs.**

44. The Monopoly Law inflicts myriad injuries on Plaintiffs. To start, the Monopoly Law inflicts ongoing constitutional violations on Plaintiffs, so they face harm from the very existence of the law.

45. Oxford Casino (operated through BB Development, LLC) is a brick-and-mortar casino that already offers in-person gaming. Oxford Casino believes that no entities should be allowed to offer iGaming in the State of Maine. But given that Maine has decided to allow iGaming, Oxford Casino, too, would be interested in applying for an iGaming license in Maine, and would plan to apply for a license. However, it is not eligible to do so because it is not a federally recognized Maine Indian Tribe.

46. Similarly, given the current state of the law, Oxford Casino would also be interested in seeking a transfer of a tribal iGaming license, but it is unable to do so because the Monopoly Law prevents the transfer of licenses except to businesses wholly owned by the Tribe that received the license.

47. Oxford Casino has heavily invested in the Maine economy, employing 364 Mainers and giving back to the Maine community. It has also invested heavily in ensuring safe and fair

casino gaming. The Monopoly Law funnels Mainers away from Oxford Casino, causing damage to its business and dealing a competitive blow to Oxford Casino's operations.

48. The Monopoly Law will lead to a loss of market share for Oxford Casino. Oxford Casino is projected to experience substantial revenue loss from the Monopoly Law, reducing tax contributions for vital public services and causing substantial job losses for Mainers.

49. Some of Oxford Casino's "customers (or prospective customers) will turn to competitors" who can offer gaming on mobile devices—what the First Circuit has described as a "handicap." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (citation omitted).

50. Churchill Downs Incorporated is significantly harmed too. Churchill Downs Incorporated is an industry-leading gaming company that already offers online and app-based wagering through its subsidiary TwinSpires. Churchill Downs Incorporated, too, does not believe that any entities should be allowed to offer iGaming in the State of Maine. But, again, given that Maine has decided to allow iGaming, Churchill Downs Incorporated would be interested in applying for an iGaming license in Maine, and would plan to apply for a license, but it is not eligible to apply because it is not a federally recognized Indian Tribe in Maine.

51. Churchill Downs Incorporated would also be interested in seeking a transfer of a tribal iGaming license, but it is unable to do so because the Monopoly Law prevents the transfer of licenses except to businesses wholly owned by the Tribe that received the license.

## COUNT ONE

### 42 U.S.C. § 1983, Equity, Declaratory Judgment Act
### (Violation of Equal Protection, U.S. Const. Amend. XIV)

52. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

53. 42 U.S.C. § 1983 provides private parties a cause of action for declaratory and injunctive relief against any person who, under color of state law, deprives them of rights guaranteed by the United States Constitution or a federal statute.

54. Courts of equity likewise provide private parties with a cause of action to seek declaratory and injunctive relief against state officials who violate federal law. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015); *Ex parte Young*, 209 U.S. 123, 157 (1908).

55. The Declaratory Judgment Act provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

56. The Monopoly Law violates the United States Constitution's guarantee of equal protection by purporting to authorize a race-based monopoly that allows the Wabanaki Nations and only the Wabanaki Nations to offer online gaming within the State of Maine.

57. The Monopoly Law directly, personally, and substantially injures Plaintiffs. Plaintiffs are prohibited from applying for or receiving a license because Plaintiffs are not a federally recognized Indian Tribe in Maine.

58. The Monopoly Law also places Plaintiffs at a competitive disadvantage by giving the Wabanaki Nations a tribal monopoly as to online gaming.

59. These injuries give rise to a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

60. Plaintiffs therefore seek a declaration that the Monopoly Law violates the United States Constitution's guarantee of equal protection.

61. Plaintiffs also seek an injunction prohibiting Defendant Champion from enforcing or administering the Monopoly Law.

62. Plaintiffs also seek an award of attorneys' fees.

## COUNT TWO

### Equity, Declaratory Judgment Act
### (Violation of Equal Protection, Maine Const. art. I, § 6-A, E)

63. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

64. The Maine Constitution provides that "[n]o person shall be deprived of . . . equal protection of the laws."  Me. Const. art. I, § 6-A.

65. The United States Constitution and Maine Constitution "have been interpreted to provide co-extensive protection." *Friends of Lincoln Lakes v. Bd. of Env't Prot.*, 989 A.2d 1128, 1136 (Me. 2010).

66. The Monopoly Law violates the Maine Constitution's guarantee of equal protection by purporting to authorize a race-based monopoly that allows the Wabanaki Nations and only the Wabanaki Nations to offer online gaming within the State of Maine.

