**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

OXFORD CASINO HOTEL, *et al.*,

*Plaintiffs*,

v.

MILTON F. CHAMPION, in his official
capacity as Executive Director of the Maine
Gambling Control Unit,

*Defendant*,

and

HOULTON BAND OF MALISEET
INDIANS, MI'KMAQ NATION,
PASSAMAQUODDY TRIBE, and
PENOBSCOT NATION,

*Defendant-Intervenors*.

Civil Action No.: 1:26-CV-00046-
LEW

<u>**THE WABANAKI NATIONS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF**</u>

Pursuant to Federal Rule of Civil Procedure 56, defendant-intervenors the Houlton Band

of Maliseet Indians, the Mi'kmaq Nation, the Passamaquoddy Tribe, and the Penobscot Nation

(collectively, "Wabanaki Nations" or "Nations") move for summary judgment in Defendants' favor

on the claims brought by plaintiffs Oxford Casino Hotel, BB Development, LLC, and Churchill

Downs Incorporated (collectively, "Oxford Casino" or "Plaintiffs"). This motion is supported by

the incorporated memorandum of law, as well as the Defendants' Joint Supporting Statement of

Material Facts ("SMF") and the declarations submitted therewith.

**INTRODUCTION**

This case is about Maine's "An Act to Create Economic Opportunity for the Wabanaki

Nations Through Internet Gaming" ("Economic Opportunity Act" or "Act"), P.L. 2025, ch. 538,

*to be codified at* 8 M.R.S.A. §§ 1401-1417,[1] a law that authorizes the four federally recognized sovereign tribal governments in Maine—the Wabanaki Nations—to conduct internet gaming within the state. For roughly two centuries, Maine has engaged in government-to-government relations with these four in-state tribal nations. And since the 1980s, Congress through a series of Settlement Acts has granted Maine unique authority in the area of Indian affairs. Congress in those statutes called out each of the four Wabanaki Nations by name and recognized Maine's unique relationship with those governments. Pursuant to that authority, the State historically has excluded the Wabanaki Nations from participating in economic activities that have fueled tribal self-determination in other parts of the country. But recently, the State exercised its prerogative under the Settlement Acts to chart a different path. In 2022, Maine authorized the Nations to conduct mobile sports wagering in the state, as part of a broader tribal-state collaboration designed to "promote[] positive government-to-government relations." 5 M.R.S.A. § 11053(1)(B). Building on that successful (and unchallenged) model, the State then enacted the Economic Opportunity Act at issue here. In the Act, the State has chosen to allow tribal gaming and, in turn, the generation of critical tribal government funding that will enhance the Nations' economic sovereignty, promote their self-sufficiency and self-determination, and help the Nations provide the full range of government services—building roads, operating police and fire departments, running educational programs—that provide for the health, welfare, and safety of Wabanaki citizens and surrounding communities.

Oxford Casino operates a brick-and-mortar gaming facility in Maine. For years, it (along with one other casino) has benefitted from a monopoly on Las Vegas–style gaming in the state.

---

[1] The Act is at https://legislature.maine.gov/legis/bills/display_ps.asp?LD=1164&snum=132. Citations to the Act herein are to the M.R.S.A. sections where the Act will be codified.

Unhappy with the Maine Legislature's considered policy choice in the Economic Opportunity Act, Oxford Casino challenges the Act on two grounds, neither of which has merit.

*First*, Defendants are entitled to summary judgment on Oxford Casino's equal protection claim (Count I). Oxford Casino makes a remarkable request. It asks this Court to issue what would be, to the Nations' knowledge, the first court decision ever to strike down under equal protection a law directed at federally recognized tribal governments. Oxford Casino's request is unprecedented for good reason. From the Founding to today, the Supreme Court has recognized that tribal nations are sovereign governments, not racial groups. For equal protection purposes, that means laws like the Act that benefit tribal nations draw political classifications—not racial ones—and must be upheld so long as they satisfy rational basis review. Indeed, the Supreme Court has applied this principle to hold that even statutes providing preferences to *individual* Indians are subject to rational basis review. *Morton v. Mancari*, 417 U.S. 535, 553 n.24 (1974). This case, because it concerns tribal *governments*, is even easier.

Moreover, rational basis review applies for a second, independent reason. The Supreme Court has held, in *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463 (1979), that rational basis review provides the governing standard for state laws enacted in response to federal measures readjusting the allocation of jurisdiction over Indian affairs. That principle applies here. Via the Maine Indian Claims Settlement Act ("MICSA"), Pub. L. No. 96-420, and related statutes, Congress has enacted a unique jurisdictional scheme that shifts Indian affairs authority from the federal government to the State in a range of areas. The First Circuit has held that those areas include Indian gaming—the subject of the Economic Opportunity Act. Rational basis review thus governs Oxford Casino's equal protection challenge to the Act. And the Act easily satisfies that standard by advancing state and federal interests.

Nor is there anything to the Complaint's suggestion that *KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1 (1st Cir. 2012), counsels a different result. That preliminary-phase ruling fully embraced the holding (articulated above) that state laws enacted in response to federal measures adjusting allocation of jurisdiction are subject to rational basis review. And the First Circuit has over and again emphasized the "unique" relationship that Maine has with the tribal nations within its borders, both as a historical matter and (more importantly) as a matter of congressional statutes. Nothing in *KG Urban* suggests that when Maine legislates for tribal governments pursuant to those congressional statutes, Maine is drawing invidious *racial* lines triggering strict scrutiny—a suggestion that, if accepted, could imperil countless Maine statutes.

*Second*, Defendants are entitled to summary judgment on Oxford Casino's Interstate Dormant Commerce Clause claim (Count II). To start, Plaintiffs lack standing to bring this claim. Their alleged injury stems not from any geographic discrimination in the Economic Opportunity Act but from the fact that they are not tribal nations. Their injury is thus not traceable to the provision of the Act they challenge, and it falls outside of the zone of interests the Interstate Dormant Commerce Clause protects. The same problem confounds Plaintiffs' merits argument, too. The Dormant Commerce Clause assumes a comparison of substantially similar entities, yet Plaintiffs are non-tribal gaming operators who are not substantially similar to sovereign tribal governments. Likewise, because the Act draws a political rather than a geographical classification, it does not discriminate against out-of-state commerce. And last but not least, Oxford Casino's argument ignores that the Founders enacted an *Indian* Commerce Clause to address commerce involving tribal nations.

For these reasons and those set forth below, both of Oxford Casino's claims fail. The Nations therefore respectfully request that the Court enter summary judgment in Defendants' favor.

**BACKGROUND**

I.    **THE WABANAKI NATIONS' HISTORIC RELATIONSHIP WITH THE STATE OF MAINE**

The Wabanaki Nations have existed as sovereign entities in what is now the state of Maine since aboriginal times,[2] and have maintained government-to-government relationships with the United States and the State since the country's beginning. On July 19, 1776, just two weeks after the Declaration of Independence, the Nations entered the Treaty of Watertown (signed by officials of the state of Massachusetts Bay on behalf of the United States) and agreed to send 600 warriors to fight alongside American colonists against Great Britain.[3] Today, each of the Nations is "recognized to have the immunities and privileges available to federally recognized Indian Tribes by virtue of their Government-to-Government relationship with the United States as well as the responsibilities, powers, limitations, and obligations of such Indian Tribes." *Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs*, 91 Fed. Reg. 4102, 4104 (Jan. 30, 2026).

Since statehood, Maine has played a prominent role in Indian affairs within the state. "[T]he Articles of Separation between Maine and Massachusetts[] provid[ed] that Maine would assume the duties and obligations which Massachusetts owed to the Indians," whether arising from treaties or otherwise. *Joint Tribal Council of the Passamaquoddy Tribe v. Morton* ("*Morton II*"), 528 F.2d 370, 377-78 (1st Cir. 1975). Congress has found that "[s]ince 1820, the State of Maine has provided special services to the Indians residing within its borders." Pub. L. No. 96-420, § 2(a)(9). For

---

[2] *See, e.g.*, Pub. L. No. 96-420, 94 Stat 1785, §§ 2(a)(3)-(5), 3(a), (h), (k) (1980); Pub. L. No. 102-171, 105 Stat 1143, § 2(a)(1) (1991).

