# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

OXFORD CASINO HOTEL,
BB DEVELOPMENT, LLC, and
CHURCHILL DOWNS INCORPORATED,

      Plaintiffs,

v.

MILTON F. CHAMPION, in his official
capacity as Executive Director of the Maine
Gambling Control Unit,

      Defendant,

HOULTON BAND OF MALISEET
INDIANS, MI'KMAQ NATION,
PASSAMAQUODDY TRIBE, and
PENOBSCOT NATION,

      Intervenor-Defendants.

Case No. 1:26-cv-00046-LEW

## DEFENDANT MILTON F. CHAMPION'S OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS

Defendant Milton F. Champion (Champion) submits this opposition to the Motion for Judgment on the Pleadings ("Mot."), ECF No. 35, filed by Plaintiffs Oxford Casino Hotel,[1] BB Development, LLC (BB Development), and Churchill Downs Inc. (Churchill Downs) (collectively, "Oxford").

In its two-count Amended Complaint ("Compl."), ECF No. 22, Oxford challenges the recent enactment of "An Act to Create Economic Opportunity for the Wabanaki Nations Through

---

[1] Oxford Casino Hotel is not a separate entity, but the trade name of BB Development, LLC.  *See* Compl. ¶¶ 13-14.  In effect, there are two Plaintiffs in this case, not three.

1

Internet Gaming," P.L. 2025, ch. 538 (eff. Jul. 29, 2026) (enacting 8 M.R.S. §§ 1401-17) ("iGaming law"), which legalized Internet gaming in Maine.  In order to be "eligible to receive an Internet gaming license, an applicant must be a federally recognized Indian nation, tribe or band in this State."  8 M.R.S. § 1406(2).  Intervenor-Defendants Houlton Band of Maliseet Indians, Mi'kmaq Nation, Passamaquoddy Tribe, and Penobscot Nation (collectively, "Wabanaki Nations" or "Nations") are the only federally recognized tribes in the State of Maine.  *See* 91 Fed. Reg. 4102, 4104 (Jan. 30, 2026).

Oxford claims that the iGaming law is unconstitutional because it constitutes a race-based classification that abridges its Equal Protection rights (Count I) and because it discriminates against out-of-state entities in violation of the Dormant Commerce Clause (Count II).  With the few uncontested facts in Oxford's Amended Complaint, Oxford is not entitled to judgment on the pleadings.

Maine's relationship with the Wabanaki Nations is atypical, *see Penobscot Nation v. Georgia-Pac. Corp.*, 254 F.3d 317, 320 (1st Cir. 2001), and that singular arrangement authorizes the State to enact laws for the benefit of the Wabanaki Nations—including the iGaming law—without running afoul of Oxford's rights under Equal Protection or the Dormant Commerce Clause.

## LEGAL BACKGROUND

Maine's relationship with the Wabanaki Nations is "unique."  *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 787 (1st Cir. 1996).

During the 1970s, the Penobscot Nation and the Passamaquoddy Tribe pursued claims to nearly two-thirds of the landmass of the State of Maine that the tribes claimed was transferred in violation of the Indian Trade and Intercourse Act of 1790, ch. 33, 1 Stat. 137 (1790).  *See generally Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 388 F. Supp. 649 (D. Me. 1975), *aff'd,*

528 F.2d 370 (1st Cir. 1975); *Bottomly v. Passamaquoddy Tribe*, 599 F.2d 1061 (1st Cir. 1979).  In 1980, after "years of strife" and many months of intense negotiation, the State of Maine, the Penobscot Nation, the Passamaquoddy Tribe, and the Houlton Band of Maliseet Indians reached a comprehensive settlement "designed to transform the legal status of [these tribes] and to create a unique relationship between state and tribal authority." *Passamaquoddy Tribe*, 75 F.3d at 787 (1st Cir. 1996).  The settlement was embodied in two negotiated legislative enactments: the Maine Implementing Act (MIA), 30 M.R.S.A. §§ 6201-6214 (2011 & Supp. 2026), and the Maine Indian Claims Settlement Act (MICSA), Pub. L. No. 96-420, 94 Stat. 1785 (1980) (formerly codified at 25 U.S.C. §§ 1721-1735),[2] which ratified MIA.[3]

Several years later, Congress recognized the Mi'kmaq Nation and affirmed an arrangement similar to that of the other Wabanaki Nations.  *See* Aroostook Band of Micmacs Settlement Act (ABMSA), Pub. L. No. 102-171, § 2 (Nov. 26, 1991) (formerly codified at 25 U.S.C. § 1721 note). The ABMSA ratified the Micmac Settlement Act, P.L. 1989, ch. 148, which is now known as the Mi'kmaq Nation Restoration Act, (MNRA), 30 M.R.S.A. §§ 7201-7210 (Supp. 2026). Collectively, these series of state and federal acts are referred to as the Settlement Acts.

The Settlement Acts accomplished three primary goals.  *See* MICSA § 1721(b) (stating purposes of MICSA).  First, the Settlement Acts resolved all current and potential land claims brought by the Penobscot, Passamaquoddy, Maliseet, and any other tribe in the State of Maine.

---

[2] MICSA and other settlement acts remain in effect but were removed from the United States Code as of 25 U.S.C. Supp. IV (September 2016) in an effort by codifiers to improve the code's organization.  For ease of reference, the State continues to refer to MICSA as previously codified at 25 U.S.C. §§ 1721-1735.  *See generally Penobscot Nation v. Frey*, 3 F.4th 484 (1st Cir. 2021) (citing to MICSA according to its previous codification).

[3] Subsequent negotiations between the Houlton Band of Maliseet Indians culminated in the Houlton Band of Maliseet Indians Supplementary Claims Settlement Act of 1986, Pub. L. No. 99-566 (Oct. 27, 1986) (formerly codified at 25 U.S.C. § 1724 note).  *See* MICSA § 1724(d)(4) (highlighting potential future agreement between Maine and the Maliseets).

MICSA §§ 1723(a)-(c) (ratifying all prior tribal transfers of land and natural resources and extinguishing aboriginal title to, and all claims regarding, land or natural resources so transferred); MIA § 6213 (similar). Second, the Acts provided a process and funds for the Nations to acquire lands within Maine. MICSA § 1724(d); ABMSA § 4(a). Third, the Acts set forth the jurisdictional relationship between the Nations and Maine going forward. This third goal is implicated here.

The Settlement Acts "define[] the relationship between the State of Maine" and the Nations. MICSA § 1721(b)(3); *see also* ABMSA § 6(b). MICSA generally provides that, except as otherwise provided, the Nations and their members, and the land and natural resources owned by or held in trust for the benefit of the Nations or their members are subject to the jurisdiction of the State of Maine. MICSA §§ 1725(a), (b)(1); *see also* ABMSA § 6(b); MIA § 6204; MNRA § 7204.

