IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

OXFORD CASINO HOTEL, *et al.*,

*Plaintiffs*,

v.

MILTON F. CHAMPION, in his official
capacity as Executive Director of the Maine
Gambling Control Unit,

*Defendant*,

and

HOULTON BAND OF MALISEET
INDIANS, MI'KMAQ NATION,
PASSAMAQUODDY TRIBE, and
PENOBSCOT NATION,

*Defendant-Intervenors*.

Civil Action No.: 1:26-CV-00046-
LEW

---

**THE WABANAKI NATIONS' OPPOSITION TO
PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS**

For nearly two centuries, the State of Maine ("State") has enacted legislation specifically

directed at defendant-intervenors the Houlton Band of Maliseet Indians, the Mi'kmaq Nation, the

Passamaquoddy Tribe, and the Penobscot Nation (collectively, "Wabanaki Nations" or

"Nations")—the four federally recognized tribal governments within Maine's borders. And over

four decades ago, Congress ratified the State's authority to do so. It enacted a series of Settlement

Acts that identify each Nation by name and establish the unique jurisdictional framework that

governs Indian affairs in Maine and expressly authorizes the State to legislate vis-à-vis the Nations.

None of these state laws has ever been deemed a violation of equal protection. Maine's "An Act

to Create Economic Opportunity for the Wabanaki Nations Through Internet Gaming" ("Economic

Opportunity Act" or "Act"), P.L. 2025, ch. 538, *to be codified at* 8 M.R.S.A. §§ 1401-1417, is the

1

latest in a long line of state laws specifically addressing the Nations. Yet plaintiffs Oxford Casino Hotel, BB Development, LLC, and Churchill Downs Incorporated (collectively, "Oxford Casino" or "Plaintiffs") now ask this Court to issue what would be, to the Nations' knowledge, the first judicial decision ever to strike down a law directed at federally recognized tribal governments as an unconstitutional racial classification. That request is remarkable. And it is wrong. Tribal nations are sovereign governments, not racial groups, and laws directed at them draw political classifications subject to rational basis review—not strict scrutiny.

Oxford Casino concedes that federal laws directed at tribal nations are subject to rational basis review. Its entire equal protection argument depends on a single proposition: that state laws are different. Oxford Casino maintains that because states lack the federal government's plenary constitutional authority over Indian affairs, a state that enacts a law to benefit tribal nations without first obtaining specific and express congressional authorization makes a racial classification subject to strict scrutiny, even if the identical law passed by Congress would involve only a political classification subject to rational basis review. That argument fails twice over.

It fails, first, because the Act here *is* congressionally authorized, making rational basis review the applicable standard under *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463 (1979). The Settlement Acts that Congress enacted submitted the Nations to state jurisdiction across a broad range of subjects, and the First Circuit has said those subjects include gaming. Oxford Casino demands something more specific—a congressional enactment that identifies gaming by name. But *Yakima* and the cases applying it have never required such magic words, and that unprecedented theory would produce an especially absurd result here. Under Oxford Casino's logic, Maine—the state whose unique jurisdictional arrangement was meant to give it *more* authority over Indian affairs than other states—would have *less* authority to allow

2

tribal gaming than other states possess under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-2721. The Settlement Acts ratified and preserved Maine's longstanding practice of enacting legislation specifically directed at the Nations. They did not silently abolish it.

Oxford Casino's equal protection argument also fails for a second, more fundamental reason: the Act draws a political classification under *Morton v. Mancari*, 417 U.S. 535 (1974), and its progeny, because it is directed at tribal nations. As the Supreme Court has recognized for over 200 years, tribal nations are sovereigns that have exercised their inherent powers of self-government since before the formation of the United States. Tribal nations do not suddenly lose their governmental status and transform into racial groups when a state enacts legislation aimed at them. Rational basis review follows from the political nature of tribal classifications, not from the identity of the legislature that drew them.

Oxford Casino's contrary position rests principally on *KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1 (1st Cir. 2012), but that case does not support the proposition for which Oxford Casino cites it. According to Oxford Casino, *KG Urban* "held" that strict scrutiny applies to tribal-specific state laws. In fact, that preliminary-phase ruling expressly endorsed rational basis review where the *Yakima* rationale applies—as it applies here. As for *KG Urban*'s other observations about the *Mancari* line of cases, the court merely "outlined" "weaknesses" it perceived in each side's positions, on the way to *denying* the plaintiff preliminary relief. *KG Urban* certainly did not hold that strict scrutiny applies, even leaving aside the *Yakima* rationale, and reading it to do so would ignore the First Circuit's own cautions and turn that case into a national outlier.

Oxford Casino's Dormant Commerce Clause claim also fails. Oxford Casino lacks standing to assert this claim: its alleged injury flows from the fact that it is not a tribal nation, not from geographic discrimination. The First Circuit has held that plaintiffs lack standing under the

Dormant Commerce Clause if they would be ineligible for a benefit even if they were located in-state, which is precisely the situation here. Indeed, two of the three plaintiffs *are* in-state entities, yet they are ineligible for a license under the Act because they are not tribal nations. On the merits, the Act does not privilege in-state businesses over out-of-state competitors—it treats all non-tribal entities identically regardless of where they are located. And Oxford Casino's argument ignores the distinction drawn by the Constitution itself between commerce with tribal nations and commerce among the several states.

The Court should deny Oxford Casino's motion for judgment on the pleadings.

## BACKGROUND

### I.      THE WABANAKI NATIONS

The Wabanaki Nations are the four federally recognized Indian tribes in Maine. *See Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs*, 91 Fed. Reg. 4102, 4104 (Jan. 30, 2026); First Am. Compl. ("FAC") ¶ 29. The Nations have existed as sovereign entities since aboriginal times,[1] and they have been recognized as such since the earliest days of the Republic. During the Revolutionary War, the Nations "fought with the American colonies against Great Britain," *Akins v. Saxbe*, 380 F. Supp. 1210, 1212-13 (D. Me. 1974).

As federally recognized tribes, the Nations are "indisputably governments," and they "exercise uniquely governmental functions," *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 392-93 (2023). They provide a wide range of programs and

---

[1] *See, e.g.*, Pub. L. No. 96-420, 94 Stat 1785, §§ 2(a)(3)-(5), 3(a), (h), (k) (1980) (recognizing the Penobscot Nation, the Passamaquoddy Tribe, and the Houlton Band of Maliseet Indians as the successors to the tribal nations that occupied Maine in aboriginal times); Pub. L. No. 102-171, 105 Stat 1143, § 2(a)(1) (1991) (same for the Mi'kmaq Nation).

services for the benefit of their citizens and broader communities, including housing, healthcare, public safety, education, family services, natural resource management, and cultural and historic preservation.[2] Like other tribal nations, however, the Nations face great challenges in funding their governmental operations, "due in large part to the . . . barriers [t]ribes face in raising revenue through more traditional means," such as taxation. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 810 (2014) (Sotomayor, J., concurring). Other sources of governmental funding, including tribal gaming operations, are thus "critical to the goals of tribal self-sufficiency." *Id.* (quotation marks omitted).

## II.    STATE AUTHORITY OVER INDIAN AFFAIRS IN MAINE UNDER THE SETTLEMENT ACTS

Since statehood, Maine has played a prominent role in Indian affairs within its borders. "[T]he Articles of Separation between Maine and Massachusetts[] provid[ed] that Maine would assume the duties and obligations which Massachusetts owed to the Indians," whether arising from treaties or otherwise. *Joint Tribal Council of the Passamaquoddy Tribe v. Morton* ("*Morton II*"), 528 F.2d 370, 377-78 (1st Cir. 1975). Congress has found that "[s]ince 1820, the State of Maine has provided special services to the Indians residing within its borders." Pub. L. No. 96-420, § 2(a)(6), 94 Stat. 1785 (1980). For example, "Maine ha[d] enacted approximately 350 laws [by 1975] which relate specifically to the Passamaquoddy Tribe," *Morton II*, 528 F.2d at 374, and held certain funds in trust for the benefit of one or more Nations, *see* Pub. L. No. 96-420, § 11; *Joint Tribal Council of the Passamaquoddy Tribe v. Morton* ("*Morton I*"), 388 F. Supp. 649, 669 (D.

---

[2] *See generally* https://www.penobscotnation.org/departments/ [https://perma.cc/9APC-737N]; https://wabanaki.com/category/departments/ [https://perma.cc/XF4H-4WXL]; https://www.passamaquoddy.com/?page_id=9 [https://perma.cc/9F49-QKKD]; https://maliseets.net/directory/ [https://perma.cc/S57U-W4Z5]; https://micmac-nsn.gov/administration/ [https://perma.cc/KK55-8XF7].