67. The Declaratory Judgment Act provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations

of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

68. The Monopoly Law directly, personally, and substantially injures Plaintiffs. Plaintiffs are prohibited from applying for or receiving a license because Plaintiffs are not a federally recognized Indian Tribe in Maine.

69. The Monopoly Law also places Plaintiffs at a competitive disadvantage by giving the Wabanaki Nations a tribal monopoly as to online gaming.

70. These injuries give rise to a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

71. Plaintiffs therefore seek a declaration that the Monopoly Law violates Maine's guarantee of equal protection.

72. Plaintiffs also seek an injunction prohibiting Defendant from enforcing or administering the Monopoly Law.

## COUNT THREE

**42 U.S.C. § 1983, Equity, Declaratory Judgment Act**
**(Violation of the Commerce Clause, U.S. Const. Art. I, § 8, cl. 3)**

73. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

74. 42 U.S.C. § 1983 provides private parties a cause of action for declaratory and injunctive relief against any person who, under color of state law, deprives them of rights guaranteed by the United States Constitution or a federal statute.

75. Courts of equity likewise provide private parties a cause of action to seek declaratory and injunctive relief against state officials who violate federal law. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015); *Ex parte Young*, 209 U.S. 123, 157 (1908).

76. The Declaratory Judgment Act provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

77. The Monopoly Law violates the dormant aspect of the Commerce Clause of the United States Constitution because it discriminates against out-of-state commerce by allowing only Maine Tribes to become licensed as online gaming operators and not allowing any out-of-state entity to become licensed as an online gaming operator.

78. The Monopoly Law directly, personally, and substantially injures Plaintiffs. Plaintiffs are prohibited from applying for or receiving a license because Plaintiffs are not a federally recognized Indian Tribe in Maine.

79. The Monopoly Law also places Plaintiffs at a competitive disadvantage by giving the Wabanaki Nations a tribal monopoly as to online gaming.

80. These injuries give rise to a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

81. Plaintiffs therefore seek a declaration that the Monopoly Law violates the United States Constitution's Commerce Clause.

82. Plaintiffs also seek an injunction prohibiting Defendant from enforcing or administering the Monopoly Law.

83. Plaintiffs also seek an award of attorneys' fees.

## COUNT FOUR

**Equity, Declaratory Judgment Act**
**(Violation of The Rule Against Special Legislation, Maine Const. art. IV, § 13)**

84. Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

85. The Maine Constitution generally bans special legislation that grants irrational monopolies or displays favoritism to a particular class. Me. Const. art. IV, pt. 3, § 13.

86. The Monopoly Law violates the Maine Constitution's ban on special legislation by purporting to authorize a race-based monopoly that allows the four Wabanaki Nations and only the four Wabanaki Nations to offer online gaming within the State of Maine.

87. The Declaratory Judgment Act provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

88. The Monopoly Law directly, personally, and substantially injures Plaintiffs. Plaintiffs are prohibited from applying for or receiving a license because Plaintiffs are not a federally recognized Indian Tribe in Maine.

89. The Monopoly Law also places Plaintiffs at a competitive disadvantage by giving the Wabanaki Nations a tribal monopoly as to online gaming.

90. These injuries give rise to a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

91. Plaintiffs therefore seek a declaration that the Monopoly Law violates Maine's prohibition against special legislation.

92. Plaintiffs also seek an injunction prohibiting Defendant from enforcing or administering the Monopoly Law.

## PRAYER FOR RELIEF

93. Plaintiffs demand a judgment against Defendant as follows:

    a. Declaring that the Monopoly Law violates the United States Constitution's guarantee of equal protection;

    b. Declaring that the Monopoly Law violates the Maine Constitution's guarantee of equal protection;

    c. Declaring that the Monopoly Law violates the prohibition on discrimination against interstate commerce under the Commerce Clause of the United States Constitution;

    d. Declaring that the Monopoly Law violates the Maine Constitution's prohibition against special legislation;

    e. Enjoining Defendant from administering and enforcing the Monopoly Law;

    f. Awarding Plaintiffs reasonable costs, including attorneys' fees, incurred in bringing this action; and

    g. Granting such other and further relief as this Court deems just and proper.

Dated: January 23, 2026                    Respectfully submitted,

/s/ *John A. Woodcock III*
John A. Woodcock III
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial St.
Portland, ME 04101
207-791-1100
jwoodcock@pierceatwood.com

Thomas H. Dupree Jr.*
Jacob T. Spencer*
Lochlan F. Shelfer*
Abby H. Walters*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
202-955-8500
TDupree@gibsondunn.com
JSpencer@gibsondunn.com
LShelfer@gibsondunn.com
AHWalters@gibsondunn.com

**Pro hac vice applications forthcoming*

*Attorneys for Plaintiffs*