[3] *See* HP0395, *Joint Resolution Acknowledging the Treaty of Watertown of 1776 on the Occasion of President George Washington's Birthday* (126th Maine Legislature), https://www.mainelegislature.org/legis/bills/bills_126th/billtexts/HP039501.asp [https://perma.cc/8V6J-FE2M]; *Joint Tribal Council of the Passamaquoddy Tribe v. Morton* ("*Morton I*"), 388 F. Supp. 649, 651-52 (D. Me. 1975).

example, "Maine ha[d] enacted approximately 350 laws [by 1975] which related specifically to the Passamaquoddy Tribe," *Morton II*, 528 F.2d at 374, and held certain funds in trust for the benefit of one or more Nations, *see* Pub. L. No. 96-420, § 11; *Morton I*, 388 F. Supp. at 669. For 200 years, Maine has also recognized the governmental status of the Nations by according them the ability to seat tribal representatives in the Legislature.[4]

In the late eighteenth and nineteenth centuries, the Nations were dispossessed of the vast majority of their aboriginal lands through agreements with the states of Massachusetts and Maine (in the case of Passamaquoddy and Penobscot) and through progressive encroachment and exclusion (in the case of Maliseet and Mi'kmaq).[5] These transfers and takings of Indian lands occurred without federal approval, in violation of the Trade and Intercourse Act of 1790, 1 Cong. Ch. 33, July 22, 1790, 1 Stat. 137, and the Nations accordingly took steps to assert land claims for roughly two-thirds of the territory within Maine's borders, *see, e.g.*, Pub. L. No. 96-420, § 2(a)(1); *Frey*, 3 F.4th at 499; *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 787 (1st Cir. 1996). Concurrently, federal and state courts confirmed the retained inherent sovereignty of the Nations, *see, e.g.*, *Bottomly v. Passamaquoddy Tribe*, 599 F.2d 1061, 1064-66 (1st Cir. 1979), and the limitations on state authority over them, *see, e.g.*, *State v. Dana*, 404 A.2d 551, 552 (Me. 1979).

---

[4] *See* 3 M.R.S.A. §§ 1-2; P.L. 2025, Ch. 705, Part A; Maine House of Representatives Rule 525 (rights and privileges of tribal representatives), https:// legislature.maine.gov/house/house/ Documents/HouseRules [https://perma.cc/2YK8-JDJM]; S. Glenn Starbird, Jr., *A Brief History of Indian Legislative Representatives in the Maine Legislature* (Me. State Legislature 1983), https:// legislature.maine.gov/lawlibrary/history-of-tribal-representation-in-maine/9261 [https://perma. cc/J2F7-BRP2].

[5] *See, e.g.*, *Penobscot Nation v. Frey*, 3 F.4th 484, 495-97 (1st Cir. 2021) (en banc); S. Rep. No. 96-957 at 11-12, *Authorizing Funds for the Settlement of Indian Claims in the State of Maine*, 96th Cong., 2nd Sess., on S. 2829 (Sept. 17, 1980).

## II.    THE UNIQUE RELATIONSHIP BETWEEN THE UNITED STATES, THE STATE, AND THE NATIONS UNDER THE SETTLEMENT ACTS

After several years of negotiations, in 1980 the Nations, the State, and the United States "reached an agreement which 'represented a good faith effort to achieve a fair and just resolution of [the Nations' land] claims . . . .'" *Frey*, 3 F.4th at 488 (quoting 30 M.R.S.A. § 6202) (citation modified); *see also* Pub. L. No. 96-420, § 2(a)(7). The agreement included a federal component, MICSA, and a state component, the Maine Implementing Act ("MIA"), P.L. 1979, ch. 732 (codified at 30 M.R.S.A. §§ 6201-14), which MICSA "approved, ratified, and confirmed," 25 U.S.C. § 1725(b)(1) (collectively, and including the laws referred to in footnote 6, the "Settlement Acts").[6] Congress described the objectives of the Settlement Acts as including both "an original, innovative allocation of authority between the State and tribes and the desire to recognize the tribe[s'] inherent self-government authority." *Akins v. Penobscot Nation*, 130 F.3d 482, 489 (1st Cir. 1997). Thus, "[t]he relations between Maine and the [Nations] are not governed by all of the usual laws governing such relationships, but by two unique laws, one Maine and one federal, approving a settlement." *Id.* at 483.

The Settlement Acts called out each of the Wabanaki Nations by name, *see supra* n.6, and emphasized the "special" historical relationship between them and the State, *see* Pub. L. No. 96-420, § 2(a)(9); Pub. L. No. 102-171, § 2(a)(6). The Acts operated to federally approve and ratify all prior transfers of land or natural resources by the Nations and to extinguish their respective land

---

[6] While Mi'kmaq was not part of this initial agreement, MICSA applied to all "Indian nation[s], or tribe[s] or band[s] of Indians" in the state, *e.g.*, Pub. L. No. 96-420, §§ 4(a)(1), 6(a), and Congress determined in the 1991 Aroostook Band of Micmacs Settlement Act that it was "fair and just to afford the [Mi'kmaq Nation] the same settlement provided to the Houlton Band of Maliseet Indians for the settlement of that Band's claims," Pub. L. No. 102-171, § 2(a)(5). Previously, in 1986, Congress had enacted the Houlton Band of Maliseet Indians Supplementary Act, Pub. L. No. 99-566 (S 2750), 100 Stat 3184, prescribing the legal process for Maliseet's acquisition of trust lands, which MICSA had contemplated but not resolved, *see* Pub. L. No. 96-420, § 5(d).

claims and aboriginal title. *See* Pub. L. No. 96-420, § 4; *see also* P.L. 1979, ch. 732 (30 M.R.S.A. § 6213) (approval of tribal transfers under state law). In return, Congress provided the Nations with certain land acquisition funds to restore their land bases, *see* Pub. L. No. 96-420, § 5(d); Pub. L. No. 102-171, § 4(a), and confirmed their status as federally recognized tribal nations entitled to the same benefits as other tribal nations, *see* Pub. L. No. 96-420, § 6(i); Pub. L No. 102-171, § 6(a).

The Settlement Acts, moreover, "established the ground rules that henceforth would govern matters of common political concern" to the Nations and the State. *Passamaquoddy Tribe*, 75 F.3d at 787. MIA provides that

> except as otherwise provided in [MIA], all Indians, Indian nations, and tribes and bands of Indians in the State and any lands or other natural resources owned by them, held in trust for them by the United States or by any other person or entity shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person or lands or other natural resources therein.

P.L. 1979, ch. 732 (30 M.R.S.A. § 6204). MICSA, for its part, provides that Passamaquoddy and Penobscot and their citizens and lands "shall be subject to the jurisdiction of the State of Maine to the extent and in the manner provided in [MIA]." Pub. L. No. 96-420, § 6(b)(1). MICSA further provides that all other Nations and their citizens and lands "shall be subject to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other persons or land therein." *Id.* § 6(a). The First Circuit has characterized "the Settlement Acts [as] establish[ing] state authority that far exceeds what is normal for Indian tribes to which no such legislation applies." *Maine v. Johnson*, 498 F.3d 37, 42 (1st Cir. 2007).

The unique relationship between the Nations and the State, and the State's authority to legislate with respect to the Nations, includes subject matter areas where Congress traditionally legislates pursuant to its constitutional authority over Indian affairs. When Congress enacted

MICSA in 1980, it provided that all federal laws generally applicable to tribal nations, including those that "accord[] or relate[] to a special status or right of or to" tribal nations, would apply in Maine, *unless* the law "affects or preempts the civil, criminal, or regulatory jurisdiction of the State of Maine." Pub. L. No. 96-420, § 6(h). Congress also provided guidance with respect to federal laws enacted for the benefit of tribal nations after MICSA's passage: if such a law "would affect or preempt the application of the laws of the State of Maine, . . . [it] shall not apply within the State of Maine, unless such provision of such subsequently enacted Federal law is specifically made applicable within the State of Maine." *Id.* § 16(b). In short, Congress limited the application of federal laws addressing Indian affairs to Maine if they would "affect or preempt" state jurisdiction granted by Congress to Maine via MICSA. In so providing, Congress sanctioned the State's authority to regulate those subjects in coordination with the Nations, absent a clear congressional directive to the contrary.