Nevertheless, the Wabanaki Nations still benefit from "the laws and regulations of the United States which are generally applicable to Indians, Indian nations, or tribes or bands of Indians or to lands owned by or held in trust for Indians, Indian nations, or tribes or bands of Indians shall be applicable in the State of Maine" unless those laws or regulations would affect or preempt Maine's jurisdiction. MICSA § 1725(h); *see also id.* § 1735(b). The Nations are also "eligible to receive all of the financial benefits which the United States provides to Indians, Indian nations, or tribes or bands of Indians to the same extent and subject to the same eligibility criteria generally applicable to other Indians, Indian nations or tribes or bands of Indians." MICSA § 1725(i); *see also* ABMSA §§ 6(a)-(b), 9(b).

The Settlement Acts also recognize and safeguard the sovereignty of the Wabanaki Nations. *See, e.g.*, *Akins v. Penobscot Nation*, 130 F.3d 482, 489 (1st Cir. 1997) (MIA recognizes "the independent source of tribal authority, that is, the inherent authority of a tribe to be self-governing" (cleaned up)). In large part, MIA vests control over tribal lands with each tribe and precludes

4

Maine from interfering with internal tribal matters, such as tribal membership, organization, and elections. MIA §§ 6206(1), 6206-B, 6207(1); MNRA §§ 7205(1)-(2), 7206(1). *See also* P.L. 1979, ch. 732, § 16 (repealing former state statutes regarding tribal internal governance). MIA and MICSA recognize the Wabanaki Nations' sovereign authority to establish tribal courts and exercise jurisdiction over Indian child custody proceedings. MIA §§ 6209-A to -C; MNRA § 7208; MICSA § 1727. Nevertheless, the Settlement Acts, with Congressional authorization, "extended state authority well beyond what is customary for Indian tribes elsewhere in the United States." *Maine v. Johnson*, 498 F.3d 37, 42 (1st Cir. 2007).

## FACTUAL AND PROCEDURAL BACKGROUND

The Court must decide Oxford's motion for judgment on the pleadings based only upon "uncontested and properly considered facts," *Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 54 (1st Cir. 2006). The Court's review is thus limited to the following facts appear, which appear to be the only undisputed facts as between Oxford's Amended Complaint and Champion's Answer ("Answer), ECF No. 23. Generally, Oxford and Champion agree as to the text of the iGaming law, the correctness of certain citations and quotations, *see, e.g.*, Compl. ¶¶ 1, 5-6, 8, 30, 35-40, 48, 54, 65; Answer ¶¶ 1, 5-6, 8, 30, 35-40, 54, 65, and the following facts.

BB Development, doing business as Oxford Casino Hotel (Oxford Casino), is a Maine corporation. Compl. ¶ 14; Answer ¶ 14. Oxford Casino (through BB Development) operates a brick-and-mortar casino that offers in-person gaming. Compl. ¶ 44; Answer ¶ 44. Oxford Casino has been licensed to operate a casino in Maine sinch 2013. Compl. ¶ 13; Answer ¶ 13.

BB Development is a subsidiary of Churchill Downs. Compl. ¶ 14; Answer ¶ 14. Churchill Downs is a Kentucky corporation and the parent corporation of Oxford Casino. Compl. ¶ 15; Answer ¶ 15. Churchill Downs acquired Oxford Casino in 2013. Compl. ¶ 24; Answer ¶ 24.

Champion is the Executive Director of the Maine Gambling Control Unit, and he is responsible for evaluating applications for internet gaming licenses under the iGaming law. Compl. ¶ 16; Answer ¶ 16.

The Houlton Band of Maliseet Indians, the Mi'kmaq Nation, the Passamaquoddy Tribe, and the Penobscot Nation (Wabanaki Nations) are federally recognized tribes and located in the State of Maine.  Compl. ¶ 29; Answer ¶ 29.

Oxford Casino is one of two licensed casinos operating in the State of Maine and that Oxford Casino has been licensed to operate a casino in Maine since 2013.  Compl. ¶ 19; Answer ¶ 19.  As of March 22, 2026, Oxford Casino reported it had 955 slot-machines and 22 table games operational on its casino floor.  Compl. ¶¶ 20-21; Answer ¶¶ 20-21.  Oxford recently started offering retail sports betting pursuant to a 2023 Maine law.  Compl. ¶ 22; Answer ¶ 22.

Maine law requires a casino operator to "collect and distribute 46% of the net slot machine income from slot machines operated by the casino operator to the [Maine Gambling Control B]oard for distribution" and "collect and distribute 16% of the net table game income from table games operated by the casino operator to the [Maine Gambling Control B]oard for distribution." 8 M.R.S.§§ 1036(2-A), (2-B).  *See also* Compl. ¶ 26; Answer ¶ 26.  In 2025, Oxford paid $41,888,333.19 to the State pursuant to the statutory cascade in 8 M.R.S. §§ 1036(2-A), (2-B). Compl. ¶ 26; Answer ¶ 26.  Amounts paid by Oxford Casino in accordance with 8 M.R.S. § 1036 are allocated to the Penobscot Nation, the Passamaquoddy Tribe, and other Maine governmental units, institutions, and programs, including the Department of Education, the University of Maine system, Maine Maritime Academy, Maine Community College System, gambling-addiction funds, the municipality of Oxford, Oxford County, the Agricultural Fair Support Fund, harness-racing purses, the Sires Stakes Fund, the Dairy Improvement Fund, and the Maine Milk Pool.  Compl. ¶ 27; Answer ¶ 27.

In April of 1980 the Maine Legislature enacted "AN ACT to Implement the Maine Indian Claims Settlement," (MIA), P.L. 1979, ch. 732, § 1 (codified at 30 M.R.S. §§ 6201-14). Compl. ¶ 32; Answer ¶ 32. Congress enacted MICSA on October 10, 1980. Compl. ¶ 32; Answer ¶ 32.

MICSA resolved all current and potential land claims by the Penobscot Nation, the Passamaquoddy Tribe, the Houlton Band of Maliseet Indians, and all other tribes in the State of Maine. MICSA §§ 1723(a)(1), (b)-(c). *See also* Compl. ¶ 31; Answer ¶ 31. MICSA and ABMSA established land acquisition funds for each of the Wabanaki Nations. MICSA § 1724(d); ABMSA § 4. *See also* Compl. ¶ 31; Answer ¶ 31. Sections 1725(h) and 1735(b) of MICSA, control the application of federal laws and regulations enacted for the benefit of Indians, Indian nations, or tribes or bands of Indians within the State of Maine. Compl. ¶ 31; Answer ¶ 31.

The Indian Gaming Regulatory Act (IGRA) was enacted by Congress in 1988, and IGRA currently does not apply within the State of Maine. Compl. ¶ 33; Answer ¶ 33. Under the iGaming law, only a "federally recognized Indian nation, tribe or band located in this State" is permitted to apply for an internet gaming license. 8 M.R.S. § 1406(2). *See also* Compl. ¶ 40; Answer ¶ 40.