Me. 1975). For 200 years, Maine has also recognized the governmental status of the Nations by according them the ability to seat tribal representatives in the Maine Legislature.[3]

In the Maine Indian Claims Settlement Act ("MICSA"), Congress solidified a "unique" jurisdictional framework to govern the relationship between the Nations, the State, and the United States. *Akins v. Penobscot Nation*, 130 F.3d 482, 483 (1st Cir. 1997). MICSA's origins were in land claims that the Nations filed in the early 1970s to "nearly two-thirds" of the territory within Maine's borders, *Penobscot Nation v. Fellencer*, 164 F.3d 706, 707 (1st Cir. 1999); *see also Akins*, 130 F.3d at 484; Pub. L. No. 96-420, § 2(a)(1), and in federal and state court decisions that confirmed the Nations' retained inherent sovereignty, *see, e.g.*, *Bottomly v. Passamaquoddy Tribe*, 599 F.2d 1061, 1064-66 (1st Cir. 1979), thereby limiting the State's authority over them, *see, e.g.*, *State v. Dana*, 404 A.2d 551, 552 (Me. 1979). In 1980, the Nations, the State, and the United States reached a settlement of these disputed issues, which was memorialized in MICSA, *see* Pub. L. No. 96-420, § 2(a)(7), a federal law, and the Maine Implementing Act ("MIA"), P.L. 1979, ch. 732 (codified at 30 M.R.S.A. §§ 6201-14), a state law that was "approved, ratified, and confirmed" by Congress via MICSA, Pub. L. No. 96-420, § 6(b)(1).[4] These federal and state laws (including those referenced in footnote 4) are herein referred to as the "Settlement Acts."

---

[3] *See* 3 M.R.S.A. §§ 1-2; P.L. 2025, ch. 705, Part A; Maine House of Representatives Rule 525 (rights and privileges of tribal representatives), https://legislature.maine.gov/house/house/Documents/HouseRules [https://perma.cc/2YK8-JDJM]; S. Glenn Starbird, Jr., *A Brief History of Indian Legislative Representatives in the Maine Legislature* (Me. State Legislature 1983), https://legislature.maine.gov/lawlibrary/history-of-tribal-representation-in-maine/9261 [https://perma.cc/J2F7-BRP2].

[4] In the 1991 Aroostook Band of Micmacs Settlement Act, Congress determined that it was "fair and just to afford the [Mi'kmaq Nation] the same settlement provided to the Houlton Band of Maliseet Indians for the settlement of that Band's claims." Pub. L. No. 102-171, § 2(a)(5). In 1986, Congress had also enacted the Houlton Band of Maliseet Indians Supplementary Act, Pub. L. No. 99-566 (S 2750), 100 Stat 3184 (1986), prescribing the legal process for Maliseet's acquisition of trust lands, which MICSA had contemplated but not resolved, *see* Pub. L. No. 96-420, § 5(d).

The Settlement Acts struck a balance between the Nations' status as independent sovereigns and the State's historic exercise of broad jurisdiction over Indian affairs. First, the Settlement Acts affirmed the Nations' status as federally recognized tribal nations entitled to the same benefits as other tribal nations, *see* Pub. L. No. 96-420, § 6(i); Pub. L. No. 102-171, § 6(a), and provided for the Nations' acquisition of trust lands to restore their respective territories, *see* Pub. L. No. 96-420, § 5(d); Pub. L. No. 102-171, § 4(a). The Acts also recognized the Nations as separate governments with their own civil regulatory authority, criminal jurisdiction, courts, and law enforcement. *See, e.g.,* P.L. 1979, ch. 732 (30 M.R.S.A. §§ 6207, 6209, 6210); Pub. L. No. 96-420, § 6(f)-(g). Thus, as stated in the final Committee Reports in both the House and Senate, MICSA "recogniz[ed the Nations'] power to control their internal affairs" and "strengthen[ed] the sovereignty of the Maine Tribes." *Akins*, 130 F.3d at 489 (quoting S. Rep. No. 96-957, at 14; H.R. Rep. No. 96-1353, at 14-15).

At the same time, the Settlement Acts permitted Maine "to extend its jurisdiction over the Nation[s] to a greater degree than most states exercise over other Indian tribes." *Fellencer*, 164 F.3d at 708. Most significantly, the Settlement Acts provided that, with certain important exceptions, the tribal nations in Maine and their citizens are subject to "the laws of the State." P.L. 1979, ch. 732 (30 M.R.S.A. § 6204); *see also* Pub. L. No. 96-420, § 6(a), (b)(1). MICSA also limited the application of federal Indian laws in Maine when such laws would "affect[] or preempt[] the civil, criminal, or regulatory jurisdiction of the State of Maine." Pub. L. No. 96-420, § 6(h). MICSA similarly provided that future laws enacted by Congress to benefit tribal nations generally that would "affect or preempt the application of the laws of the State of Maine" would not apply in Maine unless Congress "specifically made [the law] applicable within the State." *Id.* § 16(b).

In sum, the Settlement Acts reflected Congress's attempt to balance the State's interest in "continuing to exercise jurisdiction over the Nation[s] . . . with the Nation[s'] 'independent source of tribal authority, that is, the inherent authority of a tribe to be self-governing.'" *Fellencer*, 164 F.3d at 708 (quoting S. Rep. No. 96-957, at 29 (1980) (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49 (1978))).

### III.    GAMING IN MAINE

The State's treatment of tribal gaming well illustrates its authority in the area of Indian affairs. Until recently, the State prohibited the Wabanaki Nations from offering most forms of gaming. When the Penobscot Nation began offering beano games to generate revenues "to fund various tribal governmental services and programs, including snow and rubbish removal on the reservation, police and health services, and home improvement programs," the State took enforcement action. *Penobscot Nation v. Stilphen*, 461 A.2d 478, 480 (Me. 1983). The Maine Supreme Judicial Court upheld that action, reasoning that Maine had excluded the Nations from the list of entities authorized to offer beano, *id.* at 481-82, and were not exempt from state regulation under the Settlement Acts, *id.* at 490.

A few years later, after the Supreme Court held that California "could not civilly regulate tribal bingo games because such regulation 'would impermissibly infringe on tribal government,'" *Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618, 622 (1st Cir. 2017) (quoting *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 221-22 (1987)), Congress passed IGRA. IGRA created a statutory framework for tribal nations to offer gaming "as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Following the "meteoric success" of tribal casinos in other states, the Passamaquoddy Tribe made plans to open a casino in the city of Calais. *Passamaquoddy Tribe v.*

8

*Maine*, 75 F.3d 784, 788 (1st Cir. 1996). But when the Tribe sought to negotiate a gaming compact with the State (a requirement to offer casino-style gaming under IGRA, *see* 25 U.S.C. § 2710(d)(1)(C)), the State asserted that IGRA "did not apply within Maine's boundaries." *Id.* at 788. The First Circuit found that Section 16(b) of MICSA controlled because IGRA "would affect or preempt the application of the laws of the State of Maine," *id.* at 789 (quoting 25 U.S.C. § 1735(b)), and Congress had not made IGRA "specifically applicable" within Maine, *id.*

Thereafter, the Nations repeatedly sought authorization from the Maine Legislature to enter the gaming market. These efforts, however, were continually rebuffed by the Legislature or by the Governor's veto.[5] Meanwhile, the State authorized and licensed two non-tribal casinos, one of which is the Oxford Casino. *See* FAC ¶ 13; ECF No. 23 ¶ 13; ECF No. 34 ¶ 13. The monopoly held by these two casinos has allowed Oxford Casino, over the past five years alone, to generate net slot machine revenue of over $430 million (from nearly 1,000 machines) and net table game revenue of over $77 million.[6]

The State finally changed course in 2022, when it authorized the Wabanaki Nations to offer mobile sports wagering. *See* P.L. 2021, ch. 681 (Section J-6) (Me. 2022); 8 M.R.S.A. § 1207. In doing so, the Legislature stated that it was "fair and equitable" to allow the Nations to offer mobile sports wagering because they "previously have been excluded from conducting most forms of gaming in the State." P.L. 2021, ch. 681 (Section I-1(2) (Me. 2022)). The State simultaneously

---

[5] *See, e.g.*, L.D. 1274, 122d Leg., 1st Reg. Sess. (Me. 2005) (bill to allow tribal slot machines); L.D. 701, 123d Leg., 1st Reg. Sess. (Me. 2007) (same); L.D. 1379, 124th Leg., 1st Reg. Sess. (Me. 2009) (same); L.D. 1298, 126th Leg., 2d Reg. Sess. (Me. 2013) (bill to allow a tribal casino); L.D. 1446, 127th Leg., 1st Reg. Sess. (Me. 2015) (same); L.D. 1447, 128th Leg., 1st Reg. Sess. (Me. 2018) (same); L.D. 1144, 129th Leg., 2d Spec. Sess. (Me. 2019) (same); L.D. 554, 130th Leg., 1st Spec. Sess. (Me. 2021) (bill to authorize tribal gaming).