### III.    THE WABANAKI NATION GOVERNMENTS TODAY

Today, the Wabanaki Nations continue to exercise their sovereign, governmental powers, benefiting both their citizens and rural Maine more generally. The Penobscot Nation has approximately 2,400 citizens and holds over 123,000 acres of trust lands, with its seat of government located at Indian Island. SMF ¶¶ 167, 172. The Houlton Band of Maliseet Indians has approximately 2,000 tribal citizens and holds roughly 4,000 acres of reservation lands along the Meduxnekeag River near the towns of Houlton, Littleton, and Monticello. SMF ¶¶ 1, 4. The Passamaquoddy Tribe has approximately 3,700 citizens and holds roughly 130,000 acres of trust lands, including reservations at Pleasant Point and Indian Township. SMF ¶¶ 121-122, 124, 126. The Mi'kmaq Nation has over 1,600 citizens and holds roughly 3,300 acres of trust and fee land around Presque Isle. SMF ¶ 68.

Each of the Nations performs core governmental functions and provides a wide range of essential programs and services to their citizens, tribal families, and their wider communities. Their governments include tribal councils, tribal courts, and numerous departments responsible for education, health, housing, public safety, fire prevention, social services, natural resources, and cultural preservation, to name a few. *See, e.g.*, SMF ¶¶ 19, 69-70, 91, 128, 135, 150, 167, 169. These departments deliver programs and services to address critical needs relating to health and dental care; food assistance; child and elder care; education and career assistance; substance abuse and recovery; housing and energy assistance; garbage and snow removal; as well as cultural activities and language classes. *See, e.g.*, SMF ¶¶ 19, 70, 72, 80, 91, 169. The Nations' governments also fund and build infrastructure on their lands, including roads, bridges, sidewalks, and water and sewer facilities, as well as governmental buildings, such as health centers, sports facilities, and museums. *See, e.g.*, SMF ¶¶ 102, 128, 177. Each of the Nations, however, has a tremendous need for additional sources of governmental funding to support these critical services. *See* SMF ¶¶ 33-34, 47, 52, 54, 112-113. Federal funding for tribal governments is woefully insufficient, and the Nations accordingly face severe funding gaps. *See* SMF ¶¶ 42, 52, 61, 152, 197, 202-203.

The economic development and governmental revenue-generating opportunities available to the Nations are limited due to their rural location. SMF ¶¶ 37, 199. Nevertheless, the Nations— like many government entities—are often among the largest employers in their respective regions of the state, *see, e.g.*, SMF ¶ 140-141, 184, and they make community-wide investments, including in education and vocational training, aimed at improving socioeconomic conditions throughout Maine, *see, e.g.*, SMF ¶¶ 19-20, 90, 188, 197. The Economic Opportunity Act, discussed below, presents a tremendous opportunity for the Nations to develop independent, long-term sources of

10

revenue to support and expand governmental programs and services for their citizens and communities. *See, e.g.*, SMF ¶¶ 43, 65, 115, 203.

While there have been many bumps in the road of state-tribal relations, the State and the Nations have continued to refine the terms of their relationship and address issues of common concern through dozens of legislative enactments, again, as Congress intended. These laws address diverse issues including, by way of example, water quality standards, *see* P.L. 2019, ch. 463, drinking water regulation, *see, e.g.*, 30 M.R.S.A. §§ 6207-A, 6207-B, 6207-C(10), 6207-D, interlocal cooperation, *see* 30-A M.R.S.A. §§ 2201-2203, fishing, *see, e.g.*, 12 M.R.S.A. §§ 6302-A, 6302-B, and criminal jurisdiction, *see, e.g.*, 30 M.R.S.A. §§ 6209-A, 6209-B, 6209-C.

## IV.    GAMING IN MAINE

For most of its history, Maine "categorically prohibited all gambling, no matter by whom conducted." *Penobscot Nation v. Stilphen*, 461 A.2d 478, 481 (Me. 1983); *see also id.* at 487 (stating that gambling "was unlawful under the common law of Maine long before the legislature enacted its anti-gambling statutes"). In 1943, the legislature "create[d] a limited exception for certain specific entities eligible for beano licenses," *id.* at 481, namely "volunteer fire departments, agricultural fair associations, and certain nonprofit organizations, as well as to bona fide resort hotels," *id.* at 480 (quotation marks omitted). When Penobscot began "operating weekly beano games" to raise revenue "to fund various tribal governmental services and programs, including snow and rubbish removal on the reservation, police and health services, and home improvement programs," the State claimed it was prohibited by state law, and the Maine Supreme Judicial Court agreed. *Id.* at 479-80, 482, 488-89.

A few years later, in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the United States Supreme Court "held that States lacked any regulatory authority over gaming on

11

Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014) (citing *Cabazon Band*, 480 U.S. at 221-22). While the Court did not cite *Stilphen*—which California had urged the Supreme Court to follow, *see Br. of the Appellants*, at *11-13, *Cabazon*, 480 U.S. 202 (No. 85-1708), 1986 WL 728102—it soundly rejected the Maine Supreme Judicial Court's erroneous view that a tribal nation's inherent sovereignty does not include the authority to conduct gaming activities, *see Stilphen*, 461 A.2d at 482-87.

In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721, which created a statutory framework for the operation of tribal gaming "as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618, 622 (1st Cir. 2017) (quoting 25 U.S.C. § 2702(1)). IGRA requires a tribal nation and state to negotiate a compact setting forth the terms under which the tribal nation may offer casino gaming such as slot machines and table games. *See Passamaquoddy Tribe*, 75 F.3d at 788.

When Passamaquoddy sought to negotiate a gaming compact, however, the State took the position that IGRA "did not apply within Maine's boundaries." *Id.* The First Circuit agreed that due to MICSA section 16(b), the Passamaquoddy Tribe could not invoke IGRA. *Id.* at 790. It found that section 16(b) controls because IGRA was enacted after MICSA's passage, benefits Indian nations, and would affect or preempt state gaming laws. *Id.* at 789. And because "Congress did not make [IGRA] specifically applicable within Maine, . . . the Tribe [wa]s not entitled to an order compelling the State to negotiate a compact for Class III gaming." *Id.* at 794.

In 2003 and 2010, Maine authorized two non-tribal entities to offer Las Vegas–style casino gambling at facilities in Bangor (Hollywood Casino, owned by Penn National Gaming, which opened in 2005) and Oxford County (the facility owned by Plaintiffs, which opened in 2012). *See*

12

*generally* 8 M.R.S.A. § 1011(2), (2-A). These casinos have been incredibly lucrative for their owners. In the last five years, Oxford Casino's facility has generated net slot machine revenue of over $430 million (from nearly 1,000 machines) and net table game revenue of over $77 million, while Hollywood Casino has generated net slot machine revenue of over $258 million (from roughly 700 machines) and net table game revenue of over $77 million. *See* SMF ¶¶ 215-218; Maine Gambling Control Unit Casino Revenue Reports, https://www.maine.gov/dps/gcu/casino-gaming/casino-revenue-distribution [https://perma.cc/B3WK-RJ5F] (2021-2025).

In the wake of the *Passamaquoddy Tribe v. Maine* decision and Maine's authorization of casino gambling, the Wabanaki Nations sought access to this market in order to support tribal governmental services, as tribal nations in other states do under IGRA. The Nations, however, were repeatedly rebuffed by the Legislature or by gubernatorial veto.[7] Finally, in 2022, after extensive coordination with the Governor and legislators, Public Law 2022, ch. 681, was enacted to address several issues of great importance to the Wabanaki governments, including how sports wagering would be authorized in the state. The bill consisted of three parts: (1) the Tribal-State Collaboration Act, 5 M.R.S.A. §§ 11051-11056, which "[p]romotes positive government-to-government relations," *id.* § 11053(1)(B), and provides, *inter alia*, for collaboration between federally recognized tribal nations in Maine and sixteen state agencies "regarding the agency's programs, rules and services that substantially and uniquely affect the Indian tribes or tribal members," *id.* § 11053(1)(D); (2) tax law provisions to accord the Nations and their citizens tax treatment similar to that which they would receive under federal Indian law and to provide tribal governments with a share of the tax revenues generated on their lands, *see* P.L. 2021, ch. 681, pt.