With respect to the procedural history of this case, Oxford filed its original complaint on January 23, 2026. ECF No. 1. The operative Amended Complaint, ECF No. 22, contains two Section 1983 claims challenging the constitutionality of the iGaming law. Oxford asserts that the iGaming law is unconstitutional because it constitutes a race-based classification that abridges its Equal Protection rights (Count I) and because it discriminates against out-of-state entities in violation of the Dormant Commerce Clause (Count II).

The Wabanaki Nations moved to intervene in this case to protect their sovereign interests, ECF No. 26, which motion was granted on April 2, 2026, ECF No. 29. The Court adopted the proposed scheduling order presented by the parties, allowed all parties to file dispositive motions on an agreed upon schedule, and stayed discovery pending resolution of the dispositive motions.

7

ECF Nos. 25, 30. Oxford filed the present Motion for Judgment on the Pleadings on May 8, 2026. ECF No. 35.

## STANDARD OF REVIEW

Fed. R. Civ. P. 12(c) allows a party to "move for judgment on the pleadings" "[a]fter the pleadings are closed," but within such time as "not to delay trial." "Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." *Aponte-Torres*, 445 F.3d at 54. In other words, judgment on the pleadings can be granted only if the non-movant could prove no set of facts which would allow it to prevail. *Id.*

"A Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole." *Aponte-Torres*, 445 F.3d at 54-55. "Because a motion for judgment on the pleadings calls for an assessment of the merits of the case at an embryonic stage," the court "views the facts contained in the pleadings in the light most favorable to the nonmovant and draws all reasonable inferences in their favor." *ACA Connects – Am.'s Commc'ns Ass'n v. Frey*, 471 F. Supp. 3d 318, 323 (D. Me. 2020) (cleaned up). "The allegations of the moving party which have been denied are taken as false." *Austad v. United States*, 386 F.2d 147, 149 (9th Cir. 1967) (*cited in Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)). Accordingly, "any allegations in the complaint" that are "denied in the answer" are not considered. *ACA Connects*, 471 F. Supp. 3d at 323. Judgment "on the pleadings is appropriate" only when the pleadings "present[] no material issue of fact to be resolved and the moving party is clearly entitled to judgment as a matter of law." *Lefebvre v. Comm'r*, 830 F.2d 417, 419 (1st Cir. 1987).

Further, because Oxford's motion mounts only a facial challenge to the iGaming law, Mot. at 20, 30, in order to prevail on its motion Oxford must show that the pleadings "establish that no

8

set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## ARGUMENT

**I.    Oxford's motion should be denied because Oxford's standing is factually contested and otherwise not established by the pleadings.**

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). The elements of standing require that a plaintiff sufficiently allege that it, "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[G]eneralized grievance against allegedly illegal governmental conduct" is insufficient purposes of standing. *United States v. Hays*, 515 U.S. 737, 743 (1995).

A plaintiff must also satisfy prudential standing. In order to satisfy prudential standing, the plaintiff's interests must be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987) (cleaned up).

**A.    The factual basis for Oxford's standing is contested.**

In order to have standing to challenge a state law on ground that it discriminates on the basis of race, a plaintiff must plead sufficient facts to show that they have been "personally denied equal treatment by the challenged" law. *Hays*, 525 U.S. at 744-45 (quotation marks omitted). Similarly, to demonstrate standing under the Dormant Commerce Clause, a plaintiff must show how the state law, "as applied to them, disfavors[s] out-of-state businesses or hinder[s] interstate commerce generally." *Savage v. Mills*, 478 F. Supp. 3d 16, 28 (D. Me. 2020) (citing *Selevan v.*

9

*N.Y. Thruway Auth.*, 711 F.3d 253, 261 n.8 (2d Cir. 2013) ("[C]onclusory allegations ... are an insufficient basis upon which to sustain a claim of discrimination against interstate commerce.")).

Here, there is very little in the Amended Complaint that Champion admitted. Notably, Champion denied all of the paragraphs in the Amended Complaint that alleged how Oxford claims to be injured by the iGaming law. *Compare* Compl. ¶¶ 43-50, *with* Answer ¶¶ 43-50. Because the 12(c) standard requires the Court to disregard disputed facts, that includes the disputed facts over Oxford's standing.

Of course, an appropriate factual record may very well show that Oxford has standing to bring both its Equal Protection challenge and its Dormant Commerce Clause challenge. But a "plaintiff may not secure a judgment on the pleadings when the answer raises issues of fact that, if proved, would defeat recovery." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1368 (3d ed. 2004). Because the pleadings demonstrate disputes of fact over Oxford's standing, the Court can and should deny Oxford's motion on this ground alone.

Denying Oxford's motion on this basis does not mean that Oxford's claims cannot be adjudicated now. Champion has moved for summary judgment on Oxford's Amended Complaint, ECF No. 37, and that motion includes a factual record upon which the Court can evaluate Oxford's claims, *see* ECF No. 36.

### B. Oxford's Amended Complaint fails to demonstrate Article III or prudential standing for its Dormant Commerce Clause claim.

Even if the Court were to consider Oxford's factual allegations regarding standing in evaluating its 12(c) motion, Oxford has satisfied neither Article III standing nor prudential standing to challenge the iGaming law under the Dormant Commerce Clause.

Oxford broadly claims that the iGaming law favors in-state businesses over out-of-state business, in contravention of the anti-discrimination principle of the Dormant Commerce Clause.

10

Compl. ¶¶ 8-9, 62-68.  Oxford also alleges that its casino business will suffer financial injury from iGaming generally.[4]  Compl. ¶¶ 10, 46-48.

"The Commerce Clause prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (cleaned up).  "[T]he dormant Commerce Clause's fundamental objective [is] preserving a national market for competition."  *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299-300 (1997); *see also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 350 (1977) (referring to "the Commerce Clause's overriding requirement of a national 'common market'").  It does not confer civil rights upon individuals or businesses.  Rather, it "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."  *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127-28 (1978) (emphasis added).

### 1.    Oxford lacks Article III standing because it has not suffered any harm fairly traceable to the iGaming law.

Oxford has not suffered any harm fairly traceable to the statute challenged.  Here, the iGaming law treats all businesses exactly the same when it comes to iGaming operator licenses. The law permits the Wabanaki Nations to apply for a license, but precludes all others from doing so regardless of their residency or organizational structure.[5]  8 M.R.S. § 1406(2).  In other words, "[t]he injuries of which the plaintiffs complain arise in consequence of [Maine]'s [exclusion of business entities], not in consequence of [any] residency requirements."  *Wine And Spirits*

---

[4]  Champion disputes these facts, and in particular whether internet gaming has an adverse effect on brick and mortar casinos, but they are recited here solely for purposes of evaluating whether Oxford's Amended Complaint demonstrates its standing under Article III.

[5]  There is no residency or other limitation on what types of individuals or entities may apply for the other types of licenses related to internet gaming, i.e., a management services license, supplier license, or occupational license.  8 M.R.S. §§ 1407-09.

*Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 12 (1st Cir. 2007).  Simply stated, Oxford is not a federally recognized tribe, and its status as an in-state or out-of-state private business is immaterial.