[6] *See* Me. Dep't of Pub. Safety, Maine Gambling Control Unit, Casino Revenue Reports, https://www.maine.gov/dps/gcu/casino-gaming/casino-revenue-distribution    [https://perma.cc/B3WK-RJ5F] (2021-2025).

authorized *in-person* sports wagering by casinos (including Oxford Casino), commercial tracks, and off-track betting facilities. *See* 8 M.R.S.A. § 1206(2). The Nations are not eligible for these brick-and-mortar facility licenses.

## IV.    THE ECONOMIC OPPORTUNITY ACT

The Economic Opportunity Act was enacted on January 11, 2026, FAC ¶ 35, and legalizes the operation of "Internet gaming" in Maine, subject to licensing and regulation by the Maine Gambling Control Unit, *see* 8 M.R.S.A. §§ 1401, 1403. The Wabanaki Nations are the only entities that can obtain internet gaming licenses under the Act. *See* 8 M.R.S.A. § 1406(2). As evident from the title of the Act, the Legislature's specific intent was for Internet gaming to create "[e]conomic [o]pportunity" for the Nations. P.L. 2025, ch. 538. The Legislature has also expressly recognized that mobile gaming "serve[s] as an effective economic development tool for tribal governments," in addition to "provid[ing] economic stimulus to rural areas of the State." P.L. 2021, ch. 681 (Section I-1(1) (Me. 2022)). The Act has direct financial benefits for the State as well, requiring the Nations to pay an 18% tax on gross Internet gaming receipts that will be used to fund a variety of state programs, including Opioid Use Disorder Prevention and Treatment, an Emergency Housing Relief Fund, a Maine Veterans' Homes Stabilization Fund, a Fund for a Healthy Maine, and a School Revolving Renovation Fund, among others. 8 M.R.S.A. § 1416.

## V.    THIS SUIT

Oxford Casino's First Amended Complaint challenges the Economic Opportunity Act under two provisions of the U.S. Constitution: (1) the Equal Protection Clause of the Fourteenth Amendment, and (2) the Dormant Interstate Commerce Clause. *See, e.g.*, FAC ¶¶ 51-72. On April 2, 2026, the Court granted the Wabanaki Nations' motion to intervene and approved a stipulated case schedule that allows the parties to cross-file dispositive motions. ECF Nos. 29, 30. The

10

Nations filed an answer to the First Amended Complaint on May 7, 2026, ECF No. 34, and a motion for summary judgment on May 8, 2026, ECF No. 38. They now submit this response to Oxford Casino's motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

## LEGAL STANDARD

On a Rule 12(c) motion, the Court reviews the well-pleaded facts and all reasonable inferences in the light most favorable to the nonmovant. *Kando v. R.I. State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018). Judgment on the pleadings is appropriate only when "there exist no genuine issues of material fact, and the moving party establishes that it is entitled to judgment as a matter of law." *Lovell v. One Bancorp*, 690 F. Supp. 1090, 1096 (D. Me. 1988). The movant's allegations that have been denied by the adverse party are "taken to be false." 5C Wright & Miller*, Federal Practice and Procedure* § 1368 (3d ed.).[7]

## ARGUMENT

**I.    OXFORD CASINO IS NOT ENTITLED TO JUDGMENT ON ITS EQUAL PROTECTION CLAIM (COUNT I).**

Oxford Casino concedes that the "Supreme Court's decisions leave no doubt that federal legislation with respect to Indian tribes, although relating to Indians as such, is not based on impermissible racial classifications." Pls.' Mot. at 11. But it contends a statute that provides distinct treatment for tribal nations becomes racial rather than political—and is subject to strict scrutiny— when enacted by a *state*, because "[s]tates are generally precluded from exercising jurisdiction

---

[7] As the State explains in its response brief, this important procedural point disposes of Oxford's motion in its entirety. *See* State Resp. Br. at 9-10. While "Oxford Casino alleges that the Act inflicts multiple injuries on Plaintiffs," Pls.' Mot. at 6, the Nations and the State deny those allegations, *see* ECF No. 23 ¶¶ 43-50; ECF No. 34 ¶¶ 43-50. Without those injuries established, Oxford Casino lacks Article III standing.

over Indians in Indian country unless Congress has clearly expressed an intention to permit it." *Id.* at 10.

Oxford Casino is wrong for two reasons, each of which suffices to deny its motion. To start, rational basis review applies to the Act because it is federally authorized under *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*. Congress in the Settlement Acts "submitted [the Nations] . . . to the State's jurisdiction" in a wide range of areas, including gaming. *Passamaquoddy Tribe*, 75 F.3d at 787. Contrary to Oxford Casino's claim, *Yakima* does not require those acts to specifically mention gaming. And Oxford Casino's argument that the Settlement Acts *themselves* prohibit the State from enacting tribal-specific legislation gets those Acts exactly backwards.

More broadly, Oxford Casino is simply wrong that federal and state laws drawing tribal classifications are subject to different equal protection scrutiny. As the Supreme Court first explained in *Morton v. Mancari*, federal laws drawing tribal classifications are subject to rational basis review because tribal nations are governments, not racial groups.[8] That fundamental principle does not change just because a state law is at issue. Oxford Casino's argument leans heavily on *KG Urban Enterprises, LLC v. Patrick*, but that preliminary-phase decision *did not* apply strict scrutiny and *denied* the plaintiff's request to enjoin the Massachusetts tribal gaming law at issue.

Oxford Casino never engages with rational basis review—the standard that actually governs. And it is readily satisfied here: the Act advances multiple legitimate state interests, including tribal economic development, rural economic stimulus, government-to-government

---

[8] Federal authorization is therefore an *additional* ground for applying rational basis review—not a requirement. Indeed, *Yakima* involved a state law addressed to *individual* "tribal Indians." 439 U.S. at 498, 501. Federal authorization—although plainly present here—is particularly unnecessary because the Act is directed at tribal *governments* who engage with the State as sovereigns. *See infra* p. 24.

cooperation, state financial relief, well-functioning internet gaming, and remediation of the Nations' historic exclusion from gaming.

### A. The Act Is Authorized Under Maine's Unique Jurisdictional Scheme.

At the outset, rational basis review governs Oxford Casino's equal protection challenge because the State adopted the Economic Opportunity Act pursuant to the unique jurisdictional scheme Congress has established over Indian affairs in Maine. Under *Yakima*, rational basis review applies to state laws "enacted in response to . . . federal measure[s] explicitly designed to readjust the allocation of jurisdiction over Indians." 439 U.S. at 501. Here, *Yakima* compels the application of rational basis review. Maine is uniquely situated in the field of Indian affairs. As the First Circuit has stated, "the Settlement Act[s] . . . submitted [the Nations] . . . to the [S]tate's jurisdiction," including with respect to gaming activities. *Passamaquoddy Tribe*, 75 F.3d at 787. The Economic Opportunity Act is, in turn, a product of this congressional reallocation of jurisdiction. Rational basis review is therefore the applicable standard.

### 1. The Settlement Acts' Grant Of Broad Authority To Maine Over Indian Affairs Confirms That The Economic Opportunity Act Is Subject To Rational Basis Review.