---

[7] *See, e.g.*, L.D. 1274 (122nd Legis. 2005); L.D. 701 (123rd Legis. 2007); L.D. 1379 (124th Legis. 2009); L.D. 1298 (126th Legis. 2013); L.D. 1446 (127th Legis. 2015); L.D. 1447 (128th Legis. 2018); L.D. 1144 (129th Legis. 2019); L.D. 554 (130th Legis. 2021).

13

B-G; and (3) authorization of mobile sports wagering by the Nations and in-person sports wagering by casinos, commercial tracks, and off-track betting facilities, *see* 8 M.R.S.A. §§ 1201-1219.

The Legislature found that "mobile sports wagering will serve as an effective economic development tool for tribal governments and tribal members and provide economic stimulus to rural areas of the State" and that "[a]uthorizing the federally recognized Indian tribes in the State to conduct mobile sports wagering is fair and equitable because those Indian tribes previously have been excluded from conducting most forms of gaming in the State." P.L. 2022, ch. 681 (Section I-1). The Nations pay a ten percent tax on gross sports wagering receipts to support the Gambling Addiction Prevention and Treatment Fund, the General Fund, Maine Gambling Control Unit ("MGCU") administrative expenses, and the harness racing industry and agricultural interests. *See* 8 M.R.S.A. § 1218. The MGCU comprehensively regulates sports wagering. *See, e.g.*, 8 M.R.S.A. § 1203. Lawful sports wagers in Maine began at the end of 2023, following an eighteen-month rule development and licensing process. *See* SMF ¶¶ 39, 150, 200. By all accounts, the implementation of mobile sports wagering in Maine has been a success. *See, e.g.*, SMF ¶¶ 111, 150, 202.

## V.   THE ECONOMIC OPPORTUNITY ACT

When the Legislature enacted the sports wagering law, it expressed its intent that the Wabanaki Nations "ha[ve] the right to conduct all forms of mobile gaming newly authorized" in the future, finding that "mobile gaming will, if conducted by federally recognized Indian tribes in the State, serve as an effective economic development tool for tribal governments and provide economic stimulus to rural areas of the State." 30 M.R.S.A. § 8001(1). After the Nations' effective implementation of mobile sports wagering, the Legislature followed through on this intent by passing the Economic Opportunity Act in January 2026.

14

The Act authorizes each of the Nations to obtain one internet gaming license, *see* 8 M.R.S.A. § 1406, and requires the Nations to pay an eighteen percent tax on gross internet gaming receipts, which supports Opioid Disorder Prevention and Treatment, Maine Veterans' Homes, Emergency Housing Relief, Public Health, School Renovation, and Gambling Addiction Prevention and Treatment, among other things, *see* 8 M.R.S.A. § 1416. The Act largely mirrors the statutory scheme for mobile sports wagering and also borrows certain provisions from IGRA to ensure that the Nations' governments are the primary beneficiaries of tribal gaming activities, consistent with federal policy. *See* 25 U.S.C. § 2702(2); *compare* 8 M.R.S.A. § 1403(2)(F) (imposing thirty to forty percent limit on compensation of management contractors), *with* 25 C.F.R. § 531.1(i) (similar); *compare also* 8 M.R.S.A. § 1408(3) (requiring management services contracts to be approved by the director of the Gambling Control Unit), *with* 25 U.S.C. § 2710(d)(9) (requiring management contracts to be approved by the Chairman of the National Indian Gaming Commission). The Act does not alter the longstanding monopoly on brick-and-mortar casino gambling in Maine held by Oxford Casino and Hollywood Casino.

## VI.    THIS SUIT

Following the Economic Opportunity Act's passage, Oxford Casino initiated this suit against the State, challenging the Act as a violation of equal protection and the Interstate Dormant Commerce Clause. *See, e.g.*, First Am. Compl. ("FAC") ¶¶ 55, 66. The Tribal Nations intervened as defendants, and the parties agreed to (and the Court approved) a case schedule that allows the parties to cross-file dispositive motions. ECF Nos. 26, 29, 30. Pursuant to that schedule, the Tribal Nations now submit this motion for summary judgment.

## LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must

"make 'all reasonable inferences in favor of the respective non-moving party.'" *Perrier-Bilbo v. United States*, 954 F.3d 413, 422 (1st Cir. 2020) (quoting *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013)). A defendant, however, bears no burden of proof on a plaintiff's claims. A defendant need only demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If "the facts are undisputed, the court simply must determine whether one of the parties is entitled to judgment as a matter of law based on those facts." *Perrier-Bilbo*, 954 F.3d at 422 (quoting *Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir. 2004)).

## ARGUMENT

### I.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON OXFORD CASINO'S EQUAL PROTECTION CLAIM (COUNT I).

The Economic Opportunity Act comports with equal protection. As the Supreme Court has long held, tribal nations are not racial groups. They are sovereigns that possess inherent powers of self-government predating the Founding. And that distinction is critical for purposes of equal protection. Because tribal nations are sovereigns, classifications that single them out are "political rather than racial in nature," and must be upheld so long as they satisfy rational basis review. *Mancari*, 417 U.S. at 553 n.24. The Supreme Court has applied this principle to hold that even statutes providing preferences to *individual* Indians are political classifications subject to rational basis review. *See id.* When a statute is directed at tribal *governments*, that conclusion is even more straightforward.

Rational basis review is the applicable standard of review here under these well-established principles. The Economic Opportunity Act is directed at sovereigns possessing inherent governmental powers: the Wabanaki Nations. That is a political classification, not a racial one, and thus subject to rational basis review. Moreover, under *Washington v. Confederated Bands & Tribes*

16

*of Yakima Indian Nation*, rational basis review governs state laws enacted—like the Act here—in response to federal measures readjusting the allocation of jurisdiction over Indian affairs. Through the Settlement Acts, Congress has created a unique jurisdictional framework in Maine that allocates Indian affairs authority to the State in a range of areas, including, in accord with *Passamaquoddy Tribe v. Maine,* tribal gaming. The Economic Opportunity Act is thus subject to rational basis review under *Yakima*. While Oxford Casino maintains that strict scrutiny should apply because the Economic Opportunity Act is a state law (not a federal one), that distinction does not transform the Wabanaki Nations into racial groups. And employing strict scrutiny would be especially untenable where the State acts in response to a federal statutory scheme like the one here.

Applying rational basis review, the Economic Opportunity Act easily passes scrutiny. The law advances state and federal interests by enabling the Nations to fund essential government services. It also benefits Maine's rural economies, advances cooperation between the Nations and the State, eases the strain on State finances, promotes a well-functioning internet gaming market, and remedies the historic exclusion of the Nations from gaming opportunities. Defendants are therefore entitled to summary judgment on Oxford Casino's equal protection claim.

### A. Tribal Nations Are Sovereign Governments, Not Racial Groups, And Laws Directed At Them Are Subject To Rational Basis Review.

From the earliest days of the Republic, the Supreme Court has recognized that "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of . . . self-government." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832)). As "sovereign political communities," they possess inherent powers of self-government that predate the Founding. *Denezpi v. United States*, 596 U.S. 591, 598 (2022) (quoting *United States v. Wheeler*, 435 U.S. 313, 322-323 (1978)).

17

Although Congress has adjusted some aspects of their inherent authority over time, tribal nations today "remain 'separate sovereigns pre-existing the Constitution.'" *Bay Mills*, 572 U.S. at 788 (quoting *Santa Clara Pueblo*, 436 U.S. at 56).

Because tribal nations are sovereigns, laws directed at tribal nations do not draw racial classifications. Instead, preferences for tribal nations are "political rather than racial in nature." *Mancari*, 417 U.S. at 553 n.24. As the Supreme Court explained in *United States v. Antelope*, laws pertaining to tribal nations are "rooted in the unique status of Indians as 'a separate people' with their own political institutions." 430 U.S. 641, 646 (1977). "Federal regulation of Indian tribes," in turn, "is governance of . . . political communities; it is not to be viewed as legislation of a 'racial group consisting of Indians.'" *Id.* (citation modified) (quoting *Mancari*, 417 U.S. at 553 n.24). Laws concerning tribal nations are therefore like laws directed at foreign sovereigns or state governments. *See Krueth v. Indep. Sch. Dist. No. 38*, 496 N.W.2d 829, 836 & n.3 (Minn. Ct. App. 1993) (treating tribal nations, states, and other "political entit[ies]" as equivalent for equal protection purposes). As the United States has put it, "[a] sovereign government has no race." U.S. Opp'n to Stay Application, at *24, *W. Flagler Assocs., Ltd. v. Haaland*, 144 S. Ct. 10 (2023) (No. 23A315), 2023 WL 7042578. For equal protection purposes, that means laws directed at tribal nations, like all laws directed at non-suspect classes, are subject to rational basis review. *See Antelope*, 430 U.S. at 647-48 & n.8; *Mancari*, 417 U.S. at 555; *see also United States v. Skrmetti*, 605 U.S. 495, 510 (2025) (noting the general rule for non-suspect classes).