It is no answer to equate the Wabanaki Nations with businesses like Oxford that are organized for profit.  *See* Compl. ¶ 34; *see also* Mot. at 31 (characterizing Oxford as "out-of-state economic actors").  As shown, tribes are sovereign political entities, *see Cherokee Nation*, 30 U.S. (5 Pet.) at 16-17, that "possess[] attributes of sovereignty over both their members and their territory," *Worcester*, 31 U.S. (6 Pet.) at 557.  *See also* MIA §§ 6206, 6206-B, 6207, 6207-A to -D, 6209-A to -C, 6210 (demonstrating governmental authority of Penobscot, Passamaquoddy and Maliseet); MNRA §§ 7205-09 (demonstrating governmental authority of Mi'kmaq).  BB Development and Churchill Downs, on the other hand, are for-profit corporations with fiduciary obligations (presumably) to their shareholders.  Put another way, and as argued *infra* at 28-29, Oxford is not similarly situated to the Wabanaki Nations for purposes of the Dormant Commerce Clause.

Because Oxford's alleged injuries "would continue to exist even if the [legislation] were cured" of the alleged discrimination of which they complain, *Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 662 (7th Cir. 2015), Oxford cannot meet the traceability requirement for Article III standing.

### 2.    Oxford lacks prudential standing because its injury is not within the zone of interests protected by the Dormant Commerce Clause.

Oxford's claim of financial injury does not "fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (quotation marks omitted).  "Financial injury, standing alone, does not implicate the zone of interests protected by the dormant Commerce Clause.  That financial injury must somehow be tied to a

12

barrier imposed on interstate commerce." *City of Los Angeles v. Cnty. of Kern*, 581 F.3d 841, 848 (9th Cir. 2009). Here, however, Oxford's injury would be the same whether in-state tribes or out-of-state tribes were licensed to conduct iGaming in Maine. That makes this case unlike *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178 (1st Cir. 1999), where the plaintiff lost business customers due to the Commerce Clause implications of the challenged town ordinance. *Id.* at 183.

**II.     Oxford is not entitled to judgment as a matter of law on its Equal Protection claim.**

The Equal Protection Clause requires that "all persons similarly situated . . . be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Initially, the Court examines (1) whether the Plaintiffs were treated differently than others similarly situated, and (2) whether such a difference was based on an impermissible consideration. *Portland Pipe Line Corp. v. City of South Portland*, 288 F. Supp. 3d 321, 452 (D. Me. 2017), *amended by* No. 2:15-CV-00054-JAW, 2018 WL 4901162 (D. Me. Oct. 9, 2018) (citing *Macone v. Town of Wakefield*, 277 F.3d 1, 10 (1st Cir. 2002)).

The Court should deny Oxford's 12(c) motion. The preference for the Wabanaki Nations in the iGaming law was authorized by Congress through MICSA. Moreover, the Nations are sovereign political entities, not mere racial groups. Accordingly, the iGaming law makes a political classification that is subject to only rational basis review.

Champion views the issue of whether the type of classification in the iGaming law to be primarily a legal issue. Should the Court conclude otherwise, then Oxford's 12(c) motion should be denied because it has not shown that there are "no set of circumstances exists under which the [iGaming law] would be valid." *Salerno*, 481 U.S. at 745.

Further, even if the iGaming law is subject to strict scrutiny review as Oxford contends, whether the iGaming law "is narrowly tailored to advance a compelling government interest" is a

13

factual inquiry that cannot be resolved on the face of Oxford's Complaint. *Lowe v. Mills*, 68 F.4th 706, 717 (1st Cir. 2023).

**A.      Maine's iGaming law is authorized by the Settlement Acts and subject to rational basis review.**

Maine's relationship with the Wabanaki Nations is atypical, *Georgia-Pac. Corp.*, 254 F.3d at 320, and that unique jurisdictional arrangement authorizes the State to enact laws for the benefit of the Wabanaki Nations—including the iGaming law.

Outside of Maine, state laws have limited applicability in Indian country. "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history." *McGirt v. Oklahoma*, 591 U.S. 894, 928 (2020) (quoting *Rice v. Olson*, 324 U.S. 786, 789 (1945)). Tribes and tribal nations are thus "subject to the general jurisdictional principles that apply in Indian country in the absence of federal legislation to the contrary." *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 470 (1979). The Settlement Acts carved a different path, wherein Congress approved a jurisdictional arrangement that generally subjects the Nations to Maine law, while preserving the Nations' access to federal beneficial laws that do not affect or preempt Maine state law. MICSA § 1725(h).

*Yakima*, which Oxford inexplicably fails to cite in its motion, provides the relevant framework for analyzing the iGaming law. State laws affecting tribes, like the iGaming law, that are "enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians" do not involve suspect classifications. *Yakima*, 439 U.S. at 501. As long as the state law is "within the scope of the authorization" provided in federal law, those state laws are permissible. *Yakima*, 439 U.S. at 501. Accordingly,

> [w]hen a state law applies in Indian country as a result of the state's participation in a federal scheme that 'readjusts' jurisdiction over Indians, that state law is reviewed as if it were federal law. If rationally related to both Congress' trust

14

obligations to the Indians and legitimate state interests, the state law must be upheld.

*Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 734 (9th Cir. 2003); *see also Yakima*, 439 U.S. at 501 (applying rational basis review to state law enacted in response to federal statute "designed to readjust the allocation of jurisdiction over Indians").

Congress expressly provided, through MICSA, that the "Passamaquoddy Tribe, the Penobscot Nation, and their members, and the land and natural resources owned by, or held in trust for the benefit of the tribe, nation, or their members, shall be subject to the jurisdiction of the State of Maine to the extent and in the manner provided in" MIA.  MICSA § 1725(b).  The Houlton Band of Maliseet Indians is also subject "to the civil and criminal jurisdiction of the State, the laws of the State, and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or land therein."  MICSA § 1725(a); *see also id.* § 1721(b)(3) (noting one purpose of MICSA is "to ratify the Maine Implementing Act").  MIA, in turn, provides:

> Except as otherwise provided in this Act, all Indians, Indian nations, and tribes and bands of Indians in the State and any lands or other natural resources owned by them, held in trust for them by the United States or by any other person or entity shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person or lands or other natural resources therein.

MIA § 6204.  The MNRA, which Congress ratified, *see* ABMSA § 2(b)(4), includes nearly identical language as MIA with respect to the Mi'kmaq Nation:

> Except as otherwise provided in this Act, the Mi'kmaq Nation and all members of the Mi'kmaq Nation in the State and any lands or other natural resources owned by them or held in trust for them by the United States or by any other person or entity are subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person or lands or other natural resources in the State.

MNRA § 7204.  The sum of these provisions, all of which were either enacted by Congress or ratified and approved by Congress, allocates jurisdiction over tribal gaming (among other matters)

15

to Maine and therefore authorizes Maine's iGaming law. *Cf. Passamaquoddy Tribe*, 75 F.3d at 794 (concluding that the Indian Gaming Regulatory Act does not apply in Maine).