*Yakima* resolves this case in the Nations' favor. That case (which Oxford Casino cites nowhere in its motion) considered—and rejected—the Yakima Nation's challenge to a Washington law ("Chapter 36") that asserted partial state criminal and civil jurisdiction over "tribal Indians" in Indian country. 439 U.S. at 465-66, 500-01. The Court emphasized that Chapter 36 "was enacted in response to a federal measure [Public Law 280] explicitly designed to readjust the allocation of jurisdiction over Indians," a fact that made "the argument that [Chapter 36's] classifications are 'suspect' an untenable one." *Id.* at 501. In turn, the Court held that the law would be valid so long as it "b[ore] [a] rational relationship to the State's objectives." *Id.* at 501-02. And under that

13

standard, the Court "ha[d] no difficulty in concluding that Chapter 36 d[id] not offend the Equal Protection Clause." *Id.*

Applying *Yakima*, lower courts have widely recognized that state Indian affairs laws are subject to rational basis review when a state is exercising authority formally or informally authorized by Congress. *See, e.g.*, *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1217-19 (5th Cir. 1991) (holding that, despite lack of "express Congressional authorization," state could allow exemption for Native American religious peyote use that "parallel[ed]" federal exemption); *Greene v. Comm'r of Minn. Dep't of Human Servs.*, 755 N.W.2d 713, 727 (Minn. 2008) (noting that courts have generally "applied rational basis review to state laws that promote tribal self-government, benefit tribal members, or implement or reflect federal laws" and upholding state law allowing tribal nation to administer state welfare program); *N.Y. Ass'n of Convenience Stores v. Urbach*, 699 N.E.2d 904, 908 (N.Y. 1998) (applying rational basis review to disparate enforcement of state tax laws "predicated on the [state] [d]epartment's sensitivity to both tribal sovereignty issues and the complex restrictions imposed by the [federal] Indian Trader Laws"). The paradigmatic cases are where, like in *Yakima* itself, a "state is acting under a federal statute explicitly adjusting the state's jurisdiction over Indians." *Squaxin Island Tribe v. Washington,* 781 F.2d 715, 722 n.10 (9th Cir. 1986).

The Economic Opportunity Act falls squarely within this framework. The Act is the result of Congress's "readjust[ment of] the allocation of jurisdiction over Indians" in Maine. *Yakima*, 439 U.S. at 501. "[T]he Settlement Acts establish[] state authority that far exceeds what is normal for Indian tribes to which no such legislation applies." *Maine v. Johnson*, 498 F.3d 37, 42 (1st Cir. 2007). And in *Passamaquoddy Tribe*, the First Circuit said this authority includes gaming. 75 F.3d at 788. For decades, Maine exercised this broad authority to deny the Wabanaki Nations the

14

opportunity to engage in the types of gaming activities in which Indian tribes outside of Maine may engage. *See id.* at 789-90, 794; *see also Stilphen*, 461 A.2d 478. But the Legislature recently determined that a change in state policy was warranted and authorized the Nations to engage in internet gaming and mobile sports wagering. *See supra* pp. 9-10. The State's exercise of its authority under the Settlement Acts and *Passamaquoddy Tribe* to allow tribal gaming is subject to rational basis review.

### 2. *The Settlement Acts Authorize Maine To Enact Tribal Gaming Legislation, And* Yakima *Does Not Require More.*

Oxford Casino complains that the Settlement Acts "contain[] [no] express provision delegating authority from Congress to Maine to enact any sort of gaming legislation," Pls.' Mot. at 22-23, and that Congress has not otherwise "expressly delegated to Maine authority to enact preferential internet-gambling legislation to benefit the Tribes," *id.* at 21. But as the First Circuit has explained, the Settlement Acts "cover virtually the *entire* field of relationships between the State and the Indian tribes based there," including gaming. *Passamaquoddy Tribe*, 75 F.3d at 788 (emphasis added) (explaining that the Settlement Acts are "broader" than IGRA). Oxford Casino's demand for something more—that the Settlement Acts explicitly mention gaming—finds no support in *Yakima* or elsewhere. To the contrary, lower courts have applied *Yakima* to state laws benefiting tribal nations across a wide range of contexts without demanding that states first obtain an explicit congressional grant of authority. *See, e.g.*, *New York Association of Convenience Stores*, 699 N.E.2d at 908 (tax enforcement); *Peyote Way Church of God, Inc.*, 922 F.2d at 1218-19 (religious exemption); *Greene*, 755 N.W.2d at 727 (welfare administration).

Indeed, Oxford Casino's rule conflicts with basic principles of statutory construction and would perversely mean that the more authority Congress grants a state, the less authority the state gets. Given the Settlement Acts' broad sweep, it would be quite strange to require Congress to

15

additionally list every area the State could regulate vis-à-vis the Nations. "[T]he presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012); *see also Proposed Settlement of Maine Indian Land Claims: Hearings Before the Select Committee on Indian Affairs, United States Senate,* 96th Cong., 2d Sess., on S. 2829, July 1-2, 1980 (1980), p. 344 (Report of Joint Select Committee on the Indian Land Claims) (explaining that the State desired via MICSA "to establish the broad and basic provisions" governing the relationship between the State and the Nations and did not want MICSA "drafted to refer to" "intricate details" like "specific provisions of state law").

The broader statutory backdrop throws the error of Oxford Casino's approach into sharp relief. IGRA, enacted eight years after MICSA, gave states *less* authority over tribal gaming than Maine already possessed under the Settlement Acts. Because the application of IGRA in Maine would have "affect[ed] or preempt[ed]" state jurisdiction over Indian gaming, Pub. L. No. 96-420, § 16(b), the First Circuit found that Maine is exempt from IGRA's constraints altogether, *see Passamaquoddy Tribe*, 75 F.3d at 791. But even though the First Circuit read MICSA to grant Maine uniquely broad latitude with respect to Indian gaming, under Oxford Casino's theory, the Settlement Acts' broad grant of state authority somehow leaves Maine uniquely *unable* to authorize tribal gaming (yet able to prohibit it)—even as other states in the nation may freely authorize tribal gaming under IGRA. That cannot be right. Congress does not protect a state from interference by a federal regulatory regime only to leave it *more* restricted than the states the regime covers.

### 3. The Settlement Acts Authorize, Rather Than Forbid, Tribal-Specific State Legislation.

Oxford Casino also argues that the Settlement Acts themselves bar Maine from enacting tribal-specific legislation. Pls.' Mot. at 22-26. Oxford Casino contends that "the text and structure

16

of those Acts affirm that the power to enact legislation specifically benefiting Maine's Tribes rests with Congress, not the State." *Id.* at 26. That argument founders on the text and the history. And it flies in the face of the entire body of Maine Indian law, comprising scores of statutes, specifically addressing the Nations.

Start with what the Settlement Acts actually do. As noted above, they provide, subject to certain exceptions, that the Nations "shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person or lands or other natural resources therein." 30 M.R.S.A. § 6204; *see also, e.g.*, Pub. L. No. 96-420, § 6(a) (parallel federal provision). That is an express grant of state authority. It abrogates many of the federal common law immunities from state authority that tribal nations ordinarily enjoy—exemptions from state taxation, civil and criminal jurisdiction, and regulatory authority—and subjects the Nations to state legislative authority like others in Maine, with limited exceptions.[9]

Oxford Casino reads the "same extent" clause as a prohibition on tribal-specific legislation—as if by subjecting the Nations to Maine law, Congress stripped the State of the authority to address the Nations by name as the sovereign governments they are. Pls.' Mot. at 23. But "to the same extent as any other person" is a comparator, not a limitation on state authority. It answers the question: when an exception does not apply, how much state law reaches the Nations? The answer, subject to important exceptions not relevant here: as much as reaches anyone else.

Oxford Casino flips this clause upside down, arguing that this expansive grant of state authority is actually a *restriction* that prohibits the Legislature from passing laws that specifically address the Nations or provide them benefits of any sort. This argument is refuted by the plain text

---

[9] Indeed, judicial recognition of these common law immunities and the Nations' retained inherent sovereignty contributed in significant part to the circumstances giving rise to the Settlement Acts. *See, e.g.*, *Bottomly*, 599 F.2d at 1064-66; *State v. Dana*, 404 A.2d 551, 552 (Me. 1979).

17

of MICSA, which specifically acknowledges that "[s]ince 1820, the State of Maine has provided special services to the Indians residing within its borders." Pub. L. No. 96-420, § 2(a)(6). It is also refuted by MIA, which expressly contemplates that services may be "provided exclusively to members of the respective tribe or nation pursuant to state . . . law." P.L. 1979, ch. 732 (30 M.R.S.A. § 6206(1)). If Congress had intended to prevent tribal-specific state legislation in Maine, it would have said so explicitly; it would not have hidden that restriction in a clause that delegated expansive authority over Indian affairs to the State.