Indeed, the Supreme Court has held that the political nature of tribal nations can typically insulate even laws—unlike the Act here—that single out *individuals* with Native American *ancestry* from heightened equal protection review, when the classification is connected to tribal affiliation. In *Morton v. Mancari*, the Court upheld a federal Bureau of Indian Affairs hiring

18

preference for "individual[s] [who were] one-fourth or more degree Indian blood and . . . member[s] of . . . Federally-recognized tribe[s]." 417 U.S. at 553 n.24. *Mancari* underscored that the Constitution "singles Indians out as a proper subject for separate legislation"; that "[l]iterally every piece of legislation dealing with Indian tribes . . . single[s] out for special treatment a constituency of tribal Indians"; and that "[i]f these laws . . . were deemed invidious racial discrimination, an entire Title of the United States Code (25 U.S.C.) would be effectively erased." *Id.* at 552. Countless cases upholding laws targeted at *individuals* with Native American ancestry confirm the point. *See, e.g.*, *Fisher v. Dist. Ct. of Sixteenth Judicial Dist. of Mont.*, 424 U.S. 382, 390-91 (1976) (per curiam) (tribal jurisdiction over adoptions of Indians); *Moe v. Confederated Salish & Kootenai Tribes of Flathead Rsrv.*, 425 U.S. 463, 479-80 (1976) (preemption of state taxation of Indians); *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84-90 (1977) (denial of funds to certain Indians); *Antelope*, 430 U.S. at 646 (federal prosecution of Indians); *Yakima*, 439 U.S. 463, 500-02 (assertion of state jurisdiction over Indians); *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n.20 (1979) (fishing rights for Indians).

This case is far easier, because it confers a benefit not on individual Indians, but instead on federally recognized tribal nations. The Supreme Court has never held that a law targeted at tribal *governments* draws a racial classification—much less one that violates the equal protection. Indeed, to the Nations' knowledge, *no* court has ever done so. *See, e.g.*, *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 734 (9th Cir. 2003) (underscoring the "obvious distinction[]" between laws that "relate only to *tribes*" and laws that relate "to individual Indians" (emphasis in original)); *United States v. Garrett*, 122 F. App'x 628, 632 (4th Cir. 2005) (unpublished) (same). And that makes good sense: Indian Tribes are "separate sovereigns pre-existing the Constitution," *Bay Mills*, 572 U.S. at 788 (quoting *Santa Clara Pueblo*, 436 U.S. at 56), and the Constitution

19

itself treats them as such, *see* U.S. Const. art. I, § 8, cl. 3 (Commerce Clause listing "the Indian Tribes" alongside "foreign Nations" and "the several States"—sovereigns, all).

That unbroken practice is also entirely consistent with the application of heightened scrutiny to laws that addressed individual Indians in *purely* racial terms. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 4-5 & n.4 (1967) (invalidating a statute that "punish[ed] interracial marriages" and defined "white person" based on lack of "Indian" blood); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 205, 207-08, 213 (1995) (plurality op.) (applying string scrutiny to programs benefitting "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities"). Those decisions do not address laws that operate on citizens of federally recognized tribal nations and classify based on tribal affiliation. And they are especially irrelevant to laws directed at tribal *governments*.

### B.  Rational Basis Review Applies To The Economic Opportunity Act.

#### 1.  *The Act Draws A Political Classification Subject To Rational Basis Review.*

Under the foregoing principles, the Economic Opportunity Act draws a political classification and thus is subject to rational basis review. The Act is directed at the "federally recognized Indian nation[s], tribe[s] or band[s] in th[e] State"—*i.e.*, the Wabanaki Nations. 8 M.R.S.A. § 1406(2). And the Wabanaki Nations are sovereigns. They have governed themselves since "before the nation's founding," *Morton II*, 528 F.2d at 378, and they continue to possess "the immunities and privileges available to federally recognized Indian Tribes by virtue of their Government-to-Government relationship with the United States as well as the responsibilities, powers, limitations, and obligations of such Indian Tribes." 91 Fed. Reg. at 4104. For instance, they enact legal codes carrying the force of law, SMF ¶¶ 179-181, and exercise "exclusive[] . . . jurisdiction" over their "internal affairs," *Williams v. Lee*, 358 U.S. 217, 221-22 (1959). And they

20

provide governmental services and infrastructure to their citizens and to others, including courts, law enforcement, roads, water and sewer, health care, housing, and education. *See supra* pp. 10-11. In short, each of the Nations possesses and exercises the "independent" and "inherent authority of a tribe to be self-governing." *Akins*, 130 F.3d at 489 (quoting S. Rep. No. 96-957, at 29 (1980)). That is the defining attribute of sovereigns, not racial groups.

Indeed, because the Act benefits tribal *governments*, this is a case where it is particularly easy to determine that the classification at issue is political, not racial. As discussed above, the more contested cases are those in which a law singles out *individuals* with Native American ancestry. Even those laws are typically subject to rational basis review. *See supra* pp. 18-19. But the case for applying rational basis review to laws like the Act that target tribal governments is stronger still. Again, the Nations are aware of no case that has struck down a law directed at tribal governments as a violation of equal protection.

Parallel federal laws confirm that the Act draws a political classification. In *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, the Supreme Court concluded that Indian classifications in a state law were political because they matched the classifications in a related federal law and in the Court's own decisions. 439 U.S. at 501. Here, comparison to federal law yields the same conclusion. Congress, via the Settlement Acts, has identified the Wabanaki Nations as political entities that are proper subjects of both federal and state legislation. *See supra* pp. 7-9. Decisions from this Court and from the First Circuit, likewise, have consistently confirmed the Wabanaki Nations' sovereign (*i.e.* political) status, even before Congress did so. *See, e.g.*, *Bottomly*; 599 F.2d at 1064-65 (sovereign immunity); *Morton I*, 388 F. Supp. at 660-61 (federal trust obligation), *aff'd*, 528 F.2d 370 (1st Cir. 1975). Because the Act's classification is "also made by" these sources of federal law, rational basis is the governing standard. *Yakima*, 439 U.S. at 501;

*see also Artichoke Joe's*, 353 F.3d at 736 (applying rational basis review to state gaming law whose "classifications . . . echo[ed]" those in federal law).

### 2. The Act Is Authorized Under Maine's Unique Jurisdictional Scheme.

The Economic Opportunity Act is also subject to rational basis for a second, narrower reason: the State adopted it pursuant to the unique jurisdictional scheme that governs Indian affairs in Maine. *Yakima*, again, is instructive. The state law there—Washington's "Chapter 36"—was an assertion of state jurisdiction in Indian country. *Yakima*, 439 U.S. at 465-66. In addition to using classifications that aligned with federal law, Chapter 36 "was enacted in response to a federal measure"—Public Law 280—"expressly designed to readjust the allocation of jurisdiction over Indians." *Id.* at 501. This fact, the Court determined, further supported the use of rational basis review. Because "[t]he jurisdiction" the state exercised under Chapter 36 was "within the scope of the authorization of [Public Law] 280," the Court "[found] the argument that [Chapter 36's] classifications [were] 'suspect' an untenable one." *Id.* at 500-01.