The iGaming law is also within the scope of the authorization provided by Congress. It does not matter that these provisions do not call out, specifically, tribal gaming. *Cf.* Mot. at 21-23. "[T]he Settlement Acts establish[] state authority that far exceeds what is normal for Indian tribes to which no such legislation applies." *Johnson*, 498 F.3d at 42. Those Acts "govern[] the State's relationship with the [Nations] and will continue to do so without dilution unless and until Congress, by later enactment, makes a new law touching upon the same subject matter in one or more particulars specifically applicable within Maine." *Passamaquoddy Tribe v. Maine*, 75 F.3d at 791. In other words, Congress made an express, broad grant of authority to Maine (with the agreement of the Nations, *see* MIA § 6202), and that authority is not diminished because the Settlement Acts do not identify each area within that authority. Moreover, Oxford has cited no case that requires a specific "express" grant of authority from Congress in order for a state law benefiting a tribe to be valid, nor does *Yakima* impose such a requirement.

Oxford seems to recognize as much, arguing that MIA "establishes that, except in narrow circumstances, state law applies to the Tribes in the state, just as it does to any other person." Mot. at 23. From this premise, however, Oxford divines a prohibition in MIA on tribal-specific legislation, Mot. at 23-24, even though MIA says no such thing. Oxford's argument on this point flips the unique jurisdictional relationship described above to one of limited State authority. That is flatly at odds with *Passamaquoddy Tribe*, which explained that MICSA "purposes to cover virtually the entire field of relationships between the State and the Indian tribes based there." *Passamaquoddy Tribe*, 75 F.3d at 788. And the issue of tribal gaming has been specifically addressed through litigation, such that the only way the Nations can conduct any gaming under the current jurisdictional arrangement is as authorized by Maine law. *See id.* at 794; *Penobscot Nation*

16

*v. Stilphen*, 461 A.2d 478, 489-90 (Me. 1983) (concluding the Penobscot Nation's operation of a beano game on its reservation was not an "internal tribal matter" under § 6206(1) of MIA and thus was precluded by applicable state law).

Contrary to Oxford's argument, Mot. at 24-25, the broad authority granted to Maine does not preclude Congress from acting in a specific area to re-adjust that relationship when it so chooses. Indeed, Congress did just that in 2022 when it amended the Indian Civil Rights Act to authorize the Nations to exercise "special Tribal criminal jurisdiction over all persons." 25 U.S.C.A. § 1304(b)(1) (Westlaw, current through Pub. L. No. 119-98). Congress may do so again in the future, but only as permitted by section 1735(b) of MICSA which "acts as a warning signal to later Congresses to stop, look, and listen before weakening the foundation on which the settlement between Maine and the Tribe rests." *Passamaquoddy Tribe*, 75 F.3d at 789.

Champion agrees that there is no need to resort to the legislative history of the Settlement Acts, Mot. at 25-26, given the express grant of authority outlined above. *Penobscot Nation v. Frey*, 3 F.4th 484, 491 (1st Cir. 2021) ("When the text is unambiguous and the statutory scheme is coherent and consistent, we do not look to legislative history or Congressional intent."). But if the Court were so inclined, that history belies Oxford's claim that the Settlement Acts afford no "special sovereign treatment to the Tribes." Mot. at 25. On the contrary, the Senate Report on MICSA outlined the ways in which the Settlement Acts "strengthen[] the sovereignty of the Maine Tribes." S. REP. NO. 96-957 at 14-15. In any event, Oxford's citations only underscore the extent of the State's authority to enact the iGaming law. The bargain Maine struck through the Settlement Acts was that Maine law would apply uniformly across the State, unless otherwise provided, MIA § 6204, later amended by Maine and the Nations, MICSA § 1725(e); ABMSA § 6(d), or altered by Congress, MICSA § 1735(b). That bargain permits the Maine Legislature to authorize new forms of gaming in the State, including tribal gaming, within the confines of state law.

17

Finally, Maine's iGaming law is in accord with the United States' trust obligations to tribes. Although IGRA is not applicable in Maine, it expresses a clear Congressional purpose to promote, "tribal economic development, self-sufficiency, and strong tribal governments" through tribal gaming. 25 U.S.C. § 2702(1). "In its findings, Congress recognized that Indian tribes had been conducting gaming activities on Indian lands as a means of generating revenue for tribal governments." *Artichoke Joe's*, 353 F.3d at 734-35 (citing 25 U.S.C. § 2701(1)).

Maine law is in harmony with these federal purposes. Maine law expressly provides "that the conduct of mobile gaming will, if conducted by federally recognized Indian tribes in the State, serve as an effective economic development tool for tribal governments." 30 M.R.S.A. § 8001(1) (Supp. 2026); *see also id.* § 8001(2)(C) (defining "mobile gaming" as "lawful gambling activity conducted through mobile applications or other digital platforms that involve, at least in part, the use of the internet"). Similarly, the purpose of the iGaming law is clear from its title: to create economic opportunity for the Wabanaki Nations through internet gaming. P.L. 2025, ch. 538. Although 18% of adjusted gross Internet gaming receipts will be forwarded to the State, 8 M.R.S. § 1416(1), the remainder of those funds can remain with the Wabanaki Nations. *Accord* 25 U.S.C. § 2702(2) (stating one purpose of IGRA is "to ensure that the Indian tribe is the primary beneficiary of the gaming operation").

Accordingly, because the iGaming law has been authorized by Congress and is in accord with the United States' trust obligations to tribes, it is subject to rational basis review. *See KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1, 21 (1st Cir. 2012) (indicating a state law preferencing a tribe that falls within the scope of Congressional authorization is "subject to only rational basis review").

18

**B.      Maine's iGaming law is a political classification subject to rational basis review.**

In the alternative, the Court should deny Oxford's motion for judgment on the pleadings on Count I because Maine's iGaming law does not utilize a race-based classification, nor does it preference members of one racial group. Instead, Maine's iGaming law constitutes a political classification for the benefit of tribal governments.

A preference in statute (whether federal or state) for a tribe is not a race-based preference. As the Supreme Court has long held, the United States Constitution recognizes tribes for what they are: sovereign political entities. *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16-17 (1831). "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory." *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 557 (1832). Thus, a tribe is not "a discrete racial group, but, rather," a "quasi-sovereign tribal entit[y]," *Morton v. Mancari*, 417 U.S. 535, 554 (1974). The Supreme Court has repeatedly rejected Oxford's claim that tribes are nothing more than racial groups of persons sharing a similar ancestry. *See United States v. Antelope*, 430 U.S. 641, 646 (1977). Put another way, a government, whether state or tribal, has no race. *See* U.S. Opp'n to Stay Application at 24, *W. Flagler Assocs., Ltd. v. Haaland*, 144 S. Ct. 10 (2023) (No. 23A315), 2023 WL 7042578. Accordingly, federal laws that preference tribal nations are political classifications. *Mancari*, 417 U.S. at 554; *Antelope*, 430 U.S. at 646.