Oxford Casino's reliance on MICSA's Section 16(b) is equally misplaced. *See* Pls.' Mot. at 24-25. That provision has a specific and narrow purpose: preventing future federal Indian legislation from disrupting the state-jurisdiction framework the Settlement Acts established. It does so by requiring Congress to specifically make any post-1980 federal law applicable in Maine before it can override Maine law. *See Passamaquoddy Tribe*, 75 F.3d at 787. The provision is a shield against federal intrusion into state authority, not a sword against state action. *See id.* ("[S]ection 16(b) . . . gave the State a measure of security against future federal incursions . . . ."). Indeed, the First Circuit said that IGRA does not apply in Maine precisely *because* it would "affect or preempt the application of the laws of the State of Maine." *Id.* at 789 (quoting Section 16(b)). Oxford Casino's argument that Section 16(b) *prohibits* Maine from passing tribal-specific gaming laws, *see* Pls.' Mot. at 22, would transform a provision designed to protect Maine's legislative prerogatives into a constraint on those very prerogatives.

Oxford Casino's reading of these provisions also flies in the face of the history that led to the Settlement Acts' passage, their contemporaneous understanding, and their consistent post-enactment interpretation. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("[I]nterpretations issued contemporaneously with the statute at issue, and which have remained

18

consistent over time, may be especially useful in determining the statute's meaning."); *see also Nebraska v. Parker*, 577 U.S. 481, 488 (2016) (looking to contemporaneous and subsequent understanding to interpret Indian law statute). Before MICSA, "Maine actively regulated the affairs of Indians within its borders for almost 160 years, creating hundreds of laws that specifically related to the protection and regulation of the Tribes." *Great N. Paper, Inc. v. Penobscot Nation*, 770 A.2d 574, 581 (Me. 2001). Against this backdrop the Acts codified, with certain exceptions, the State's "authority to regulate Indian affairs in Maine." *Id.* at 584. And since MICSA's enactment, Maine has passed countless statutes that treat the Nations uniquely, just as Congress intended.[10]

MIA's so-called "municipal model" provisions do not support Oxford Casino's claim that the Settlement Acts forbid tribal-specific legislation. Pls.' Mot. at 23. As a threshold matter, First Circuit precedent makes clear that the Settlement Acts did not transform any of the Nations from federally recognized tribal governments into municipalities. *See Akins,* 130 F.3d at 486 (citing *Santa Clara Pueblo*, 436 U.S. at 56). To the contrary, the Acts confirmed the Nations' sovereign status. *See id.*; *supra* p. 7. But even under Oxford Casino's unfounded premise, states regularly authorize particular towns to take particular actions, grant unique powers to named cities, and provide targeted benefits to specific communities. Such legislation presents no equal protection

---

[10] *See, e.g.*, P.L. 2021, ch. 681 (Me. 2022) (5 M.R.S.A. § 11055) (requiring the governor to meet at least annually with the Nations' leaders); P.L. 1997, ch. 708 (12 M.R.S.A. § 6302-A) (exempting Nation citizens from state marine organism harvesting license requirements when they hold a valid tribal license); P.L. 2013, ch. 485 (12 M.R.S.A. § 6302-B(1)) (allocating 21.9% of the state elver fishing quota to the Nations); P.L. 2023, ch. 359 (Me. 2023) (22 M.R.S.A. §§ 3941-55) (enacting special protections for Indian children in child welfare proceedings); P.L. 2003, ch. 683 amended by P.L. 2007, ch. 383 (29-A M.R.S.A. § 524-A) (directing the secretary of state to issue Wabanaki registration plates to Nation citizens).

problems. *See City of Newark v. State of New Jersey*, 262 U.S. 192, 193 (1923); *City of Trenton v. State of New Jersey*, 262 U.S. 182, 187 (1923).

Oxford Casino's resort to legislative history fares no better. There is no need to even consider the legislative record: the statute is clear, so the inquiry ends there. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 673 (2020). But regardless, Oxford Casino misreads the history it invokes. When some Maine officials claimed that the settlement would not create "a nation within a nation," Pls.' Mot. at 25, their statements reflected the State's insistence that *it*—rather than the federal government—would possess broad jurisdiction over the Nations. Those statements were thus directed at the federal common law immunities the Settlement Acts abrogated, not at the Nations' governmental status, which MICSA in fact confirmed. *See supra* p. 7.

Other statements from the State's officials confirm that they were not attempting to shackle the State's own hands. The officials desired "to continue the significant role for the State [in Indian affairs] while establishing a sound and undisputed legal basis for that role,"[11] and their "understanding and intent" was that the State would "retain[] exclusive and unlimited discretion and authority to amend or repeal any statute relating to Indians."[12] At every step, the State's aim was to preserve its authority to legislate in the field of Indian affairs, not limit it.

At bottom, Oxford Casino treats the Settlement Acts as having terminated the sovereign status of the Wabanaki Nations. *See, e.g.*, Pls.' Mot. at 26 ("[T]he intent of those acts was not to grant Maine's Tribes sovereign, political status within the State."). Oxford Casino is sorely

---

[11] *Proposed Settlement of Maine Indian Land Claims: Hearings Before the Select Committee on Indian Affairs*, United States Senate, 96th Cong., 2d Sess., on S. 2829, July 1-2, 1980 (1980), p. 338 (Statement of State Rep. Bonnie Post).

[12] *Proposed Settlement of Maine Indian Land Claims: Hearings Before the Select Committee on Indian Affairs*, United States Senate, 96th Cong., 2d Sess., on S. 2829, July 1-2, 1980 (1980), pp. 345-46 (Report of Joint Select Committee on the Indian Land Claims).

20

mistaken. Indeed, the Settlement Acts expressly refute Oxford Casino's reading: they recognize the Nations as sovereign political bodies, with their own laws, their own courts, and their own law enforcement authority. *See supra* p. 7.

The sheer destructive force of Oxford Casino's arguments bears emphasis. By Oxford Casino's own admission, its theories would mean that the Settlement Acts forbid Maine from enacting "preferential [tribal] legislation of *any* kind." Pls.' Mot. at 23 (emphasis added). If that were true, the entire body of Maine Indian law—the innumerable statutes Maine has enacted specifically addressing the Nations—would be invalid. That is a result "demonstrably at odds with the intentions of" Congress when it enacted the Settlement Acts to authorize Maine's unique authority over Indian affairs. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989). Oxford Casino would transform a provision designed to expand Maine's authority over Indian affairs into a straitjacket on that very authority. The text will not bear it, the history contradicts it, and it would mark a tectonic shift in Maine law and the relationship the State and the Nations have developed over the past four decades.

### B. The Act Makes A Political Classification, Not A Racial One, And Is Subject To Rational Basis Review Under *Morton v. Mancari* And Its Progeny.

Oxford Casino's argument for strict scrutiny also fails for an even more fundamental reason: it misstates *why* federal laws directed at tribal nations are subject to rational basis review. Oxford Casino presumes—without analysis or explanation—that tribal nations are racial groups, and it treats the *Mancari* line of cases as allowing the federal government to draw tribal classifications *even though* they are racial. *See* Pls.' Mot. at 10, 11-12, 20. Not so. Rational basis review applies to tribal classifications because tribal nations are *not* racial groups—they are sovereign governments. And that is as true for tribal classifications in state laws as it is for those in federal law.

1. ***State Laws Directed At Tribal Governments Are Not Subject To Heightened Scrutiny.***

From the Founding onward, tribal nations have been recognized as "distinct, independent political communities, retaining their original natural rights." *Santa Clara Pueblo*, 436 U.S. at 55 (quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832)). The Constitution itself identifies "Indian Tribes" as governments on par with "foreign Nations" and "States." U.S. Const., art. I, sec. 8, cl. 3. Congress, in turn, "has repeatedly characterized tribes as governments." *Lac du Flambeau*, 599 U.S. at 392. "And [the Supreme] Court has long recognized tribes' governmental status as well." *Id.* at 392-93; *see also, e.g.*, *Denezpi v. United States*, 596 U.S. 591, 598 (2022) (describing tribal nations as "self-governing sovereign political communities"); *Bay Mills Indian Cmty.*, 572 U.S. at 788 (noting that tribal nations are "separate sovereigns pre-existing the Constitution").

Because tribal nations are governments, tribal-specific laws have always been understood as consistent with equal protection. In a line of cases beginning with *Mancari*, the Supreme Court has easily and repeatedly rejected equal protection challenges to tribal classifications.[13] It has explained that tribal classifications are "not even . . . 'racial,'" *Mancari*, 417 U.S. at 553, but rather "rooted in the unique status of Indians as 'a separate people,' with their own political institutions," *Antelope*, 430 U.S. at 646. Tribal classifications are therefore "political rather than racial in nature," *Mancari*, 417 U.S. at 553 n.24, and rational basis review, not strict scrutiny, is the equal protection standard, *see, e.g.*, *id.* at 555; *Antelope*, 430 U.S. at 647-48 & n.8.