Applying *Yakima*, lower courts—including the First Circuit—have widely recognized that state Indian affairs laws are subject to rational basis review when a state is exercising authority sanctioned by Congress. *KG Urban Enterprises, LLC*, 693 F.3d at 19; *see, e.g.*, *Greene v. Comm'r of Minn. Dep't of Human Servs.*, 755 N.W.2d 713, 727 (Minn. 2008) (noting that courts have generally "applied rational basis review to state laws that promote tribal self-government, benefit tribal members, or implement or reflect federal laws"). This test is applied expansively. Courts have found it satisfied, for example, when a state law "parallel[s]" a federal statute, *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1217-19 (5th Cir. 1991) (holding that, despite lack of "express Congressional authorization," *id.* at 1218, state could allow exemption for Native American religious peyote use that mirrored federal exemption), and when a state law acts

22

alongside federal law directed at tribal nations and their citizens, *see, e.g.*, *Greene*, 755 N.W.2d at 727 (determining that, when federal law allowed tribal nations to administer welfare program directly, state law could allow tribal nation to administer aspects of state's welfare program, as the state's action was "consistent with federal policy"); *N.Y. Ass'n of Convenience Stores v. Urbach*, 699 N.E.2d 904, 908 (N.Y. 1998) (concluding that rational basis standard applied to disparate enforcement of state tax laws "predicated on the [state] [d]epartment's sensitivity to both tribal sovereignty issues and the complex restrictions imposed by the [federal] Indian Trader Laws"). The easiest cases are where, like in *Yakima* itself, a "state is acting under a federal statute explicitly adjusting the state's jurisdiction over Indians." *Squaxin Island Tribe v. Washington,* 781 F.2d 715, 722 n.10 (9th Cir. 1986).

That is the situation here, where the State has acted pursuant to Congress's Maine-specific jurisdictional scheme. As Oxford Casino acknowledges, "Maine's Indian Tribes are uniquely situated from Tribes in other States." FAC ¶ 28; *see, e.g.*, *Passamaquoddy Tribe*, 75 F.3d at 787 (explaining that the jurisdictional arrangement in Maine is "unique"). Congress, via the Settlement Acts, has "submitted . . . the [Wabanaki Nations] and their tribal lands to *the State's* jurisdiction" in a range of areas. *Passamaquoddy Tribe*, 75 F.3d at 787 (emphasis added); *see supra* pp 7-9.

The Economic Opportunity Act is an exercise of jurisdiction under this unique scheme. Under *Passamaquoddy Tribe v. Maine*, whether and to what extent the Nations may engage in gaming activities fall within the "specific grant of Federal authority" to the State "encompassed in" the Settlement Acts. 75 F.3d at 791 (citation modified) (quoting S. Rep. No. 446, 100th Congress, 2d Sess. 12 (1998)). Thus, the Economic Opportunity Act is not an ordinary state law. It is a state law "enacted in response to . . . federal measure[s] explicitly designed to readjust the allocation of jurisdiction over Indians." *Yakima*, 439 U.S. at 463. And because Maine "legislat[ed]

23

with reference to the authority that Congress ha[s] granted to the State of [Maine]," rational basis review is the applicable equal protection standard. *Artichoke Joe's*, 353 F.3d at 736.

### 3. The Act Does Not Trigger Strict Scrutiny By Being A State Law.

Plaintiffs maintain that the Economic Opportunity Act must satisfy strict scrutiny because it is a state law. *See* FAC ¶ 6. They are wrong. The nature of a classification turns on the type of group it designates, not the type of government that makes it. *See Krueth*, 496 N.W.2d at 831-32, 837, 840 (applying rational basis review to state law and rejecting federal equal protection challenge because state classification was "limited to members of federally recognized tribes," making it "not racial but political," *id.* at 837). The Wabanaki Nations are sovereigns. They did not transform into racial groups because the Maine legislature, rather than Congress, acted. To the contrary, the Nations have interacted with the State as sovereign governments throughout the state's history. *See supra* pp. 5-6. And because the Nations are the Act's subjects, the Act draws a political classification.

Rational basis review in all events applies because the Act was passed in response to a federal scheme "readjust[ing] the allocation of jurisdiction over Indians." *Yakima*, 439 U.S. at 501. *Yakima* treated this as an *additional*, independent reason to apply rational basis; it did not hold that state Indian affairs laws *require* federal authorization to qualify for rational basis review. *See id.*; *supra* pp. 21-22 (explaining that *Yakima* also looked to the fact that the state classifications mirrored those in federal law). But even if (counterfactually) states under equal protection needed some federal overlay to enact laws addressing Indian nations within their borders, that type of overlay is present here.

Nor does *KG Urban Enterprises, LLC v. Patrick*—which Oxford Casino invokes—support a contrary conclusion. *See* FAC ¶ 6 (citing *KG Urban*, 693 F.3d at 19). That interim decision

24

applied a likelihood-of-success standard and *denied* a request for a preliminary injunction against a Massachusetts tribal gaming law. 693 F.3d at 25-27. To the extent the First Circuit considered an applicable standard of review, its preliminary analysis of the equal protection issue affirmed that *Yakima*'s jurisdictional-scheme rationale "states a sound argument" for rational basis review. *Id.* at 20. As discussed above, that rationale squarely applies here. *See supra* pp. 22-24. To be sure, on the facts presented in *KG Urban*, it was not clear that *Yakima* was satisfied. But that was because the First Circuit concluded "it [wa]s questionable" whether the relevant federal law—IGRA— permitted the Massachusetts gaming law. 693 F.3d at 20. In fact, the First Circuit found real force to the argument that "the intent of Congress [wa]s on the other side of the issue." *Id.* So the features that are so important here—Maine's "unique" relationship with the Indian Nations within its borders, and Congress's recognition of that relationship in statute—were absent in *KG Urban.* That decision thus provides no support for Oxford Casino's position.

Indeed, Oxford's argument for strict scrutiny would threaten to invalidate countless Maine laws. As discussed above, from statehood to today, the State has legislated directly with respect to the Nations and their citizens. *See supra* pp. 5-6. By the time of MICSA, for instance, "Maine ha[d] enacted approximately 350 laws which relate specifically to the Passamaquoddy Tribe." *Morton II*, 528 F.2d at 374. The Settlement Acts, in turn, granted Maine an important role in Indian affairs within its borders with authority to continue legislating with respect to the Nations going forward. In all that time, no one has seriously questioned that these laws comport with equal protection. Oxford Casino's position, however, would cast doubt on every law the State has enacted in the field of Indian affairs, and, taken to its logical conclusion, undo the jurisdictional arrangement that Congress judged best for Maine's unique circumstances. Oxford Casino's argument is thus similar to the one the Supreme Court rejected in *Mancari*, which asked the Court

25

to "effectively erase[]" "an entire Title of the United States Code" as unlawful racial discrimination. 417 U.S. at 552. Equal protection did not require that drastic result in *Mancari*, and it does not demand the dire and unprecedented consequences threatened here.

### C.  The Economic Opportunity Act Rationally Furthers State And Federal Interests.

Applying the rational basis standard, the Economic Opportunity Act readily passes muster. Under rational basis review, "legislative classifications are valid unless they bear no rational relationship to the State's objectives." *Yakima*, 439 U.S. at 501. This standard is highly deferential: a law "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," and the burden is on the challenger "'to negative every conceivable basis which might support [the law].'" *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-15 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Indeed, the Supreme Court has observed that it "hardly ever strikes down a policy . . . under rational basis scrutiny." *Trump v. Hawaii*, 585 U.S. 667, 705 (2018).

Here, the Economic Opportunity Act is rationally related to state and federal interests. *See Artichoke Joe's*, 353 F.3d at 734; *Thornburgh*, 922 F.2d at 1216. First, and as its name implies, the Economic Opportunity Act is an "economic development tool for tribal governments." 30 M.R.S.A. § 8001(1); *see Yakima*, 439 U.S. at 502 (finding it rational for Washington State to design law to "allow[] scope for tribal self-government"); *Garrett*, 122 F. App'x at 633 (noting the United States's interest in "'promot[ing] the economic development of federally recognized Indian tribes . . .'" (quoting *Am. Fed'n of Gov. Emps., AFL-CIO v. United States,* 330 F.3d 513, 522-23 (D.C. Cir. 2003))). "By providing exclusive rights to engage in" internet gaming, the State gives the Wabanaki Nations "valuable tools to promote the general welfare of their members," "help[ing] generate jobs and revenues to support the governmental services and programs of the [Nations]."

26

*Artichoke Joe's*, 353 F.3d at 741. The Act will, for instance, enable the Wabanaki Nations to fund health and dental care, police services, garbage and snow removal, roads, bridges, and water and sewer facilities. *See supra* pp. 10-11.