The same is true of state laws that treat activities by tribes differently than the conduct of private businesses elsewhere. State laws that apply to Indian tribes reflect "not a racial classification, but a political one," and thus are subject only to rational basis review when applying the Equal Protection Clause. *Squaxin Island Tribe v. Washington*, 781 F.2d 715, 722 (9th Cir. 1986) (upholding state law giving preferential treatment to tribal liquor enterprises); *accord Greene v. Comm'r of Minn. Dept. of Human Servs*, 755 N.W.2d 713, 726-729 (Minn. 2008)

19

(upholding state law requiring tribal member to obtain services through tribal program); *New York Ass'n of Convenience Stores v. Urbach*, 699 N.E.2d 904, 908 (1998) (upholding state decision not to collect taxes from cigarette and motor fuel sales on Indian reservations). So long as the iGaming law does not contain provisions based on racial classifications of individuals, any equal-protection challenge to the law is subject only to rational basis review. *See Fitzgerald v. Racing Ass'n*, 539 U.S. 103, 107 (2003); *United States v. Garrett*, 122 Fed. App'x. 628, 632 (4th Cir. 2005).

Here, Maine's iGaming law reflects a preference for tribal governments, not individuals. Nothing in the iGaming law includes any reference to race or a racial group or classifies on the basis of race. Instead, the iGaming law permits the Director to issue an internet gaming license to "a federally recognized Indian nation, tribe or band in this State." 8 M.R.S. § 1406(2). The Wabanaki Nations are the only federally recognized tribes in the State of Maine. *See* 91 Fed. Reg. 4102, 4104 (Jan. 30, 2026). But there is no preference or classification in the text of the iGaming law for any member of any race or for individuals based on descent.[6]

The treatment of the Wabanaki Nations as tribal governments is not unique to Maine's iGaming law. Numerous Maine statutes treat the Nations and other federally recognized Indian tribes as governmental entities. *See, e.g.*, 14 M.R.S.A. § 402(4) (Supp. 2026) ("'State' means a state of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, a federally recognized Indian tribe . . ."); 19-A M.R.S.A. § 1734(2) (Supp. 2026) ("A court of this State shall treat a tribe as if it were a state of the United States for the purpose of applying this subchapter and subchapter II."); 19-A M.R.S.A. § 2802(19) (Supp. 2026) ("The term 'state' includes an Indian nation or tribe."); 19-A M.R.S.A. §§ 4102(8)(C), (D) (Supp. 2026) ("'Order'

---

[6] Indeed, even a preference for individual members of federally recognized tribes, as distinguished from a preference for tribes themselves, would be "political rather than racial in nature" because it would "exclude many individuals who are racially to be classified as 'Indians.'" *Mancari*, 417 U.S. at 553 n.24.

means: . . . [a]n order of the Passamaquoddy Tribe or the Penobscot Nation" or "[a] similar order issued by a court of the United States or of another state, territory, commonwealth or federally recognized Indian tribe"); 30-A M.R.S.A. § 5250-I(22) (Supp. 2026) ("'Unit of local government' means a municipality, county, plantation, unorganized territory or Indian tribe."). *Cf.* MICSA § 1725(g) ("The Passamaquoddy Tribe, the Penobscot Nation, and the State of Maine shall give full faith and credit to the judicial proceedings of each other.").

The State of Maine and its agencies also routinely engage with the Wabanaki Nations as sovereign political entities, via statute and otherwise. For example, Maine law requires key state agencies, like the Maine Department of Environmental Protection and the Maine Department of Inland Fisheries and Wildlife, 5 M.R.S.A. §§ 11052(1)(E), (G) (Pamph. 2026), to collaborate with the Wabanaki Nations[7] on each "agency's programs, rules and services that substantially and uniquely affect the Indian tribes or tribal members." 5 M.R.S.A. § 11053(1)(D) (Pamph. 2026). All of the Wabanaki Nations are separately represented in the Maine House of Representatives by a Representative from each tribe, if those Nations so choose.[8] 3 M.R.S.A. § 1 (2016); P.L. 2025, ch. 705, § A-1 (eff. Jul. 29, 2026) (amending 3 M.R.S.§ 1 to add a Representative to the House from the Mi'kmaq Nation beginning in the 133rd Maine Legislature). And, in recognition of the economic importance of Maine's elver fishery, since 2014 "21.9% of the overall annual quota of elver fishery annual landings" are allocated "to the federally recognized Indian tribes in the State." 12 M.R.S.A. § 6302-B(1) (Supp. 2026); *see also id.* § 6302-B(2) (recognizing tribal authority to distribute elver licenses to tribal members).

---

[7] The Tribal-State Collaboration Act defines tribe as "a federally recognized Indian tribe within the State of Maine." 5 M.R.S.A. § 11052(2).

[8] These Representatives can participate in committees and debate on the House floor, but they cannot vote on legislation. *See* Me. Op. Atty. Gen. No. 99-1 (Nov. 16, 1999).

Like the iGaming law, these state laws recognize the Wabanaki Nations and other tribes as governmental entities and treat them as such. The Equal Protection Clause does not prohibit Maine from doing so.

### C.    *KG Urban Enterprises* does not compel a different outcome.

Oxford relies extensively on the First Circuit's decision in *KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1 (1st Cir. 2012), Mot. *passim*, but that case does not dictate the result here.

In *KG Urban Enterprises*, the First Circuit addressed a Massachusetts law that established a process by which gaming, including casino gaming, would be conducted in the state. *Id.* at 4-7. At issue was a particular provision that addressed the possibility that a federally recognized tribe in Massachusetts may acquire IGRA-eligible land in the future, and then seek to negotiate a Class III gaming compact with Massachusetts under IGRA. *Id.* at 6-7. In order to account for that possibility, the state law paused applications in one region of Massachusetts from any other party for a certain period of time. *Id.* at 6. If no IGRA compact was negotiated, then applications for casino gaming from other applications could be submitted. *Id.* KG Urban Enterprises, LLC challenged that pause and preference in part on Equal Protection grounds as a race-based classification. *Id.* at 12-12. The District Court denied KG Urban's motion for preliminary injunction and later dismissed the case. *Id.* at 13-14. On appeal, the First Circuit affirmed the denial of preliminary injunctive relief, but permitted KG Urban's Equal Protection claim to proceed. *Id.* at 27-28.

*KG Urban Enterprises* is distinguishable from this case in several ways. First, there was a serious question as to whether the standard set forth in *Yakima* applied because of the specific circumstances of the Mashpee Wampanoag Tribe and the Wampanoag Tribe of Gay Head (Aquinnah), i.e., the two federally recognized tribes in Massachusetts. *KG Urban Enterprises*, 693 F.3d at 20. At the time, neither tribe had a land base that was IGRA-eligible, and neither Tribe

22

was recognized by the federal government before 1934. *Id.* at 21-25; *see also Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) (concluding the Indian Reorganization Act, including its land acquisition provisions, only applies to tribes "under Federal jurisdiction" in 1934). Thus, there was a serious question in *KG Urban Enterprises* as to whether IGRA even applied to the Wampanoag Tribes— and no party disputed that IGRA constitutes a jurisdiction-shifting statute under *Yakima*. Here, however, MICSA and ABMSA clearly provide the requisite authority for the iGaming law, MICSA § 1725; ABMSA § 6(2); MIA § 6204; MNRA § 7204, and, as argued *supra* at 15-18, the iGaming law falls within the scope of that authority.