---

[13] *E.g.*, *United States v. Antelope*, 430 U.S. 641, 646 (1977) (federal prosecutions); *Fisher v. Dist. Ct. of Sixteenth Judicial Dist. of Mont.*, 424 U.S. 382, 390-91 (1976) (per curiam) (tribal jurisdiction); *Moe v. Confederated Salish & Kootenai Tribes of Flathead Rsrv.*, 425 U.S. 463, 479-80 (1976) (preemption of state taxes); *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84-90 (1977) (distribution of funds); *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n.20 (1979) (fishing rights).

Oxford Casino's error is to treat this conclusion as dependent on federal authority rather than on the nature of tribal nations themselves. It draws on the unremarkable point that states generally may not exercise jurisdiction over tribal nations without congressional authorization. *See* Pls.' Mot. at 10 (citing *Washington v. EPA*, 752 F.2d 1465, 1469-70 (9th Cir. 1985)). But that is not an equal protection principle—that is a general principle concerning states' *authority* to act in Indian affairs. It says nothing about what level of equal protection scrutiny applies when a state enacts a law directed at tribal governments. *Cf. Haaland v. Brackeen*, 599 U.S. 255, 272-280, 291-96 (2023) (analyzing the power to enact an Indian law and its equal protection considerations as separate questions). For equal protection purposes, what matters is the kind of entity the state has singled out. Whether the federal government or a state draws the classification, "[a] sovereign government has no race." U.S. Opp'n to Stay Application, at *24, *W. Flagler Assocs., Ltd. v. Haaland*, 144 S. Ct. 10 (2023) (No. 23A315), 2023 WL 7042578. Courts have accordingly recognized that "[i]f, as Mancari holds, . . . an interest [in tribal self-determination] is legitimate, and a preference for Indians is constitutional for the federal government . . . , then the same must be true of a state government." *Livingston v. Ewing*, 455 F. Supp. 825, 832 (D.N.M. 1978) (rejecting equal protection challenge to state museum policy benefitting individual Native Americans), *aff'd*, 601 F.2d 1110 (10th Cir. 1979); *see also Krueth v. Indep. Sch. Dist. No. 38*, 496 N.W.2d 829, 831-32, 837, 840 (Minn. Ct. App. 1993) (upholding state classification "limited to members of federally recognized tribes" as "not racial but political," *id.* at 837).

Applied to the Economic Opportunity Act, these principles are straightforward. The Act is directed at "federally recognized Indian nation[s], tribe[s] or band[s] in th[e] State"—*i.e.*, the Wabanaki Nations. P.L. 2025, ch. 538 (8 M.R.S.A. § 1406(2)). The Nations are sovereign governments that possess "the immunities and privileges available to federally recognized Indian

23

Tribes by virtue of their Government-to-Government relationship with the United States." 91 Fed. Reg. at 4104. That is a political classification from top to bottom.

Indeed, the case for rational basis review is even stronger here than in *Mancari* itself, which upheld a hiring preference for "individual[s] [who were] one-fourth or more degree Indian blood and . . . member[s] of . . . Federally-recognized tribe[s]." 417 U.S. at 553 n.24. The Act, by contrast, is directed at tribal *governments*, not individual Indians. Oxford Casino obscures this by characterizing the Act as one that "grants the members of a racial group exclusive access to an entire sub-industry." Pls.' Mot. at 20. But that is not what the Act says. It grants licenses to the Nations as governments—not to their citizens. As the Ninth and Fourth Circuits have emphasized, the "distinction[]" between laws that "relate only to *tribes*" and laws relating "to individual Indians" is "obvious." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 734 (9th Cir. 2003) (emphasis in original); *United States v. Garrett*, 122 F. App'x 628, 632 (4th Cir. 2005) (unpublished) (same). This factor also distinguishes the Economic Opportunity Act from the state law at issue in *Yakima*, which concerned individual "tribal Indians," not strictly tribes. *Yakima*, 439 U.S. at 501; *see also id.* at 466 n.1 (quoting state law). Here, the Act is plainly authorized consistent with the *Yakima* framework, *see supra* pp. 13-21, and presents an even stronger basis for rational basis review without need for any additional federal imprimatur because it is directed solely at federally recognized tribes, *political entities as such*.

The Act's classification is also confirmed as political by the parallel federal framework at work in Maine. *Yakima* is again instructive. There, the Supreme Court applied rational basis review not just because Chapter 36 was adopted under Public Law 280's jurisdiction scheme, *but also* because Chapter 36's classifications matched the classifications drawn by federal law and by the Court's own precedents. *See* 439 U.S. at 501. Here, Congress via the Settlement Acts identified

24

each of the Wabanaki Nations by name as distinct sovereign entities subject to a unique jurisdictional framework. The Act draws the same line. And because it is political when used in the Settlement Acts, it is political in the Economic Opportunity Act as well. *See Artichoke Joe's*, 353 F.3d at 736 (determining that rational basis review applied where state law's "classifications . . . echo[ed]" those in federal law).

### 2. *Oxford Casino Mischaracterizes* KG Urban.

Oxford Casino's equal protection argument rests principally on *KG Urban*, but that decision does not support the proposition for which Oxford Casino cites it. According to Oxford Casino, *KG Urban* "held" that strict scrutiny applies to tribal-specific state laws. Pls.' Mot. at 20. *But see* FAC ¶ 6 (characterizing *KG Urban* as making a "suggesti[on]"). In fact, that preliminary-phase ruling expressly endorsed rational basis review where the *Yakima* rationale applies—as it applies here—and *denied* the plaintiff's request for preliminary relief.

*KG Urban* arose when a non-tribal casino development company brought an equal protection challenge to a Massachusetts gaming law that permitted exclusive tribal gaming in a portion of the state if the United States took land into trust for tribes in the area within a prescribed period. 693 F.3d at 4, 6-7. The appeal was heard in an expedited posture, and the First Circuit accordingly cast its analysis as an "outline[]" of "weaknesses" in each side's positions rather than a resolution of the applicable legal standards. *Id.* at 25. It ultimately affirmed the denial of plaintiff's request for a preliminary injunction, resolving the case without deciding the equal protection standard of review. *Id.* at 4, 27.

On *Yakima*, the court's observations cut entirely against Oxford Casino. The First Circuit stated that *Yakima*'s federal-approval rationale "states a sound argument where it applies." *Id.* at 20. The weakness the court identified was not in that rationale as such, but in its application: given

25

the Supreme Court's then-recent decision in *Carcieri v. Salazar*, 555 U.S. 379 (2009), there was a "serious" question whether the Secretary could take land into trust for Massachusetts tribal nations and, therefore, whether Massachusetts's law was authorized—or even prohibited—by IGRA. *KG Urban*, 693 F.3d at 10-11, 23-24. That concern has no purchase here. The Act operates within Maine's unique federal framework, and the *Yakima* rationale applies straightforwardly. *See supra* pp. 13-21.

Oxford Casino fares no better with the court's observations about *Mancari*'s scope. The First Circuit noted "doubt[]" whether "*Mancari*'s language" extends to preferential state classifications based on tribal status. *KG Urban*, 693 F.3d at 19. But the court offered that observation as part of its preliminary "outline" of the parties' relative positions, not as a holding that strict scrutiny applied—indeed, the court took care not to resolve the applicable standard of scrutiny. *Id.* at 21, 27. And for good reason: the record on that issue was thin. Massachusetts devoted minimal briefing to the equal protection merits. *See* Aplt.'s Reply Br. at 1, *KG Urb. Enters.* (1st Cir. No. 12-1233), 2012 WL 1653007 (emphasizing that Massachusetts spent most of its briefing on ancillary issues like ripeness). Neither of the affected Massachusetts tribal nations participated. *Cf. Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 560 (2018) (declining to decide "grave [Indian law] question" without tribal participation). And the court did not address the distinction between laws benefiting individual Indians and laws directed at tribal nations as sovereigns—the latter being the most straightforward case for political classification of all. *See supra* p. 24.

Oxford Casino disregards all of that. It takes *KG Urban*'s tentative, expressly hedged observations and reads them as establishing the very proposition the court did not resolve. *KG*

*Urban* did not hold that state laws concerning tribal nations trigger strict scrutiny, and this Court should decline Oxford Casino's invitation to treat it as if it did.