Second, the Act "provide[s] economic stimulus to rural areas of the State." 30 M.R.S.A. § 8001(1); *see* P.L. 2022, ch. 681 (Section B-1) (finding that tribal economic development "benefits . . . not only . . . the tribes and their tribal members but also . . . surrounding communities and the State"). Maine's experience with tribally operated mobile sports wagering (a more limited form of internet gaming) has shown that tribal gaming is good for all of rural Maine. It has allowed the Nations to provide large-scale employment (they are among the biggest employers in the state), to patronize local vendors, and to donate to local governments and organizations. *See supra* pp. 10-11; *see also, e.g.*, SMF ¶¶ 27, 32, 131, 185. The Economic Opportunity Act was thus the next logical step for boosting the State's rural economies.

Third, the Economic Opportunity Act "promote[s] cooperative relationships between the tribes and the State." *Artichoke Joe's*, 353 F.3d at 737. The history of tribal-state relations in Maine has been marred by conflict. *See supra* pp. 6, 11-13. But "by fostering tribal sovereignty and self-sufficiency," *Artichoke Joe's*, 353 F.3d at 734, the Act furthers the State's "desire to work with Tribal leaders to improve the lives and livelihoods of the Wabanaki Nations" and advances "a historic agreement" between them.[8] The Economic Opportunity Act thus promotes the State's "interest in fostering relations with tribes as separate sovereigns." *Artichoke Joe's*, 353 F.3d at 741.

---

[8] Office of Governor Janet T. Mills, *Governor Mills Announces Bill to Create Economic Opportunities for the Wabanaki Nations to Become Law*, https://www.maine.gov/governor/mills/news/governor-mills-announces-bill-create-economic-opportunities-wabanaki-nations-become-law-2026 [https://perma.cc/G92T-5Z6C] (Jan. 8, 2026).

27

Finally, the Act advances state interests in conserving government revenues, fostering successful and responsible internet gaming, and redressing past disparate treatment of the Nations in the gaming context. By enabling the Nations to provide robust governmental services and infrastructure in rural parts of the state, the Act reduces the burden on the State's own finances. *See* SMF ¶¶ 21-24, 171, 187. In addition, the Act fosters a well-functioning internet gaming market—the Nations' proven track record operating mobile sports wagering made them the logical choice to operate full internet gaming, which is regulated under a statutory framework parallel to mobile sports wagering. *See* SMF ¶¶ 39-40, 110-111, 238, 240; *cf.* P.L. 2022, ch. 681 (Section I-1) (selecting gaming operators based on "their infrastructure and experience with the conduct of wagering in the State"). And the Act remedies the Nations' historic "exclu[sion] from conducting most forms of gaming in the State," P.L. 2022, ch. 681 (Section I-1)—gaming opportunities previously available only to others, like Oxford Casino, *see supra* pp. 12-13.

For these reasons, the Economic Opportunity Act easily satisfies rational basis review, and Defendants are entitled to summary judgment on Oxford Casino's equal protection claim.

## II.   DEFENDANTS ARE ENTITLED TO JUDGMENT ON OXFORD CASINO'S CLAIM UNDER THE INTERSTATE DORMANT COMMERCE CLAUSE (COUNT II).

Oxford Casino's claim under the Interstate Dormant Commerce Clause also fails. The Commerce Clause contains three separate grants of authority to Congress: the powers "[t]o regulate Commerce [1] with foreign Nations, and [2] among the several States, and [3] with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Although the Economic Opportunity Act addresses commerce with Indian Tribes, Plaintiffs here invoke only the dormant aspect of the *Interstate* Commerce Clause, claiming that the Economic Opportunity Act "discriminates against out-of-

28

state commerce by allowing only Maine Tribes to become licensed as online gaming operators." FAC ¶ 66; *see id.* ¶¶ 1, 8.

But the Interstate Dormant Commerce Clause has nothing to say here. "At [its] very core," the doctrine embodies an "antidiscrimination principle" that "prohibits the enforcement of state laws driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (citation modified); *see id.* at 369-70 (collecting cases). The Economic Opportunity Act is not such a law. It does not privilege in-state businesses as against out-of-state competitors. Rather, it privileges federally recognized tribal nations with whom Maine has a distinctive political relationship as against all others, in-state or out. And such laws—which reflect not economic protectionism but one sovereign's choice to confer a benefit on another sovereign—are far removed from the Interstate Commerce Clause's concerns. This mismatch dooms Plaintiffs' claim.

## A. Plaintiffs Lack Standing To Bring An Interstate Dormant Commerce Clause Claim.

To begin, because Plaintiffs' alleged injuries flow not from any geographic discrimination in the Economic Opportunity Act but from the fact that Plaintiffs are not tribal nations, Plaintiffs fail to satisfy Article III standing, and their claim falls outside the Interstate Dormant Commerce Clause's zone of interests.

***Article III standing.*** Article III confines federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. That limitation requires plaintiffs, as an "irreducible constitutional minimum," to establish standing: "(1) . . . an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted).

Here, Plaintiffs cannot "demonstrate that their alleged injuries are traceable to (i.e., the result of, or a consequence of) discrimination against interstate commerce." *Coal. for Competitive Elec. v. Zibelman* ("*Coalition II*"), 906 F.3d 41, 58 (2d Cir. 2018) (citation modified). As the First Circuit has held, if a plaintiff would not qualify for the benefit even if it were an in-state entity, traceability is absent. In *Wine & Spirits Retailers, Inc. v. Rhode Island*, the plaintiffs—in-state franchisers and franchisees wishing to sell liquor—challenged Rhode Island laws that (1) prohibited all "franchisees from holding Class A liquor licenses" and (2) "impose[d] an in-state residency requirement for prospective liquor licensees." 481 F.3d 1, 5 (1st Cir. 2007). The plaintiffs claimed that "by limiting Class A licenses to Rhode Island residents, [the law] discriminate[d] on its face against out-of-state residents." *Id.* at 10. The First Circuit held plaintiffs "lack[ed] standing" because "[t]he injuries of which the plaintiffs complain arise in consequence of Rhode Island's ban on franchise and chain-store arrangements, not in consequence of the residency requirements per se." *Id.* at 12; *see also Coalition II*, 906 F.3d at 58 (out-of-state generators lacked standing to challenge a law allegedly favoring in-state nuclear power plants because "Plaintiffs do not represent that they own any nuclear plants, in-state or out"); *accord Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 662 (7th Cir. 2015).

Likewise here, Plaintiffs do not allege any injury that is "directly traceable to the alleged illegal conduct," *Conservation L. Found. of New England, Inc. v. Reilly*, 950 F.2d 38, 42 (1st Cir. 1991)—namely, the "discrimination against interstate commerce" that the Interstate Dormant Commerce Clause proscribes, *Coalition II*, 906 F.3d at 58. True, the Economic Opportunity Act limits license eligibility to "federally recognized Indian nation[s], tribe[s] or band[s] *in this State*." 8 M.R.S.A. § 1406(2) (emphasis added). But that limitation does not injure Plaintiffs. Plaintiffs are ineligible not because of where they are located but because they are not "federally recognized

30

Indian nation[s], tribe[s] or bands." *Id.* That is, even if the statute included no geographic limitation, Plaintiffs would still be ineligible to obtain a license. Indeed, two of the three Plaintiffs—Oxford Casino Hotel and BB Development, LLC—are Maine entities. FAC ¶¶ 13-14. These Plaintiffs *are* "in this State" but are nevertheless ineligible for a license as they are not "federally recognized Indian . . . tribe[s]." 8 M.R.S.A. § 1406(2). That point underscores that for all Plaintiffs, their injuries are not traceable to any "discrimination against interstate commerce." *Coalition II*, 906 F.3d at 58; *see Wine & Spirits Retailers*, 481 F.3d at 12 (no standing under Dormant Commerce Clause where injuries did not "arise in consequence of . . . the [statute's] residency requirements"); FAC ¶ 9 (acknowledging that Plaintiffs "are unable to do [obtain a license] because they are not federally recognized Maine Indian Tribes").

*Zone of Interests.* Oxford Casino's claim also falls outside of "the zone of interests to be protected . . . by the . . . constitutional guarantee in question." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982); *see Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977) (applying test to Dormant Commerce Clause claim). The Interstate Dormant Commerce Clause's zone of interests encompasses "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474 (5th Cir. 2013) (quoting *Dep't of Revenue v. Davis*, 553 U.S. 328, 337-38 (2008)). Thus, "[a]ny alleged injury 'must somehow be tied to a barrier imposed on interstate commerce.'" *Yakima Valley Mem'l Hosp. v. Washington State Dep't of Health*, 654 F.3d 919, 932 (9th Cir. 2011) (quoting *City of Los Angeles v. Cnty. of Kern*, 581 F.3d 841, 848 (9th Cir. 2009)).