Second, *KG Urban Enterprises* conflated a tribe's sovereignty with a State's authority to act with respect to federally recognized tribes. Federally recognized tribes like the Wabanaki Nations are governments, not mere racial groups. That status does not change based on whether the Wabanaki Nations are interacting with the United States or with Maine. In other words, there is no basis to conclude that the Wabanaki Nations are sovereign political entities under federal law or when engaging with the United States but somehow transmogrify into mere racial groups under state law or when engaging with Maine. Instead, this Court should conclude that the Wabanaki Nations are sovereign political entities, regardless of the application of federal or state law. *See Akins*, 130 F.3d at 489.

Third, the Wampanoag tribes did not participate in *KG Urban Enterprises*. *KG Urban Enterprises*, 693 F.3d at 11-12. Thus, the First Circuit did not have the benefit that this Court has from the intervention of the Wabanaki Nations who can address directly their unique sovereign status and interests as related to the iGaming law.

### D.     Maine's iGaming law easily passes rational basis review.

Oxford's motion does not address the rational basis analysis, instead relying on strict scrutiny alone. Mot. at 27-30. Under well trod precedent, the iGaming law easily satisfies rational

23

basis review.  Oxford can only overcome the iGaming law's "strong presumption of validity" "by demonstrating that there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals." *Wine and Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 53-54 (1st Cir. 2005) (quotation marks omitted).

Here, it was rational for the Legislature to authorize the Wabanaki Nations to conduct iGaming in the State.  "The Legislature finds and declares that the conduct of mobile gaming will, if conducted by federally recognized Indian tribes in the State, serve as an effective economic development tool for tribal governments and provide economic stimulus to rural areas of the State."  30 M.R.S.A. § 8001(1).  "[G]aming," and particularly casino style gaming, "can be a source of substantial revenue for" "Indian tribes."  *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1097 (9th Cir. 2003).  The iGaming law will support the economic development and self-sufficiency of the Wabanaki Nations, and thus has a rational basis.

It is also rational for the State only to authorize the Wabanaki Nations to conduct iGaming, but not any business entity.  The Wabanaki Nations are located in rural and remote areas of the State, *see, e.g.*, MIA § 6203(8) (locating the Penobscot Indian Reservation in the Penobscot River at Indian Island and certain islands northward), where traditional opportunities for economic development have been limited.  iGaming, like mobile sports wagering, does not require its patrons to travel to those areas and will provide additional needed funding to the Nations.  A statute that regulates methods of gaming in order to promote economic development has a rational basis.  *See Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 109-110 (2003) (differential tax rate favoring intrastate racetrack over intrastate riverboat gambling had rational basis and thus satisfied equal protection).  Further, the Wabanaki Nations are already licensed to conduct mobile sports

wagering, and they thus have experience with the operation of internet gaming through mobile sports wagering. *See* 8 M.R.S.A. 1207(3) (Supp. 2026).

It was also rational for the Legislature to continue to support gaming opportunities for the Wabanaki Nations. Maine law has authorized various types of gaming in an ad hoc manner through a series of citizen-initiated bills voted on at referendum. That history demonstrates, and the Legislature has recognized, that the Wabanaki Nations "previously have been excluded from conducting most forms of gaming in the State." P.L. 2021, ch. 585, § I-1. The Legislature took reasonable steps to correct that imbalance in Maine's gaming industry through further gaming opportunities for the Wabanaki Nations.

**E.      Should the Court conclude the iGaming law's classification is not solely a legal issue or mandates application of strict scrutiny, then Oxford's 12(c) motion on its Equal Protection claim should be denied.**

Champion views the issue of whether the classification in the iGaming law to be primarily a legal issue, not a factual issue. Should the Court conclude otherwise, or conclude that strict scrutiny applies, then Oxford's 12(c) motion should be denied because it has not shown that there are "no set of circumstances exists under which the [iGaming law] would be valid." *Salerno*, 481 U.S. at 745.

Oxford has not requested that the Court take judicial notice of any facts outside of its Amended Complaint. Accordingly, the Court's review is the limited face of the pleadings, which do not demonstrate that Oxford is entitled to judgment as a matter of law on their Equal Protection claim.

First, the pleadings demonstrate disputed factual issues that, if proved, would defeat Oxford's entitlement to recovery on Count I. The pleadings demonstrate that Oxford and Champion dispute whether the iGaming law constitutes a race-based classification and the appropriate standard of review the Court should apply to evaluate Oxford's Equal Protection claim.

25

CITE.  As argued *supra* at 19-22, Champion contends that the iGaming law preferences tribal governments, not individuals of a particular race, and the iGaming law is thus subject to rational basis review.  Indeed, the Supreme Court has repeatedly rejected Oxford's claim that tribes are nothing more than racial groups of persons sharing a similar ancestry.  *See Antelope*, 430 U.S. at 646 (explaining a tribe is "'a separate people' with their own political institutions").  On the other hand, Oxford relies on *KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1 (1st Cir. 2012), for its claim that the iGaming law is a raced-based classification.  Mot. *passim*.

Because the iGaming law does not mention race at all, the Court may decide that a factual record will be necessary to evaluate the strength of the parties' arguments on this point.[9]  On a developed record the Court could (and should) decide these legal issues in Champion's favor— which would likely defeat Oxford's recovery.  *See, e.g.*, *Palmer & Cay, Inc. v. Marsh & McLennan Cos., Inc.*, 404 F.3d 1297, 1303 (11th Cir. 2005) (judgment on the pleadings can be granted "only if the non-movant can prove no set of facts which would allow it to prevail" (cleaned up)).

Second, if Oxford is correct on the type of classification, application of strict scrutiny requires factual development, not just an examination of the text of the iGaming law.  As Oxford recognizes, *see* Mot. at 27, "[a] State's interest in remedying the effects of past or present racial discrimination may in the proper case justify a government's use of racial distinctions."  *Shaw v. Hunt*, 517 U.S. 899, 909 (1996).  Here, the Maine Legislature has recognized, that the Wabanaki Nations "previously have been excluded from conducting most forms of gaming in the State" by statute, P.L. 2021, ch. 585, § I-1, while entities like Oxford Casino have been permitted to operate a casino through other statutory enactments.  Moreover, whether a law is narrowly tailored "involves a careful judicial inquiry" into whether the State's goal could be achieved through other,

---

[9] As discussed *infra*, *KG Urban Enterprises* does not compel the Court to conclude that the iGaming law makes a race-based classification.

race-neutral methods. *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 312 (2013). The Court cannot make that determination in the absence of a factual record and on the face of the pleadings.