Indeed, Oxford Casino does not cite a *single* case that has applied strict scrutiny to a state law concerning tribal nations.[14] That is notable. State laws that classify based on tribal status are common. They existed at the time of the Founding.[15] They continued in the wake of the Fourteenth Amendment.[16] And states have adopted them unabated up to today.[17] Even the Economic Opportunity Act itself is not novel. It was preceded by the statutory provisions authorizing the Nations to operate mobile sports wagering and reserving facility sports wagering to Oxford Casino

---

[14] *Malabed v. North Slope Borough*, 42 F. Supp. 927 (D. Alaska 1999), is of no help to Oxford. *See* Pls.' Mot. at 26. The local ordinance at issue in *Malabed* was directed at individual Native Alaskans, not tribal nations. *Malabed v. N. Slope Borough*, 70 P.3d 416, 418 (Alaska 2003). And the law was ultimately struck down under Alaska's *state* constitution, which "affords greater protection to individual rights than the United States Constitution's Fourteenth Amendment." *Id.* at 420 (answering state constitutional question certified by the Ninth Circuit); *Malabed v. N. Slope Borough*, 335 F.3d 864, 867 n.2 (9th Cir. 2003) (resolving case on state constitutional grounds). Oxford Casino has dropped its state constitutional challenge. *See* Pls.' Mot. at 7.

[15] *See, e.g.*, Act for the Relief of the Indians Who are Entitled to Lands in Brothertown, ch. 22, 1796 N.Y. Laws 655, 657 (authorizing certain Indian trespass actions); *id.* at 661 (setting rules of inheritance for certain Indians); An Act in Addition to the Act for Preventing Abuses to the Indians, ch. XXXIV 3 Perpetual Laws of the Commonwealth of Massachusetts 172 (I. Thomas & E.T. Andrews eds., 1801) (enacted 1799) (rendering bonds given by Indians invalid unless entered into before two state justices of the peace); An Act Authorising the Opening and Repairing of the Road from Hamilton District to the District of Mero, ch. LXXIII, Laws of the State of Tennessee 303 (George Roulstone 1803) (enacted 1801) (exempting Indians from turnpike tolls).

[16] *See, e.g.*, An Act in Addition to an Act Concerning Domestic Relations, ch. LXXXIII, 1872 Conn. Pub. Acts 79 (authorizing apprenticeships of Indian youth lacking caretakers); An Act to prohibit the sale of ardent spirits to the Indians, ch. LXXXII, 1877 Nev. Stat. 133 (prohibiting the sale of liquors to Indians); An Act Making It Unlawful for Any Indian Connected with Any United States Indian Agency to Have in His Possession, or to Bear Firearms Beyond the Limits of the County or Counties Within Which the Reservation is Situated, S.B. No. 42, 1899 Idaho Sess. Laws 361 (regulating firearm possession by Indians "connected with any United States Indian agency").

[17] *See, e.g.*, Cal. Fish & Game Code § 7155 (setting unique rules for Yurok subsistence fishing); Colo. Rev. Stat. § 33-12-103.8 (exempting Southern Ute and Ute Mountain tribal citizens from Colorado state park entrance fees); N.M. Stat. Ann. § 22-5-4.3 (allowing tribal citizen high school students to wear traditional regalia during graduation); Wash. Rev. Code § 28B.15.541 (authorizing community colleges to waive tuition for tribal elders).

and other brick-and-mortar facilities. *See* 8 M.R.S.A. §§ 1201-1219. If there were an equal protection problem with all these state laws that draw tribal classifications, the case reporters would be filled with decisions striking them down. The absence instead is not a gap—it is the answer.

### C. Oxford Casino Does Not Dispute That the Economic Opportunity Act Survives Rational Basis Review.

Having argued—wrongly—that strict scrutiny applies, Oxford Casino never engages with rational basis review. Rational basis review requires only that the Act be rationally related to a legitimate state interest, and Oxford Casino bears the burden of "negat[ing] every conceivable basis which might support" it. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). Courts "hardly ever strike[] down a policy . . . under rational basis scrutiny," *Trump v. Hawaii*, 585 U.S. 667, 705 (2018), and Oxford Casino has not even tried to justify that extraordinary result here.

Nor could Oxford Casino do so. The Act's rational bases are easy to spot—indeed, Oxford Casino highlights some of them. *See* Pls.' Mot. at 5. First, the Economic Opportunity Act is an "economic development tool for tribal governments," 30 M.R.S.A. § 8001(1), enabling the Nations to "generate jobs and revenues to support the[ir] governmental services and programs." *Artichoke Joe's*, 353 F.3d at 741. Second, the Act provides "economic stimulus to rural areas of the State," 30 M.R.S.A. § 8001(1), as demonstrated by Maine's experience with tribally operated mobile sports wagering. Third, the Act "promote[s] cooperative relationships between the tribes and the State," *Artichoke Joe's*, 353 F.3d at 737, advancing the State's "desire to work with Tribal leaders to improve the lives and livelihoods of the Wabanaki Nations."[18] Fourth, the Act reduces

---

[18] Office of Governor Janet T. Mills, *Governor Mills Announces Bill to Create Economic Opportunities for the Wabanaki Nations to Become Law*, https://www.maine.gov/governor/mills/news/governor-mills-announces-bill-create-economic-opportunities-wabanaki-nations-becomelaw-2026 [https://perma.cc/G92T-5Z6C] (Jan. 8, 2026).

the burden on the State's finances by enabling the Nations to fund their own governmental services. Fifth, the Act fosters a well-functioning internet gaming market, as the Nations' proven track record operating mobile sports wagering make them the ideal choice to operate full internet gaming. *Cf.* P.L. 2021, ch. 681, § I-1(4) (selecting gaming operators based on "their infrastructure and experience with the conduct of wagering in the State"). And last, but by no means least, the Act remediates the Nations' historic exclusion from gaming, an exclusion that Maine actively enforced for decades while Oxford Casino and one other non-tribal operator enjoyed a monopoly. *Id.* § I-1(3). Each of these interests independently satisfies rational basis review.

For the reasons discussed above, strict scrutiny is not the proper standard of review for the Act. But even if it were, Oxford Casino's strict scrutiny arguments present "fact-dependent inquiries that are unsuitable for resolution at the pleading stage." *Duronslet v. Cnty. of Los Angeles*, 266 F. Supp. 3d 1213, 1223 (C.D. Cal. 2017). Strict scrutiny requires "close analysis" of how a challenged law "works in practice." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 313 (2013). That close examination demands a developed factual record and is impossible on a motion for judgment on the pleadings, where the court is confined to the face of the pleadings and must accept as true the State's and the Nations' denials of Oxford Casino's allegations. *See Duronslet*, 266 F. Supp. 3d at 1223 (determining that application of equal protection scrutiny was "premature").

For example, two of the rational basis interests identified above—remediating the Nations' historic gaming exclusion and advancing tribal self-government—would be highly relevant to any inquiry into strict scrutiny as well. The State applied its anti-gambling statutes specifically to prohibit the Nations from operating gaming to fund tribal governmental services. *See Stilphen*, 461 A.2d at 486-87. Indeed, the Maine Legislature expressly found the Nations had been "excluded from conducting most forms of gaming in the State." P.L. 2021, ch. 681, § I-1(2). Remedying that

specific, identified, statutory discrimination is a compelling interest. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023). And the promotion of tribal self-government is likewise a compelling interest that would warrant close review in a strict scrutiny analysis. *See Garrett*, 122 F. App'x at 633 (explaining that tribal development is "not just a legitimate, but an important government interest" (citing *Cabazon,* 480 U.S. at 216-17)). Finally, Oxford Casino's claim that the Economic Opportunity Act is not narrowly tailored raises several questions—for example, whether the Act appropriately remedies the State's intentional exclusion of the Nations from the gaming market—that cannot be resolved on a motion for judgment on the pleadings.

## II.    OXFORD CASINO IS NOT ENTITLED TO JUDGMENT ON ITS CLAIM UNDER THE DORMANT INTERSTATE COMMERCE CLAUSE (COUNT II).

Oxford Casino's fallback Dormant Commerce Clause claim fails. Pls.' Mot. at 30-33. The Economic Opportunity Act does not discriminate against out-of-state commerce or businesses, which is what the Dormant Commerce Clause proscribes. It benefits sovereign tribal nations with whom Maine has for centuries maintained a close political relationship. *See supra* pp. 5-8. The Dormant Commerce Clause has nothing to say about such laws. Oxford Casino lacks standing to press its claim, which also fails on the merits and—to boot—ignores the key differences between the Interstate Commerce Clause and Indian Commerce Clause.