Here, Plaintiffs' alleged injury has nothing to do with any barrier against interstate commerce—for substantially the reasons set forth above. *See supra* pp. 29-31. Their injury does

not stem from their status as out-of-state businesses; again, two Plaintiffs are in-state, and the third Plaintiff is their parent corporation. The problem for Plaintiffs is they are not tribal nations. Differential treatment based on factors unrelated to interstate protectionism—here, whether an entity is a sovereign tribal government—falls outside the Interstate Dormant Commerce Clause's zone of interests. *See, e.g.*, *Wine & Spirits Retailers*, 481 F.3d at 12; *Coal. for Competitive Elec. v. Zibelman ("Coalition I")*, 272 F. Supp. 3d 554, 582 (S.D.N.Y. 2017), *aff'd on Article III grounds by Coalition II*, 906 F.3d 41 (challenge to nuclear-power subsidy program "d[id] not fall within the zone of interests protected by the dormant Commerce Clause" because plaintiffs did not allege discrimination against "out-of-state economic interests" and the Clause "does not protect the economic interests of non-nuclear power plants").

### B.  Plaintiffs' Interstate Dormant Commerce Clause Claim Fails On The Merits.

Plaintiffs' Interstate Dormant Commerce Clause claim also fails on the merits. Plaintiffs invoke that Clause's prohibition on discrimination, under which "[a] statute that discriminates on its face against interstate commerce" will be held invalid "unless it furthers a legitimate local objective that cannot be served by reasonable non-discriminatory means." *Wine & Spirits Retailers*, 481 F.3d at 10-11 (citation modified); *see* FAC ¶ 8. Even granting Oxford Casino's premise that Dormant Commerce Clause doctrines (which arise from the Interstate Commerce Clause) can be lifted wholesale and engrafted onto this case (where the Indian Commerce Clause is the relevant constitutional power), *but see infra* pp. 34-35, Plaintiffs cannot show the type of discrimination against interstate commerce that the Dormant Commerce Clause proscribes.[9]

---

[9] Plaintiffs have not alleged that the Economic Opportunity Act, even if nondiscriminatory, violates the Dormant Commerce Clause by imposing a burden on interstate commerce that is disproportionate to its local benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Regardless, any such claim would fail. Plaintiffs have not alleged a cognizable burden on interstate

The reason is by now familiar. The Dormant Commerce Clause "assumes a comparison of substantially similar entities," *General Motors Corp. v. Tracy*, 519 U.S. 278, 298-99 (1997), and prohibits only differential treatment based on geography, not other sorts of distinctions, *see Wine & Spirit Retailers*, 481 F.3d at 12. Here, Plaintiffs and the Wabanaki Nations are not "similarly situated for constitutional purposes," *Tracy*, 519 U.S. at 299, because plaintiffs are private corporations and the Nations are sovereign governments, *see, e.g.*, *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343-45 (2007) (holding that "laws favoring local government[s]" do not discriminate against out-of-state commerce because they "treat in-state private business interests exactly the same as out-of-state ones"). And as explained, the Economic Opportunity Act's sole distinction that could even arguably constitute a "local preference," *Tracy*, 519 U.S. at 300—the reference to tribal nations "in this State," 8 M.R.S.A. § 1406(2)—is not a geographical classification but a political one: the phrase simply identifies the four tribal nations that endure as separate sovereigns within Maine's territorial jurisdiction and with which Maine maintains a special political relationship, blessed by Congress in MICSA. *See supra* pp. 7-9. Non-tribal gaming operators lack that relationship, and, importantly, the Economic Opportunity Act treats those other operators *identically* whether they are in-state or out-of-state. That is not the kind of "differential treatment of in-state and out-of-state economic interests" that triggers strict scrutiny. *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994).

---

commerce *at all*. And they do not, and cannot, plead that any (nonexistent) harms to interstate commerce outweigh Maine's plainly legitimate interest in providing for the Wabanaki Nations, as Congress expressly permitted it to do. *E.g.*, *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 107-08 (2d Cir. 2017) (affirming dismissal of *Pike* claim given clear local benefits); *Elec. Power Supply Ass'n v. Star*, 904 F.3d 518, 525 (7th Cir. 2018) (same where Congress authorized state regulation in question).

33

The Fourth Circuit's decision in *United States v. Garrett* illustrates the point. 122 F. App'x 628. There, the criminal defendant invoked the Dormant Commerce Clause to move to dismiss his indictment under a North Carolina law "permitting Native American-run gambling on tribal lands, but denying [that right] to all other citizens." *Id.* at 631. The Fourth Circuit rejected the argument, noting that the defendant's "claims [we]re not at all similar to the typical dormant commerce clause cases." *Id.* at 634. That was so, the court explained, because "both in-state and out-of-state gambling purveyors are either subjected to, or exempted from, the laws of North Carolina, depending on their [tribal] status," not "because of their residence inside or outside of North Carolina." *Id.* Put another way, because "there [wa]s no unequal treatment vis-à-vis North Carolinians and residents of other states," the Dormant Commerce Clause was not offended. *Id.* The same is true here.

Accepting Oxford Casino's contrary theory would imply that any state-conferred benefit on tribal nations within its borders potentially violates the Dormant Commerce Clause, threatening to invalidate hundreds of state statutes. *See Morton II*, 528 F.2d at 374 (noting the hundreds of laws pertaining to just one of the four Wabanaki Nations enacted "[s]ince [Maine's] admission as a state"); *cf. supra* pp. 25-26 (discussing the similar problem with Oxford Casino's equal protection claim). Their theory also implies that Maine cannot treat in-state tribal nations differently from, say, California tribal nations. That is not the law.

### C.  Oxford Casino's Theory Fails To Account For The Indian Commerce Clause.

Oxford Casino's Dormant Commerce Clause claim fails for yet another reason. Although the Commerce Clause addresses commerce both "among the several States" and "with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3, Plaintiffs here have invoked only the former provision, *see* FAC ¶¶ 1, 8, 66; *see supra* pp. 28-29. This case, however, concerns a statute affecting commerce

34

with Indian Tribes, and so implicates distinct interests under the *Indian* Commerce Clause. As the Supreme Court has emphasized, the Interstate and Indian Commerce Clauses "have very different applications." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989). While the Interstate Commerce Clause "is concerned with maintaining free trade among the States," the Indian Commerce Clause serves to grant Congress "plenary power to legislate in the field of Indian affairs." *Id.* (citation modified). Oxford Casino's claim thus rests on a category error: "[t]he extensive case law that has developed under the Interstate Commerce Clause" is "premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause." *Id.*

More than that: Constitutional structure makes clear that the Interstate Commerce Clause's dormant aspect cannot be imported to invalidate the Economic Opportunity Act. Plaintiffs argue (and must argue) that the Interstate Commerce Clause impliedly forbids states from treating tribal nations differently from nontribal commercial businesses; if the Clause did not impose such a prohibition, Plaintiffs could have no claim. But the Constitution itself draws a distinction between "Commerce . . . with the Indian Tribes" and "Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. And no sensible reading of the Interstate Commerce Clause could impliedly prohibit the very same distinction that the Constitution itself draws.

## CONCLUSION

The Court should enter summary judgment in Defendants' favor on Oxford Casino's claims.

35

Respectfully submitted this 8th day of May, 2026.

/s/ *Leonard R. Powell*

| | |
|---|---|
| Melissa Hewey | Leonard R. Powell* |
| DRUMMOND WOODSUM | NATIVE AMERICAN RIGHTS FUND |
| 84 Marginal Way, Suite 600 | 950 F Street, NW, Suite 1050 |
| Portland, ME 04101 | Washington, D.C. 20004 |
| (207) 253-0528 | (202) 785-4166 |
| mhewey@dwmlaw.com | powell@narf.org |

Matthew Campbell*
Allison Neswood*
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302
(303) 447-8760
mcampbell@narf.org
neswood@narf.org

*Admitted pro hac vice*

*Counsel for Defendant-Intervenors*