In short, because the pleadings do not "conclusively establish" Oxford's "entitlement to a favorable judgment," Oxford's motion should be denied. *Aponte-Torres v. Univ. of Puerto Rico*, 445 F.3d 50, 54 (1st Cir. 2006).

**III.    Oxford is not entitled to judgment as a matter of law on its Dormant Commerce Clause claim.**

The Constitution's Commerce Clause provides that "Congress shall have power" "[t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const., art. I, § 8, cl. 3. As noted, "the dormant Commerce Clause's fundamental objective [is] preserving a national market for competition." *Tracy*, 519 U.S. at 299-300. It does not confer civil rights upon individuals or businesses. Rather, it "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp.*, 437 U.S. at 127-28.

Oxford focuses on the portion of the Commerce Clause that governs commerce "among the several states," *id.*, and in particular the negative implications of the interstate clause. Compl. ¶¶ 8-9, 62-68. Oxford ignores, however, that the portion of the iGaming Act it challenges, 8 M.R.S. § 1406(2), implicates Congress's power to "regulate commerce" "with the Indian tribes." U.S. Const., art. I, § 8, cl. 3. Thus, it is not all clear that the negative implications of the Commerce Clause for interstate commerce apply to the challenged portion of Maine's iGaming law. *See Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989) ("The extensive case law that has developed under the Interstate Commerce Clause, moreover, is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause.").

27

Regardless, Oxford's motion for judgment on its Dormant Commerce Clause claim should be denied. As argued *supra* at 11-13, Oxford does not have standing to challenge the iGaming law, which treats all in-state and out-of-state private business entities alike. Further, Oxford is not similarly situated to the Wabanaki Nations for purposes of the Commerce Clause, and thus Maine's iGaming law does not discriminate against interstate commerce nor burden interstate commerce in any cognizable way.

### A.      Oxford is not similarly situated to the Wabanaki Nations.

Under the Dormant Commerce Clause "any notion of discrimination assumes a comparison of substantially similar entities." *Tracy*, 519 U.S. at 298. Oxford makes no attempt to demonstrate how it is similarly situated to the Nations, either factually or legally. But that inquiry is necessary, because "when the allegedly competing entities provide different products, as here, there is a threshold question whether the companies are indeed similarly situated for constitutional purposes." *Id.* at 299.

The First Circuit's hypothetical in *American Trucking Associations, Inc. v. Rhode Island Turnpike & Bridge Authority*, 123 F.4th 27, 38 (1st Cir. 2024), is instructive. There, the First Circuit explained that a toll which applied only to motor vehicles but not to bicycles would not be impermissibly discriminatory, even if motor vehicles were more likely to come from out of state, because '[n]o one ... would seriously argue that motorists and bicyclists are 'substantially similar entities.'" *Id.* (quoting *Tracy*, 519, U.S. at 298-300). Naturally, "the factual context in assessing who is similarly situated to whom" is key. *Ass'n To Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40, 61 (1st Cir. 2025).

Here, Oxford and the Wabanaki Nations are not similarly situated because private companies and governments are not the same. Indeed, it is hard to see how any government (tribal or otherwise) could be similarly situated to a private business for purposes of the Dormant

28

Commerce Clause. The Commerce Clause "does not elevate free trade above all other values." *Maine v. Taylor*, 477 U.S. 131, 151 (1986). Instead, as the Supreme Court has explained, "[l]aws favoring local government" "may be directed toward any number of legitimate goals unrelated to protectionism." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007). Oxford's approach "of treating public and private entities the same under the dormant Commerce Clause would lead to unprecedented and unbounded interference by the courts with state and local government." *Id.*

Although the Supreme Court was addressing a county-owned entity in *United Haulers*, there is no principled or constitutional basis to apply a different analysis to a tribal government. As Oxford notes, "the Tribes themselves are treated just like any other municipality in the State." Mot. at 23. Established principles allow the State (and the Nations) "to decide what activities are appropriate for state and local government" or a tribal government "to undertake, and what activities must be the province of private market competition." *United Haulers*, 550 U.S. at 343; *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978) (Commerce Clause does not protect "the particular structure or methods of operation" of a market). The Dormant Commerce Clause does not prohibit the State from doing so.

  **B.**  **The iGaming law does not discriminate against interstate commerce or burden interstate commerce in any cognizable way.**

The Commerce Clause prevents states from creating protectionist barriers to interstate trade. *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980). However, "as long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources." *Taylor*, 477 U.S at 151 (cleaned up); *see also Lewis*, 447 U.S. at 36 ("[T]he States retain authority under their general police powers to regulate matters of legitimate

29

local concern, even though interstate commerce may be affected.").  A court's threshold inquiry is "directed to determining whether [a law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).

Here, Oxford relies solely on the text of the iGaming law establish its allegedly discriminatory purpose.  Mot. at 32.  While the iGaming law only permits federally recognized tribes in Maine to apply for an operator license, the law otherwise applies equally to in-state and out-of-state businesses.  That distinction is not material, however, because a state law is discriminatory only when it affects similarly situated entities in a market by imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests.  *See Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 99 (1994) ("'[D]iscrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.").

As shown above, Oxford is not similarly situated to the Wabanaki Nations in any relevant way.  Moreover, there is no residency or other limitation on what types of individuals or entities may apply for the other types of licenses related to internet gaming, i.e., a management services license, supplier license, or occupational license.  8 M.R.S. §§ 1407-09.  The iGaming law "which treat[s] in-state private business interests exactly the same as out-of-state ones, do[es] not 'discriminate against interstate commerce' for purposes of the dormant Commerce Clause." *United Haulers*, 550 U.S. at 345; *accord Garrett*, 122 Fed. App'x at 633-35 (rejecting dormant Commerce Clause claim against state law that criminalized providing gambling mechanisms to non-tribal gaming establishments).

Non-discriminatory laws like the iGaming law generally are analyzed under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), which weighs local public interests against effects on interstate

30

commerce.  *See Sidman*, 147 F.4th at 64.  "[I]f a local measure 'regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'"  *Id.* at 65 (quoting *Pike*, 397 U.S. at 142).  Oxford makes no attempt in its motion to demonstrate a burden on interstate commerce by the iGaming law, and its motion should therefore be denied.

## CONCLUSION

For the reasons set forth above, Director Champion requests that Oxford's motion for judgment on the pleadings be denied.

DATED:  June 12, 2026

Respectfully submitted,

AARON M. FREY
Attorney General, State of Maine

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
kimberly.patwardhan@maine.gov

REID HAYTON-HULL
Assistant Attorney General
reid.hayton-hull@maine.gov

Office of the Maine Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145

31

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2026, I electronically filed this document and any attachments with the Clerk of the Court using the CM/ECF system and that the same will be sent electronically to registered participants as identified in the CM/ECF electronic filing system for this matter.

DATED:  June 12, 2026

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8570
Fax (207) 287-3145
kimberly.patwardhan@maine.gov

32