### A.  Oxford Casino Lacks Standing.

Oxford Casino, to begin, lacks Article III standing. To satisfy the "irreducible constitutional minimum" of standing, Oxford Casino must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). Here, Oxford Casino fails the second requirement. Its alleged injuries are not

30

"traceable to (i.e., the result of, or a consequence of) discrimination against interstate commerce." *Coal. for Competitive Elec. v. Zibelman* ("*Coalition II*"), 906 F.3d 41, 58 (2d Cir. 2018) (citation modified). They are traceable instead to Oxford Casino's lack of tribal status.

The First Circuit's decision in *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1 (1st Cir. 2007), is on point. There, a Rhode Island law (1) limited retail liquor licenses to in-state residents, and (2) prohibited entirely licenses for franchises and chain stores. *See id.* at 10. A group of franchise stores challenged the in-state residency requirement as discriminatory in violation of the Dormant Commerce Clause. The First Circuit, however, held that the stores lacked standing because their claimed injury did not arise "in consequence of the [statute's] residency requirements per se," but rather in consequence of their status as franchise stores. *Id.* at 12. *Wine & Spirits Retailers* thus recognizes that if a Dormant Commerce Clause plaintiff would remain ineligible for the sought-after benefit even were it located in-state, the plaintiff "lack[s] standing." *Id.*

That principle decides Oxford Casino's claim. Oxford Casino observes that "license eligibility" for an Internet gaming license is limited to "federally recognized Indian nation[s], tribe[s] or band[s] *in this State.*'" Pls.' Mot. at 30 (emphasis in original) (quoting 8 M.R.S.A. § 1406(2)). Plaintiffs' ineligibility for an Internet gaming license, however, "arise[s] . . . not in consequence of the [Act's] residency requirements per se," *Wine & Spirits Retailers*, 481 F.3d at 12, but from the fact that "they are not . . . federally recognized Indian Tribes," FAC ¶ 9. That is particularly clear here because (similar to *Wine & Spirits Retailers*) two of the three Plaintiffs—Oxford Casino Hotel and BB Development, LLC—*are* in-state entities, FAC ¶¶ 13-14, which underscores that no plaintiff has suffered an injury that is traceable to any "discrimination against interstate commerce." *Coalition II*, 906 F.3d at 58 (no standing where plaintiffs would be ineligible for the benefit even if the law had no in-state preference); *see Wine & Spirits Retailers*, 481 F.3d

31

at 12; *cf., e.g.*, *Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 662 (7th Cir. 2015) (no standing where injuries "would continue to exist even if the [challenged law] were cured of all of its alleged infirmities").

Oxford Casino's claim also falls outside "the zone of interests to be protected . . . by" the Dormant Commerce Clause. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982). The Clause provides for "the protection of *out-of-state* economic interests," *Coal. for Competitive Elec. v. Zibelman* ("*Coalition I*"), 272 F. Supp. 3d 554, 582 (S.D.N.Y. 2017), *aff'd on Article III grounds by Coalition II*, 906 F.3d 41. Here, however, "[P]laintiffs' [alleged] injury [i]s 'not related to any out-of-state characteristic of their business,'" but the fact that they are not federally recognized tribal nations. *Id.* (quoting *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 500 (5th Cir. 2004)).

**B. Oxford Casino's Dormant Commerce Clause Claim Fails on the Merits.**

Oxford Casino's claim also fails on the merits. Oxford Casino simply asserts that the Act "facially discriminates against out-of-state economic actors." Pls.' Mot. at 31. But Oxford Casino ignores the crucial "threshold question": whether Plaintiffs and the Wabanaki Nations are "similarly situated for constitutional purposes." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). The Dormant Commerce Clause, like other antidiscrimination doctrines, "assumes a comparison of substantially similar entities." *Id.* at 298. And Plaintiffs here—private for-profit corporations—are not similarly situated to the Wabanaki Nations, which are not private businesses but sovereign governments. *See supra* pp. 4-5.

Oxford Casino's own brief makes the point clear. Oxford Casino contends that, under MIA, "the [Wabanaki Nations] . . . are treated just like *any other municipality* in the State" of Maine. Pls.' Mot. at 23 (emphasis added). As a result, under Oxford Casino's own view, the Economic

32

Opportunity Act operates as a "[l]aw[] favoring local government," *not* as a law "favor[ing] in-state business over out-of-state competition." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007); *see id.* at 342 (explaining that "municipalities are not private businesses—far from it"). Such laws, which "treat[] in-state private business interests exactly the same as out-of-state ones" and "may be directed toward any number of legitimate goals unrelated to protectionism," do not violate the Dormant Commerce Clause. *Id.* at 330, 345. Any other result "would lead to unprecedented and unbounded interference by the courts with state and local government," *id.* at 343—as well as *tribal* governments, as here—while doing nothing to advance the Dormant Commerce Clause's purpose of "safeguard[ing] against state protectionism," *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 370 (2023).

Moreover, the Dormant Commerce Clause prohibits only differential treatment based on geography, not other sorts of distinctions. *See Wine & Spirits Retailers*, 481 F.3d at 11-12. Here, Oxford Casino relies on the Act's reference to "federally recognized Indian nation[s], tribe[s] or band[s] *in this State*." Pls.' Mot. at 31-32 (quoting 8 M.R.S.A. § 1406(2) (emphasis in Plaintiffs' brief)). But as the Nations have explained, that phrase here operates as a *political* rather than a geographic classification: It identifies the four Wabanaki Nations—separate sovereigns with which Maine maintains, with Congress's blessing, a distinctive political relationship. It does not draw a line between in-state and out-of-state *private businesses*, which is what the Dormant Commerce Clause proscribes. *See Wine & Spirits Retailers*, 481 F.3d at 10. *All* non-tribal gaming operators, whether or not located in Maine, are ineligible for Internet gaming licenses, and thus "there is no unequal treatment." *Garrett*, 122 F. App'x at 634. Laws "which treat in-state private business interests exactly the same as out-of-state ones, do not 'discriminate against interstate commerce' for purposes of the dormant Commerce Clause." *United Haulers*, 550 U.S. at 345.

33

That fact distinguishes this case from *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978), which Oxford Casino cites, *see* Pls.' Mot. at 33. As *United Haulers* recognized, *Philadelphia* involved a classic case of "a law favor[ing] in-state business over out-of-state competition." *United Haulers*, 550 U.S. at 343; *see Philadelphia*, 437 U.S. at 628 ("the State ha[d] overtly moved to slow or freeze the flow of [interstate] commerce for protectionist reasons"). This case is instead like *United States v. Garrett*, 122 F. App'x 628. In that case, North Carolina "permit[ed] Native American-run gambling on tribal lands, but den[ied] [that privilege] to all other citizens." *Id.* at 631. As the Fourth Circuit recognized, because the law's application "depend[ed] on . . . [tribal] status" rather than "residence inside or outside of North Carolina," it did not involve "unequal treatment vis-à-vis North Carolinians and residents of other states," and so did not violate the Dormant Commerce Clause. *Id.* at 634. So too here.[19]

### C.  Oxford Casino Wrongly Ignores the Indian Commerce Clause.

Finally, constitutional structure makes clear that the dormant aspect of the Interstate Commerce Clause cannot be imported to invalidate the Economic Opportunity Act. Oxford Casino argues that the Interstate Commerce Clause impliedly forbids states from treating tribal nations differently from nontribal private businesses; if the Clause did not impose such a prohibition, Oxford Casino could have no claim. But the Constitution itself draws a distinction between "Commerce . . . among the several States" and "Commerce . . . with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. No sensible reading of the Interstate Commerce Clause could prohibit the very same distinction that the Constitution itself draws via the separate *Indian* Commerce Clause.

---

[19] Application of strict scrutiny under the Dormant Commerce Clause would be premature in any event, as explained above, *see supra* pp. 29-30.

34

**CONCLUSION**

The Court should deny Oxford Casino's motion for judgment on the pleadings.


Respectfully submitted this 12th day of June, 2026.

/s/ *Leonard R. Powell*

Melissa Hewey                     Leonard R. Powell*
DRUMMOND WOODSUM                  NATIVE AMERICAN RIGHTS FUND
84 Marginal Way, Suite 600        950 F Street, NW, Suite 1050
Portland, ME 04101                Washington, D.C. 20004
(207) 253-0528                    (202) 785-4166
mhewey@dwmlaw.com                 powell@narf.org

                                  Matthew Campbell*
                                  Allison Neswood*
                                  NATIVE AMERICAN RIGHTS FUND
                                  250 Arapahoe Ave.
                                  Boulder, CO 80302
                                  (303) 447-8760
                                  mcampbell@narf.org
                                  neswood@narf.org

                                  *Admitted pro hac vice*

          Counsel for Defendant-Intervenors