**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| OXFORD CASINO HOTEL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MILTON F. CHAMPION, <br><br> Defendant, <br><br> HOULTON BAND OF MALISEET INDIANS, MI'KMAQ NATION, PASSAMAQUODDY TRIBE, and PENOBSCOT NATION, <br><br> Intervenor-Defendants. | No. 1:26-cv-00046-LEW |

**AMICUS BRIEF OF THE CALIFORNIA GAMING ASSOCIATION IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S AND INTERVENOR-DEFEND-ANTS' MOTIONS FOR SUMMARY JUDGMENT**

*/s/Patrick Strawbridge*
Patrick Strawbridge (ME Bar #10024)
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02019
(703) 243-9423
patrick@consovoymccarthy.com


*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

Table of Authorities .........................................................................................................................ii

Interest of Amicus Curiae ................................................................................................................1

Introduction & Summary of Argument ...........................................................................................2

Argument .........................................................................................................................................5

    I.     Maine's iGaming law is a racial classification that cannot survive strict scrutiny. .....................5

    II.    *Mancari* does not apply to state-law Indian preferences, and should not be extended to race-based occupational-licensing regimes and commercial monopolies. ..........................................11

    III.  *Mancari* was egregiously wrong and should be confined to its specific facts. ...........................15

Conclusion .....................................................................................................................................24

Certificate of Service ....................................................................................................................25

i

## TABLE OF AUTHORITIES

**Cases**

*Abood v. Detroit Bd. of Educ.*,
  431 U.S. 209 (1977) ...................................................................................................19

*Adarand Constructors v. Pena*,
  515 U.S. 200 (1995) .............................................................................................passim

*Adoptive Couple v. Baby Girl*,
  570 U.S. 637 (2013) ...................................................................................................17

*Afroyim v. Rusk*,
  387 U.S. 253 (1967) ...................................................................................................18

*Allen v. Milligan*,
  146 S. Ct. 1377 (2026) ......................................................................................5, 15, 17

*Apadoca v. Oregon*,
  406 U.S. 404 (1972) ...................................................................................................19

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ...................................................................................................20

*Brackeen v. Haaland*,
  994 F.3d 249 (5th Cir. 2021) .....................................................................................23

*Brown v. Board of Education*,
  347 U.S. 483 (1954) ...................................................................................................17

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) .....................................................................................................8

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ...................................................................................................17

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) ..............................................................................................10, 17

*Craig v. Boren*,
  429 U.S. 190 (1976) ...................................................................................................20

*Crawford v. Washington*,
  541 U.S. 36 (2004)......................................................................................................19

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ...................................................................................................19

*Fisher v. Univ. of Texas at Austin*,
  570 U.S. 297 (2013) ...................................................................................................17

*Fisher v. Univ. of Texas at Austin*,
  579 U.S. 365 (2016) ...................................................................................................17

*Franchise Tax Bd. of California v. Hyatt*,
  587 U.S. 230 (2019) ...................................................................................................19

*Furman v. Georgia*,
    408 U.S. 238 (1972) ...............................................................................................................19

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) .......................................................................................................... 17, 23

*Gregg v. Georgia*,
    428 U.S. 153 (1976) ...............................................................................................................19

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ...............................................................................................................17

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) .......................................................................................................... 18, 23

*Hernandez v. Texas*,
    347 U.S. 475 (1954) ...............................................................................................................18

*Hirabayashi v. United States*,
    320 U.S. 81 (1943) .................................................................................................................18

*In re Santos Y.*,
    92 Cal. App. 4th 1274 (Cal. Ct. App. 2001) ........................................................................15

*In re Taylor*,
    48 Md. 28 (Md. 1877) .............................................................................................................3

*Janus v. AFSCME*,
    585 U.S. 878 (2018) ...............................................................................................................19

*Johnson v. California*,
    543 U.S. 499 (2005) ...............................................................................................................17

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ...............................................................................................................19

*KG Urban Enterprises v. Patrick*,
    693 F.3d 1 (1st Cir. 2012) ..............................................................................................3, 12, 13

*Korematsu v. United States*,
    323 U.S. 214 (1944) ...............................................................................................................17

*Kornhass Construction v. Oklahoma*,
    140 F. Supp. 2d 1232 (W.D. Okla. 2001) ............................................................................15

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ...............................................................................................................19

*Louisiana v. Callais*,
    146 S. Ct. 1131 (2026) ...........................................................................................................19

*Loving v. Virginia*,
    388 U.S. 1 (1967) ............................................................................................................... 6, 17

*Malabed v. North Slope Borough*,
    42 F. Supp. 2d 927 (D. Alaska 1999) ...................................................................................15

iii

*McLaughlin v. State of Fla.*,
    379 U.S. 184 (1964) ...................................................................................................17

*Minor v. Happersett*,
    88 U.S. (21 Wall.) 162 (1875) ..................................................................................18

*Montoya v. United States*,
    180 U.S. 261 (1901) ......................................................................................6, 7, 10, 16

*Morton v. Mancari*,
    417 U.S. 535 (1974) ...........................................................................................passim

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) .................................................................................................20

*Nevada v. Hall*,
    440 U.S. 410 (1979) .................................................................................................19

*Ohio v. Roberts*,
    448 U.S. 56 (1980)...................................................................................................19

*Palmore v. Sidoti*,
    466 U.S. 429 (1984) .................................................................................................17

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) .............................................................................................17, 23

*Plessy v. Ferguson*,
    163 U.S. 537 (1896) .............................................................................................15, 17

*Ramos v. Louisiana*,
    590 U.S. 83 (2020)...................................................................................................19

*Regents of Univ. of California v. Bakke*,
    438 U.S. 265 (1978) .............................................................................................17, 19

*Rice v. Cayetano*,
    528 U.S. 495 (2000) ...........................................................................................passim

*Roe v. Wade*,
    410 U.S. 113 (1973) .................................................................................................19

*Saint Francis Coll. v. Al-Khazraji*,
    481 U.S. 604 (1987) .............................................................................................17, 18

*SFFA v. Harvard*,
    600 U.S. 181 (2023) ...........................................................................................passim

*Shaw v. Hunt*,
    517 U.S. 899 (1996) .................................................................................................17

*Shaw v. Reno*,
    509 U.S. 630 (1993) .................................................................................................17

*Tafoya v. Albuquerque*,
    751 F. Supp. 1527 (D.N.M. 1990).............................................................................14

iv

*United States v. Candelaria,*
  271 U.S. 432 (1926) ...................................................................................................15, 16

*United States v. Gillis,*
  938 F.3d 1181 (11th Cir. 2019) ...............................................................................13

*United States v. Sandoval,*
  231 U.S. 28 (1913)....................................................................................................6, 7

*W. Flagler Assocs. v. Haaland,*
  144 S. Ct. 10 (2023) .........................................................................................9, 18, 23

*W. Flagler Assocs. v. Haaland,*
  71 F.4th 1059 (D.C. Cir. 2023) ...................................................................................4

*Washington v. Confederated Bands & Tribes of Yakima Indian Nation,*
  439 U.S. 463 (1979) ...................................................................................................12

*Williams v. Babbitt,*
  115 F.3d 657 (9th Cir. 1997) ....................................................................4, 5, 12, 23

*Wygant v. Jackson Bd. of Educ.,*
  476 U.S. 267 (1986) ...................................................................................................17

**Statutes**

8 U.S.C. §1359 ..................................................................................................................6

16 U.S.C. §3101 ...............................................................................................................27

42 U.S.C. §2000e-2 ..........................................................................................................6

8 M.R.S.A. §1401 .............................................................................................................3

8 M.R.S.A. §1402 .............................................................................................................3

8 M.R.S.A. §1403 .............................................................................................................3

8 M.R.S.A. §1404 .............................................................................................................3

8 M.R.S.A. §1405 .............................................................................................................3

8 M.R.S.A. §1406 .........................................................................................................3, 7

8 M.R.S.A. §1407 .............................................................................................................3

8 M.R.S.A. §1408 .............................................................................................................3

8 M.R.S.A. §1409 .............................................................................................................3

8 M.R.S.A. §1410 .............................................................................................................3

8 M.R.S.A. §1411 .............................................................................................................2

8 M.R.S.A. §1412 .............................................................................................................2

8 M.R.S.A. §1413 .............................................................................................................2

8 M.R.S.A. §1414 .............................................................................................................2

8 M.R.S.A. §1415 .............................................................................................................2

8 M.R.S.A. §1416 .............................................................................................................2

8 M.R.S.A. §1417 ...................................................................................................................................2

17-A M.R.S.A. §1604 ...........................................................................................................................4

17-A M.R.S.A. §1704 ...........................................................................................................................4

17-A M.R.S.A. §1705 ...........................................................................................................................4

17-A M.R.S.A. §954 .............................................................................................................................4

**Regulations**

8 C.F.R. §289.1 ....................................................................................................................................4

25 C.F.R. §273.112 ..............................................................................................................................4

25 C.F.R. §83.1 ....................................................................................................................................6

**Constitutional Provisions**

Cal. Const. art. IV ...............................................................................................................................1

U.S. Const. amend. XIV ......................................................................................................................2

**Other Authorities**

124 Cong. Rec. 14,162 (1978) (Statement of Rep. John F. Seiberling) .........................................21

146 Cong. Rec. E1864 (Oct. 19, 2000) ............................................................................................21

154 Cong. Rec. S987 (Feb. 13, 2008) ..............................................................................................21

I Navajo Nation Code, §701 .............................................................................................................16

Bogen, *The Transformation of the Fourteenth Amendment: Reflections from the Admission of Maryland's First Black Lawyers*, 44 Md. L. Rev. 939 (1985) ..................................................................... 3, 9, 10

Cong. Globe 2459 ...............................................................................................................................2

Constitution of the Passamaquoddy Tribe art. III, §1 ......................................................................6

*Constitutionality of Race-Based Department of Education Programs*, 49 Op. O.L.C. __ (Dec. 2, 2025) ..........22

Frickey, *Adjudication and Its Discontents: Coherence and Conciliation in Federal Indian Law*, 110 Harv. L. Rev. 1754 (1997) ..............................................................................................................16

Gila River Indian Cmty. Const. art. III, §1 ....................................................................................16

H.P. 769, 132nd Me. Leg. (2025) .....................................................................................................2

H.R. Rep. No. 95-1386 (1978) .........................................................................................................21

Houlton Band of Maliseet Indians Enrollment Statute §4 ...............................................................7

*Membership*, Mi'kmaq Nation, perma.cc/C49R-RREW (archived May 8, 2026) .......................6

Memorandum for Andrew Fois, *Re: HHS Report on H.R. 1833, Tribal Self-Governance Amendments of 1997* (O.L.C. Oct. 30, 1997) ...................................................................................................22

Memorandum for Dick Thornburgh, *Re: Indian Racial Preferences* (O.L.C. Mar. 19, 1990) .....................22

Memorandum for Sheryl L. Walter, *Re: H.R. 1, No Child Left Behind Act (Elementary and Secondary Education Act of 1965 Reauthorization)* (O.L.C. Apr. 5, 2001) ..............................................................22

Off. of Governor Janet T. Mills, *Governor Mills Announces Bill to Create Economic Opportunities for the Wabanaki Nations to Become Law* (Jan. 8, 2026) ................................................................. 2, 10

Penobscot Nation Tribal Census Maintenance Procedure §1.6 ................................................................. 6

*Peyote Exemption for Native American Church*, 5 Op. O.L.C. 403 (1981) ........................................................ 22

Pub. L. No. 112-157, 126 Stat. 1213 (2012) ................................................................................................. 16

Spruhan, *A Legal History of Blood Quantum in Federal Indian Law to 1935*, 51 S.D. L. Rev. 1 (2006) ...... 16

U.S. Census Bureau, *Maine QuickFacts*, perma.cc/98LY-X7TW (archived May 27, 2026) ...................... 2

## INTEREST OF AMICUS CURIAE[1]

The California Gaming Association ("CGA") is a non-profit trade association made up of over 90% of California's state-licensed cardrooms and third-party providers. CGA members generate approximately $5.6 billion of economic impact, 20,000 jobs, and $500 million of tax revenue for the communities in which they operate. CGA members are also one of the leading sources of general fund revenue used by many local jurisdictions to provide essential community services. CGA's mission includes monitoring legislation and regulation and taking legal action to protect its members' interests.

CGA and its members have an interest in upholding fundamental constitutional principles of equality before the law, especially with respect to the industry in which they participate. They recognize that "'[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *SFFA v. Harvard*, 600 U.S. 181, 208 (2023). They know that "'it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities.'" *Id.* at 220. And they believe that "[e]liminating racial discrimination means eliminating all of it." *Id.* at 206.

Maine's iGaming law flouts these principles by creating an unlawful occupational licensing regime in which a person's eligibility to participate in the industry turns on race and ancestry. CGA, whose members have experienced the harms caused by race-based commercial monopolies firsthand, *see* Cal. Const. art. IV, §19(f), has an interest in combatting the spread of race-based occupational licensing around the country.

---

[1] No party's counsel authored this brief in whole or in part. And no party, party's counsel, or person (other than amicus, its members, or its counsel) contributed money to fund this brief's preparation or submission.

1

Plaintiffs are not asking for special treatment; they just want the opportunity to compete on a level playing field without having to prove their race and ancestry to a state regulator. CGA and its members agree that the Constitution demands as much and compels a ruling for Plaintiffs.

### INTRODUCTION & SUMMARY OF ARGUMENT

The Fourteenth Amendment states that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1. The Amendment's Framers were determined that the Constitution "'should not permit any distinctions of law based on race or color,'" *SFFA*, 600 U.S. at 202 (quoting Supp. Brief for United States on Reargument in *Brown v. Board of Education*, O. T. 1953, No. 1 etc., p. 41), "because any 'law which operates upon one man [should] operate equally upon all,'" *id.* (quoting Cong. Globe 2459 (statement of Rep. Stevens)). Thus, the Amendment's "clear and central purpose … was to eliminate all official state sources of invidious racial discrimination in the States." *Id.* at 206. "'Purchased at the price of immeasurable human suffering,'" our colorblind Constitution "recognizes that classifications based on race lead to ruinous consequences." *Id.* at 261 (Thomas, J., concurring).

Notwithstanding this foundational prohibition, last year Maine adopted "An Act to Create Economic Opportunity for the Wabanaki Nations Through Internet Gaming," H.P. 769, 132nd Me. Leg., *to be codified at* 8 M.R.S.A. §§1401-1417. Although Maine has over 1.4 million residents, the iGaming law grants four Indian tribes with fewer than 10,000 total members (less than 0.7% of the state's population), a race- and ancestry-based monopoly over internet gaming. *See* U.S. Census Bureau, *Maine QuickFacts*, perma.cc/98LY-X7TW (archived May 27, 2026). Governor Janet Mills explained the law's purpose in blunt identitarian terms: "offering life-changing revenue for Tribal communities." Off. of Governor Janet T. Mills, *Governor Mills Announces Bill to Create Economic Opportunities for the Wabanaki Nations to Become Law* (Jan. 8, 2026), perma.cc/8YR2-GRRM. To that end, the new law restricts iGaming licenses to Maine's four federally recognized Indian tribes and in-state businesses wholly owned

by those tribes. 8 M.R.S.A. §1406.2. Anyone else who engages in iGaming operations faces criminal liability, including up to ten years in prison and tens of thousands of dollars in fines per count of aggravated unlawful gambling. *See* 17-A M.R.S.A. §§954, 1604, 1704-05.

This is not the first time that a state has tried to inject race and ancestry into occupational licensing to create a commercial monopoly. *See In re Taylor*, 48 Md. 28, 31 (Md. 1877) (Maryland law "limiting the right of admission to the bar to white men"). But "[t]he Constitution abhors classifications based on race," and such schemes are presumptively unlawful. *SFFA*, 600 U.S. at 261-62 (Thomas, J., concurring). To overcome this presumption of unconstitutionality, a racial classification "must survive a daunting two-step examination known [as] 'strict scrutiny.'" *Id.* at 206. Race-based occupational licensing and commercial monopolies, which pick winners and losers by fencing members of certain ethnic groups out of certain economic activities, decisively fail strict scrutiny and "fail to comply with the twin commands of the Equal Protection Clause that race may never be used as a 'negative' and that it may not operate as a stereotype." *Id.* at 218. Thus, although this suit was filed more than 140 years after courts struck down Maryland's race-based attorney-licensing law on equal protection grounds, the result should be the same. *See* Bogen, *The Transformation of the Fourteenth Amendment: Reflections from the Admission of Maryland's First Black Lawyers*, 44 Md. L. Rev. 939, 1039-40 (1985).

There is no credible argument that the iGaming law satisfies strict scrutiny, so the State and the Intervenors insist on a different test—arguing that the iGaming law is presumptively constitutional because it involves Indian tribes. *See* Champion-MSJ at 13-14 (citing *Morton v. Mancari*, 417 U.S. 535 (1974)); Intervenors-MSJ 3, 16-20 (same). Not so. For starters, *KG Urban Enterprises v. Patrick*, 693 F.3d 1 (1st Cir. 2012), not *Mancari*, is the most on-point precedent addressing *state-law* Indian preferences. But even if *Mancari* applied, nothing justifies extending its "limited exception" for certain federal employment programs to the "new and larger dimension" of race-based occupational licensing and commercial monopolies. *Rice v. Cayetano*, 528 U.S. 495, 520 (2000).

*Mancari* was a "sui generis" decision involving "a specific provision applying to a very specific situation." 417 U.S. at 550, 554. That decision turned on the "unique fashion" in which the Department of the Interior governed Indians' "lives and activities" and the perception that BIA employment preferences were "directed to participation by the governed in the governing agency." *Id.* at 554. Thus, "[t]he opinion was careful to note … that the case was confined to the authority of the BIA." *Rice*, 528 U.S. at 520. The Supreme Court did not hold that all Indian employment preferences are constitutional, *Mancari*, 417 U.S. at 554 (conceding that creating a "blanket exemption for Indians from all civil service examinations" would pose an "obviously more difficult question"), much less endorse race-based occupational licensing and commercial monopolies, *see Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997).

Limited as it was, *Mancari* has aged poorly. Each year, Indian preferences inflict untold harm on Americans because of their race and ancestry. The Johnson-O'Malley Act provides educational funding for students, but only those who are members of an Indian tribe or "[a]t least one-fourth … degree Indian blood descendant of a member of an Indian Tribe." 25 C.F.R. §273.112 (c)(1). Title VII allows businesses "on or near a reservation" to adopt "non-Indians-need-not-apply" policies that would otherwise be plainly illegal. 42 U.S.C. §2000e-2(i). States negotiate race-based commercial monopolies over a range of productive economic activities under the Indian Gaming Regulatory Act. *E.g.*, *W. Flagler Assocs. v. Haaland*, 71 F.4th 1059 (D.C. Cir. 2023). Indian preferences even touch immigration law, with Canadians of "at least 50 per centum of blood of the American Indian race" boasting exemptions from many requirements of the Immigration and Nationality Act. 8 U.S.C. §1359; 8 C.F.R. §289.1.

Like past systems of *de jure* discrimination, these preferences inject race and ancestry into nearly every facet of ordinary life—obtaining an education, earning a living, starting a business, adopting a child, and even immigrating to the United States. The government treating even one person differently

4

because of his race or ancestry is repugnant to "our colorblind Constitution." *Allen v. Milligan*, 146 S. Ct. 1377, 1380 (2026). Treating millions of Americans differently as part of a formal program of preferencing Indians is worse, not better.

Proponents of these policies have often attempted to justify them by invoking *Mancari*'s "limited exception" to strict scrutiny. As noted, *Mancari* is plainly inapplicable here even by its own terms. But if that decision is found to bind the Court, it should ultimately be overruled. The Supreme Court's departure from longstanding equal protection doctrine was egregiously wrong when decided and has been further undermined by intervening developments in the law. "[W]henever the government treats *any person* unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors v. Pena*, 515 U.S. 200, 229-30 (1995) (emphasis added). For such an injury to be constitutionally justifiable, the government must satisfy strict scrutiny—no exceptions. *Id.*; *see also SFFA*, 600 U.S. at 206-07. The "logical implicatio[n]" is clear: "*Mancari*'s days are numbered." *Williams*, 115 F.3d at 665.

At a minimum, *Mancari* is an outlier in the law and there is surely no justification to *extend* its reasoning to any new context, much less the sweeping new context of race-based occupational licensing and commercial monopolies. *See Rice*, 528 U.S. at 520; *Williams*, 115 F.3d at 665. The Court should apply strict scrutiny, hold that Maine's iGaming law violates the Equal Protection Clause, and deny the Defendants' motions for summary judgment.

## ARGUMENT

### I.    Maine's iGaming law is a racial classification that cannot survive strict scrutiny.

**1.** "'[R]acial discrimination' is that which singles out 'identifiable classes of persons ... solely because of their ancestry or ethnic characteristics.'" *Rice*, 528 U.S. at 515. Maine's iGaming law limits licenses to "federally recognized Indian nation[s], tribe[s] or band[s] in th[e] State." 8 M.R.S.A. §1406.2. It is well-settled that "Indian" classifications are "racial" classifications. *Loving v. Virginia*, 388 U.S. 1,

5

2, 5 & n.4 (1967). Classifications that turn on an individual's membership in a federally recognized Indian tribe or a group's status as a federally recognized Indian tribe, like the classification in the iGaming law, are no different.

The Interior Department's tribal recognition regulations require that any group petitioning for federal recognition must prove that its "membership consists of individuals who descend from a historical Indian tribe." 25 C.F.R. §83.11(e). Though no statute authorizes the Department to use descent (or any other substantive factor) as a basis for recognition, the practical reason for doing so is obvious: Congress cannot "bring a community or body of people within the range of [its power over Indians] by arbitrarily calling them an Indian tribe." *United States v. Sandoval*, 231 U.S. 28, 46 (1913). Indeed, the Supreme Court has explained that, rather than reaching any group of persons that Congress decides to call a "tribe," the legislative branch's power over Indian tribes extends only to a definition of "tribe" meaning "a body of Indians *of the same or a similar race*, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." *Montoya v. United States*, 180 U.S. 261, 266 (1901) (emphasis added). "Ancestral tracing of this sort achieves its purpose by creating a legal category which employs the same mechanisms … as laws or statutes that use race by name." *Rice*, 528 U.S. at 517. In other words, "[a]ncestry can be a proxy for race." *Id.* at 514. When a classification turns on an individual's membership in or a group's status as a federally recognized Indian tribe, tribal ancestry "is that proxy." *Id.*

Examining Maine's four federally recognized Indian tribes proves the point. The Penobscot Nation and the Passamaquoddy Tribe explicitly require a 25% blood quantum for membership. *See* Penobscot Nation Tribal Census Maintenance Procedure §1.6, perma.cc/YCR3-ADXH (archived May 8, 2026); Constitution of the Passamaquoddy Tribe art. III, §1, at 2, perma.cc/V7SV-5HUG (archived May 8, 2026). The Mi'kmaq Nation requires documented Mi'kmaq ancestry. *See Membership*, Mi'kmaq Nation, perma.cc/C49R-RREW (archived May 8, 2026). And the Houlton Band of Maliseet

Indians requires direct lineal descent from a 1980 base enrollee, or from a currently enrolled collateral member. *See* Who Is Eligible to Become a Member of the Houlton Band of Maliseet Indians?, perma.cc/6ADV-9YQH (archived May 8, 2026). The purpose of these requirements is "to treat [members of Maine's Indian tribes] as a distinct people, commanding their own recognition and respect." *Rice*, 528 U.S. at 515. By linking eligibility for an iGaming license with membership in a federally recognized Indian tribe, Maine "has used ancestry as a racial definition and for a racial purpose." *Id.*

*Mancari*, in a footnote, suggested that a BIA employment preference that required applicants to be "one-fourth or more degree Indian blood and be a member of a Federally-recognized tribe" was "not directed towards a 'racial' group consisting of 'Indians'" and thus "political rather than racial in nature" because it "exclude[d] many individuals who are racially to be classified as 'Indians.'" 417 U.S. at 553 n.24. The Supreme Court has since acknowledged that this characterization was factually inaccurate and that "the classification [in *Mancari*] had a racial component." *Rice*, 528 U.S. at 519. The Court also rejected *Mancari*'s suggestion that a statutory definition must include every member of a racial group for the resulting classification to discriminate based on race.

Repudiating the logic of *Mancari*'s footnote, *Rice* correctly held that "[s]imply because a class defined by ancestry does not include all members of the race does not suffice to make the classification race neutral." *Id.* at 516-17. Because establishing a group's shared race and ancestry is a predicate to federal recognition as an Indian tribe under the Interior Department's regulations and the Supreme Court's limits on Congress's plenary power, this insight should apply just as much to classifications that turn on tribal membership or status. *See* 25 C.F.R. §83.11(e); *Sandoval*, 231 U.S. at 46; *Montoya*, 180 U.S. at 266. When used to allocate government benefits and burdens, "[t]he ancestral inquiry mandated by [such classifications] implicates the same grave concerns as a classification specifying a particular race by name" or including an explicit blood quantum requirement. *Rice*, 528 U.S. at 517. Any argu-

7

ment that such classifications are race-neutral is fatally "undermined by [the] express racial purpose" of the rules for determining what a "tribe" is in the first place. *Rice*, 528 U.S. at 517.

To sum up, the iGaming law *does* "utilize a race-based classification" and "preference members of one racial group." *Contra* Maine-MSJ 13.

**2.** Because the iGaming law classifies based on race and ancestry, it "must survive a daunting two-step examination known [as] 'strict scrutiny,'" *SFFA*, 600 U.S. at 206-07. Strict scrutiny is "the most demanding test known to constitutional law," so that is no easy task. *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). To pass constitutional muster, Maine must prove that the iGaming law's race- and ancestry-based occupational licensing scheme is "narrowly tailored" to further a "compelling interest." *SFFA*, 600 U.S. at 206-07. The State does not come close on either point, and the Intervenors do not even try.

Maine has not identified any compelling interest sufficient to justify imposing an "Indians-only" rule for holding iGaming licenses. The Supreme Court "ha[s] identified only two compelling interests" that satisfy strict scrutiny. *Id.* at 207. "One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the other is "avoiding imminent and serious risks to human safety in prisons." *Id.* Neither exists here. Indeed, Maine has not even attempted to produce evidence of "specific" "past discrimination" to justify its conclusion that only tribes should be able to conduct iGaming. The most the State can muster is a vague suggestion that the iGaming law will "improv[e] the historic imbalance in Maine's gaming industry, which largely has excluded any opportunities for the Wabanaki Nations." Maine-MSJ 3. But the State's only evidence of "exclu[sion]" appears to be that the voters rejected a referendum proposal that would have approved a tribal casino in 2003. Maine-MSJ 7, 20. There is no evidence that the 2003 referendum "violated the Constitution or a statute," much less that it was tainted by racial animus against Indian

8

tribes. *Contra SFFA*, 600 U.S. at 207. The State may wish that Mainers had voted differently in 2003, but that does not justify present-day discrimination against non-Indian internet gaming concerns.

The State also argues that the iGaming law is designed to "support [its in-state Indian tribes'] sovereignty and economic development." Maine-MSJ 2. Like the nebulous diversity interests that the Supreme Court found insufficient to justify race-conscious admissions, these interests "are not sufficiently coherent for purposes of strict scrutiny." *SFFA*, 600 U.S. at 214. "At the outset, it is unclear how courts are supposed to measure any of these goals." *Id.* "How is a court to know whether" an Indian tribe's "sovereignty" is sufficiently supported, or its economy sufficiently developed? *Id.* And "[e]ven if [Maine's] goals could somehow be measured, … how is a court to know when they have been reached, and when the perilous remedy of racial preferences may cease?" *Id.* "There is no particular point at which there exists sufficient" sovereignty or economic development. *Id.* at 214-215. If such vague interests could justify race-based occupational licensing laws, Maine could just as easily prohibit non-Indians from being licensed as lawyers, doctors, or members of any other particularly lucrative profession. Those examples, like the nineteenth century bans on non-white attorneys, would be patently unconstitutional. *See* Bogen, *Reflections from the Admission of Maryland's First Black Lawyers*, *supra*, at 1039-40. The only difference between them and Maine's iGaming law is that the latter deals with gaming. But there is no "Indian gaming" exception to the Equal Protection Clause. *See W. Flagler Assocs. v. Haaland*, 144 S. Ct. 10 (2023) (Kavanaugh, J., statement respecting the denial of application for stay) ("To the extent that a separate [state] statute … authorizes the Seminole Tribe—and only the Seminole Tribe—to conduct certain off-reservation gaming operations in Florida, the state law raises serious equal protection issues.").

The iGaming law is not narrowly tailored either. In *SFFA*, the Supreme Court explained that Harvard's race-conscious admissions policies did not satisfy strict scrutiny because they "fail[ed] to comply with the twin commands of the Equal Protection Clause that race may never be used as a

9

'negative' and that it may not operate as a stereotype." 600 U.S. at 218. The iGaming law has the same deficiencies. To state the obvious, a blanket exclusion of non-Indians from holding iGaming licenses acts as a "negative" for non-Indians, just like the exclusion of non-whites from the Maryland Bar operated as a negative for non-white attorneys seeking admission. *Id.* at 218-19; Bogen, *Reflections from the Admission of Maryland's First Black Lawyers*, *supra*, at 1039-40.

By barring all non-Indians (and businesses not wholly owned by Indians) from obtaining an iGaming license, Maine has effectively used occupational licensing to impose an unconstitutional racial "quota." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507 (1989). The quota operates as a racial stereotype—pigeonholing Indians into the iGaming industry (and non-Indians out of it) without regard to merit or proclivity. But the fact that the Intervenors are Indian tribes has no bearing on whether they can expect to operate a successful iGaming business. Nor does the fact that Oxford Casino and Churchill Downs are *not* wholly owned by tribes cast doubt on their ability to run an iGaming business well. Indeed, a person's membership in "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory" says absolutely nothing about their ability to run a business of *any* sort. *Montoya*, 180 U.S. at 266. Neither does the fact that a group's "membership consists of individuals who descend from a historical Indian tribe." 25 C.F.R. §83.11(e).

The State's only rationale for distinguishing between iGaming license applicants based on these categories is that, when the applicant is a tribe or business wholly owned by a tribe, the resulting "life changing revenue" will flow directly to "Tribal communities." *Governor Mills Announces Bill to Create Economic Opportunities for the Wabanaki Nations to Become Law*, *supra*. But that is exactly the kind of race-based spoils system that the Equal Protection Clause was designed to prohibit. "History has taught us to abhor theories that call for elites to pick racial winners and losers in the name of sociological experimentation." *SFFA*, 600 U.S. at 283 (Thomas, J., concurring).

10

Exacerbating the problem, the iGaming law "lack[s] a 'logical end point.'" *Id.* at 221. The Supreme Court has been clear that, in the rare circumstances when race-conscious remedies are permissible, "at some point—they must end." *Id.* at 213 But there is no sign that Maine plans to open the iGaming industry to non-Indian participation in the foreseeable future (or indeed, ever). Thus, like in *SFFA*, "there is no reason to believe that [the State] will—even acting in good faith—comply with the Equal Protection Clause any time soon." *Id.* at 225.

Nothing prevents Maine from passing a law offering iGaming licenses to all comers, including Indian tribes and businesses wholly owned by tribes, on a race-neutral basis. Likewise, nothing prevents the State (on a race-neutral basis) from using some of the tax revenue earned from iGaming licensees to help under-resourced local communities, including tribal communities, provide essential "services, like courts, law enforcement, education, housing substance abuse recovery, and youth and elder programs." Maine-MSJ 19. But the Equal Protection Clause prohibits Maine from creating a race- and ancestry-based occupational licensing scheme that grants a government-imposed commercial monopoly to a single ethnic group.

## II. *Mancari* does not apply to state-law Indian preferences, and should not be extended to race-based occupational-licensing regimes and commercial monopolies.

Rather than try to carry their burden of justifying the iGaming law under strict scrutiny, the State and the Intervenors argue that race-based occupational-licensing regimes and commercial monopolies are presumptively constitutional so long as they involve Indian tribes under *Mancari*'s "limited exception" to longstanding equal protection doctrine. *Rice*, 528 U.S. at 520. But *Mancari* does not apply to *state* laws at all, so its "limited exception" does not help Maine and the Intervenors.

**1.** *Mancari* was a "sui generis" decision involving "a specific provision applying to a very specific situation." 417 U.S. at 550, 554. The challenged employment preference turned on whether a person had "'one-fourth or more degree Indian blood,'" clearly a racial classification. *Id.* at 553 n.24; *Rice*, 528 U.S. at 519. But rather than apply strict scrutiny, the Supreme Court examined only whether

11

the preference was "tied rationally to the fulfillment of Congress' unique obligation toward the Indians." *Mancari*, 417 U.S. at 555. The Court based this departure from ordinary equal protection principles on the "unique fashion" in which the BIA governed Indians' "lives and activities" and its perception that the preference was "directed to participation by the governed in the governing agency." *Id.* at 554. It also invoked "the unique legal status of Indian tribes under *federal* law and upon the plenary power of *Congress.*" *Id.* at 551 (emphasis added). Still, the Court acknowledged that creating a "blanket exemption for Indians from all civil service examinations" would pose an "obviously more difficult question." *Id.* at 554. And it never endorsed race-based occupational licensing regimes or commercial monopolies. *See Williams*, 115 F.3d at 665. Most importantly, "[t]he opinion was careful to note … that the case was confined to the authority of the BIA." *Rice*, 528 U.S. at 520.

It is black letter law that "[a]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. *Mancari*'s creation of a "sui generis" exception for a narrow category of BIA employment preferences says nothing about whether the federal government's power to regulate Indian tribes gives *States* license to do the same and thereby evade strict scrutiny. Indeed, it suggests exactly the opposite. States "do *not* enjoy [the] same unique relationship with Indians" as the federal government. *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 501 (1979). The Supreme Court has emphasized and reemphasized this point in the years since *Mancari*. *See, e.g.*, *Rice*, 528 U.S. at 520. And lower courts have repeatedly recognized it as a substantive limitation. *See, e.g.*, *KG Urban*, 693 F.3d at 19 ("[I]t is quite doubtful that *Mancari*'s language can be extended to apply to preferential *state* classifications based on tribal status." (emphasis in original)).

The Intervenors suggest *Mancari* applies to state laws anyway because "tribal nations are sovereigns." Intervenors-MSJ 18. But the Supreme Court and the First Circuit have already rejected that syllogism. *See Yakima*, 439 U.S. 501; *KG Urban*, 693 F.3d at 19. It is also suspect as a matter of first

12

principles. It is more than a little unusual for a "sovereign" to concede that its "inherent authority" can be "adjusted" by someone else. Intervenors-MSJ 18. Indeed, the notion that "tribal sovereignty" permits ignoring the Equal Protection Clause is ironic given the Intervenors' insistence that they have "a tremendous need for additional sources of governmental funding to support" basic sovereign responsibilities, such as managing "water and sewer facilities." Intervenors-MSJ 10. There is no question, of course, that *the State* is bound by the Fourteenth Amendment when its confers privileges and benefits on another group, whether deemed "sovereign" or not. *See Adarand*, 515 U.S. at 227.

The State tries to distinguish the binding, on-point precedent in *KG Urban* because there the two federally recognized tribes in Massachusetts did not participate in that case. *See* Maine-MSJ 22. That is not how vertical stare decisis works. *KG Urban*'s holding and *ratio decidendi* are just as binding on this Court regardless of which parties litigated the case. *Cf. United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019). Even less plausibly, Maine argues that *KG Urban* does not apply because "this case has a different procedural posture." Maine-MSJ 21. To state the obvious, the procedural posture of a case does not change the substantive legal question *KG Urban* answered: whether "'the limited exception of *Mancari*'" could be "'extend[ed] … to a new and larger dimension.'" *KG Urban*, 693 F.3d at 19 (quoting *Rice*, 528 U.S. at 520). On that question, the First Circuit was clear: "it is quite doubtful that *Mancari*'s language can be extended to apply to preferential *state* classifications based on tribal status." *Id.* Eventually, the State retreats to claiming that *KG Urban* "conflated tribal status with a State's authority to act with respect to federally recognized tribes." Maine-MSJ 22. If Maine wants to make that argument in an en banc petition before the First Circuit, it can do so. But that doesn't mean this Court can ignore binding precedent in the interim.

In sum, Plaintiffs are correct that "[t]he First Circuit has rejected the argument that a state-granted preference to an Indian tribe is 'not a racial preference' that escapes strict-scrutiny review." Oxford-Mot. 13 (quoting *KG Urban*, 693 F.3d at 17-19).

13

**2.** Assuming *arguendo* that *Mancari* ever applies to state-law tribal preferences, the State and the Intervenors would still need to show that the Supreme Court's "sui generis" employment-law holding should be "extend[ed] … to [the] new and larger dimension" of race-based occupational-licensing regimes and commercial monopolies. *Rice*, 528 U.S. at 520. Neither has shown anything of the sort. *Mancari*'s "limited exception" from ordinary equal protection principles has always been construed narrowly. *Id.* The Supreme Court took pains to highlight the narrowness of its holding—emphasizing that its reasoning rested on the "sui generis" nature of the BIA. *Mancari*, 417 U.S. at 554.

Indeed, the linchpin of the Court's analysis was the "unique fashion" in which the BIA governed the "lives and activities" of Indian tribes. *Id.* The Court relied on the BIA's one-of-a-kind role in regulating tribes to conclude that the challenged Indian preference was "directed to participation by the governed in the governing agency." *Id.* That "unique" status—combined with the federal government's power to regulate tribes—was a key factor in the Court's conclusion that the classification did "not constitute 'racial discrimination.'" *Id.* at 553. Thus, the *Rice* Court explained (while rejecting Hawaii's attempt to extend *Mancari* beyond its facts) that *Mancari* "was careful to note … that the case was confined to the authority of the BIA." *Rice*, 528 U.S. at 520. Without a "sui generis" entity like the BIA, the rationale for *Mancari*'s "limited exception" collapses. *Id.*

Lower courts have taken the same tack, heeding *Mancari*'s caveats regarding its "unique" facts and "*sui generis*" analysis and declining invitations to overread its narrow holding. Indeed, lower courts often apply strict scrutiny to state and local ordinances establishing Indian preferences. In *Tafoya v. Albuquerque*, for example, the court enjoined a municipal ordinance that permitted only members of federally recognized Indian tribes to sell wares in the Old Town Zone of Albuquerque. 751 F. Supp. 1527 (D.N.M. 1990). The court explained *Mancari* was "inapplicable" because "[t]he Albuquerque City Council has considerably less power than the United States Congress to pass law[s] discriminating in favor of members of federally recognized Indian tribes." *Id.* at 1531. Strict scrutiny thus applied. *Id.*

14

*Kornhass Construction v. Oklahoma* is cut from the same cloth. 140 F. Supp. 2d 1232 (W.D. Okla. 2001). There a district court enjoined enforcement of a state statute that gave a preference in contract bidding to minority-owned businesses, including those owned by Indians. The *Kornhass Construction* court held that "strict scrutiny applie[d] to [the state statute at issue] even so far as it awards a bidding preference to American Indians." *Id.* at 1249. *Mancari* was inapplicable because the decision was confined to "special legislation designed to fulfill Congress' unique obligation toward the Indian tribes by further-ing tribal self-government." *Id.* Similar examples abound. *See, e.g.*, *In re Santos Y.*, 92 Cal. App. 4th 1274, 1317 (Cal. Ct. App. 2001) (applying strict scrutiny to an as-applied equal protection challenge to ICWA because the Act "requires Indian children … to be treated differently from [those] who are not Indian children"); *Malabed v. North Slope Borough*, 42 F. Supp. 2d 927, 928, 939 (D. Alaska 1999) (holding a local ordinance that granted employment preferences to any "person belonging to an Indian tribe" was "subject to strict scrutiny").

## III.   *Mancari* **was egregiously wrong and should be confined to its specific facts.**

As discussed above, *Mancari* is inapplicable to this case even under its own reasoning. But if *Mancari* is found to apply here, it should ultimately be overruled by a higher Court. *Mancari*'s "limited exception" to one of the clearest rules in our constitutional structure—that racial classifications are unconstitutional unless the government can satisfy strict scrutiny—has been on a collision course with the Constitution since the day it was announced. Even a narrow exception for state-endorsed racial preferences would run afoul of a century of Supreme Court precedent holding that laws giving a pref-erence "to a class of tribal Indians, to the exclusion of all non-Indian citizens," are "racial classifica-tion[s]." *Rice*, 528 U.S. at 520, 522; *see also United States v. Candelaria*, 271 U.S. 432, 442 (1926). And all racial classifications are subject to strict scrutiny. *Adarand*, 515 U.S. at 227. *Mancari*'s nakedly race-conscious reasoning does violence to "our color-blind Constitution." *Allen*, 146 S. Ct. at 1380; *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting). Moreover, *Mancari*'s "political" classifica-

15

tion reasoning was inconsistent on its own terms and has largely been repudiated since. *See Rice*, 528 U.S. at 519-520. These obvious infirmities stripped *Mancari* of any ability to settle even the limited issues it purported to address, and every branch of government has repeatedly questioned the constitutionality of Indian preferences ever since *Mancari* was decided.

**1.** *Mancari* "is rooted in a double-barreled cluster of constitutional fictions." Frickey, *Adjudication and Its Discontents: Coherence and Conciliation in Federal Indian Law*, 110 Harv. L. Rev. 1754, 1760 (1997). Chief among them is "ignoring the ethnic quality of the classification at issue." *Id. Mancari* reasoned that the BIA's "blood" classification was political because of an ancillary reference to "tribes." But make no mistake—tribal membership classifications are racial classifications. "[A] person generally must possess a threshold amount of Indian or tribal 'blood,' expressed as one-half, one-quarter, or some other fractional amount" to establish Indian ancestry for tribal membership. Spruhan, *A Legal History of Blood Quantum in Federal Indian Law to 1935*, 51 S.D. L. Rev. 1, 1 (2006). Indeed, for an Indian tribe to be recognized by the federal government, its membership must extend *only* to "individuals who descend from a historical tribe." 25 C.F.R. §83.11(e). And tribal membership classifications across the country are routinely explicitly racial. *See, e.g.*, I Navajo Nation Code, §701(b) (membership requires 25% Navajo blood); Gila River Indian Cmty. Const. art. III, §1(b) (requiring 25% Indian blood and biological descent from a tribal member); Pub. L. No. 112-157, 126 Stat. 1213 (2012) (membership in the Ysleta del sur Pueblo Tribe is based on "Indian blood"); *see supra* (listing Maine's tribal ancestry requirements). In short, even classifications limited to members of federally recognized tribes are racial. *See supra* 6-8.

The Supreme Court has repeatedly confirmed that tribal membership classifications are racial. In *United States v. Candelaria*, for example, the Court understood an "Indian tribe" as "a body of Indians of the same or a similar race." 271 U.S. at 442; *see also Montoya*, 180 U.S. at 266 ("By a 'tribe' we understand a body of Indians of the same or a similar race, united in a community under one leadership

16

or government, and inhabiting a particular though sometimes ill-defined territory."); *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 611, 613 (1987) (dictionaries in the 1800s defined "race" to include "tribe"); *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 641 (2013) (explaining the child at issue was "classified as an Indian because she is 1.2% (3/256) Cherokee"). But racial classifications are odious to our Constitution. As Justice Harlan famously explained, "in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy*, 163 U.S. at 559 (Harlan, J., dissenting). Justice Harlan was right. *See Allen*, 146 S. Ct. at 1380; *SFFA*, 600 U.S. at 250 (Thomas, J., concurring) ("[T]he Fourteenth Amendment is colorblind."). And in *Brown v. Board of Education*, the Supreme Court vindicated the Constitution's promise. 347 U.S. 483 (1954).

To make real the promise of our colorblind Constitution, the Supreme Court has reiterated time and again that "all racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227.[2] Tribal racial classifications are no exception. Indeed, the Supreme Court has repeatedly instructed that classifications based on "Indian" or "Native American" status are racial classifications subject to strict scrutiny. *See Adarand*, 515 U.S. at 207-08, 213, 223-24 (A classification of "Native Americans" is a "classificatio[n] based explicitly on race."); *see also, e.g.*, *Loving*, 388 U.S. at 2, 6 & n.4 (Statutes that prohibited marriage between "American Indians" and "white persons" were "racial classifications."); *Wygant*, 476 U.S. at 271 n.2, 273-74 (A preferential scheme that "operate[d] against whites and in favor of certain minorities," including "American Indian[s]," was "a classification based on race."); *Croson*, 488 U.S. at 476, 478, 493 (A preference for "Indians" is a "race-

---

[2] *See also Korematsu v. United States*, 323 U.S. 214, 216 (1944); *McLaughlin v. State of Fla.*, 379 U.S. 184, 191 (1964); *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 291 (1978); *Palmore v. Sidoti*, 466 U.S. 429, 432-33 (1984); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 279-80 (1986); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493-95 (1989); *Shaw v. Reno*, 509 U.S. 630, 653 (1993); *Shaw v. Hunt*, 517 U.S. 899, 915 (1996); *Gratz v. Bollinger*, 539 U.S. 244, 274 (2003); *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003); *Johnson v. California*, 543 U.S. 499, 505 (2005); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007); *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 303 (2013); *Fisher v. Univ. of Texas at Austin*, 579 U.S. 365, 376 (2016); *SFFA*, 600 U.S. at 206.

based measur[e].”); *Rice*, 528 U.S. at 520, 522 (A state law giving preferential voting rights “to a class of tribal Indians, to the exclusion of all non-Indian citizens,” was an impermissible “racial classification.”). Such classifications plainly treat Indians as a “discrete racial group” rather than “members of quasi-sovereign tribal entities.” *Mancari*, 417 U.S. at 554. And that remains true even when a classification is nominally aimed at an “Indian nation,” because “[t]here cannot be a nation without a people.” *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 165-66 (1875); *see also Afroyim v. Rusk*, 387 U.S. 253, 268 (1967) (“Its citizenry is the country, and the country is its citizenry.”).

The Supreme Court could not have been clearer in *SFFA*: “Racial discrimination is invidious in all contexts.” 600 U.S. at 214 (cleaned up). That categorical language includes racial discrimination in favor of Indians. Indeed, at least one Justice has already suggested as much: Justice Kavanaugh explained that a state statute allowing only Indians to “conduct certain off-reservation gaming operations” would raise “serious equal protection issues.” *W. Flagler Assocs.*, 144 S. Ct. 10 (Kavanaugh, J., respecting the denial of application for stay) (citing *SFFA*, 600 U.S. at 206); *see also Haaland v. Brackeen*, 599 U.S. 255, 333-34 (2023) (Kavanaugh, J., concurring).

Nor can racial classifications be recast as ancestry classifications. An ancestry requirement is often “a proxy for race.” *Rice*, 528 U.S. at 514. Indeed, ancestry and race are so closely intertwined that “[d]istinctions between citizens solely because of their ancestry” are interchangeable with “discrimination based on race alone.” *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943); *see also Saint Francis Coll.*, 481 U.S. at 613 (“discrimination solely because of … ancestry or ethnic characteristics … is racial discrimination”); *Rice*, 528 U.S. at 519 (Ancestry classifications “emplo[y] the same mechanisms, and caus[e] the same injuries, as laws or statutes that use race by name.”). The Supreme Court has accordingly recognized that discrimination “solely because of [a person’s] ancestry or national origin” is unconstitutional. *Hernandez v. Texas*, 347 U.S. 475, 479 (1954); *see also Hirabayashi*, 320 U.S. at 100 (“Dis-

18

tinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."); *SFFA*, 600 U.S. at 208.

That *Mancari* eschews these foundational principles only confirms it is an aberration "decided at a time when [the Supreme] Court often paid insufficient attention to the language of [the Constitution]" and its original meaning. *Louisiana v. Callais*, 146 S. Ct. 1131, 1146 (2026). The modern Supreme Court has recognized the excesses of that bygone era. And the list of discarded decisions from just the decade *Mancari* was decided is already long.[3] *Mancari* should be next, to the extent that it applies at all to state-law tribal preferences. The tribes suggest that the mountain of Supreme Court precedent and the Constitution's original meaning must yield because "from statehood to today …. no one has seriously questioned that these laws comport with equal protection" and applying strict scrutiny "would threaten to invalidate countless Maine laws." Intervenors-MSJ 25; *see also id.* at 19. The tribes are wrong. But even if they were right, those defending racial classifications often argue that eliminating them would upend longstanding practices and "social traditions." Brief for the State of Kansas on Reargument in *Brown v. Board of Education*, O.T. 1953, at 53; Brief of Appellees in *Davis v. County School Board of Price Edward County*, O.T. 1952, at 29. That racial discrimination is longstanding or wide-reaching is *more* reason to end it—not less.

*Mancari*'s halfhearted invocation of a "political classification" as reason to apply rational basis review does not work either. Despite recognizing that the BIA's classification was based on "blood"— that it *was* racial—the Court treated the classification as if it were not. The next time the Supreme Court applied *Mancari*, it acknowledged that the BIA's "classification had a racial component." *Rice*,

---

[3] *See, e.g.*, *Lemon v. Kurtzman*, 403 U.S. 602 (1971) (overruled by *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)); *Apadoca v. Oregon*, 406 U.S. 404 (1972) (overruled by *Ramos v. Louisiana*, 590 U.S. 83 (2020)); *Furman v. Georgia*, 408 U.S. 238 (1972) (overruled by *Gregg v. Georgia*, 428 U.S. 153 (1976)); *Roe v. Wade*, 410 U.S. 113 (1973) (overruled by *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977) (overruled by *Janus v. AFSCME*, 585 U.S. 878 (2018)); *Wolman v. Walter*, 433 U.S. 229 (1977) (overruled by *Mitchell v. Helms*, 530 U.S. 793 (2000)); *Bakke*, 438 U.S. 265 (overruled by *SFFA*, 600 U.S. 181); *Nevada v. Hall*, 440 U.S. 410 (1979) (overruled by *Franchise Tax Bd. of California v. Hyatt*, 587 U.S. 230 (2019)); *Ohio v. Roberts*, 448 U.S. 56 (1980) (overruled by *Crawford v. Washington*, 541 U.S. 36 (2004)).

528 U.S. at 519; *see also id.* at 518 (explaining that *Mancari* involved an "employment preferenc[e] to persons of tribal ancestry"). Indeed, the majority and dissent agreed on this point: "[T]ribal membership cannot be seen as the decisive factor in [the Supreme] Court's opinion upholding the BIA preferences in *Mancari*; the hiring preference at issue in that case not only extended to nontribal member Indians, it also required for eligibility that ethnic Native Americans possess a certain quantum of Indian blood." *Id.* at 535 (Stevens, J., dissenting).

That *Mancari* purported to involve a political classification in addition to the racial classification does not resolve the internal inconsistency for at least two reasons. First, action taken even "in part" on the basis of discriminatory animus is illegal. *See, e.g.*, *Bostock v. Clayton County*, 590 U.S. 644, 659 (2020); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Second, when a State uses two classifications that entail different levels of scrutiny, the higher level of scrutiny applies. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 208-10 (1976) (applying intermediate scrutiny to a law that classified on the basis of age and on the basis of sex). Nor does a statute's under-inclusiveness—excluding certain blood Indians if they are not also tribal members—resolve *Mancari*'s internal inconsistency. *Contra* Maine-MSJ 14 n.6 ("even a preference for individual members of federally recognized tribes, as distinguished from a preference for tribes themselves, would be political rather than racial … because it would exclude many individuals who are racially to be classified as 'Indians'") (cleaned up). "Simply because a class defined by ancestry does not include all members of the race does not suffice to make the classification race neutral." *Rice*, 528 U.S. at 516-17.

**2.** Every branch of the American government has recognized that *Mancari* did not settle the issue of race-based tribal preferences. For example, early drafts of the Alaska National Interest Lands Conservation Act allocated access to subsistence resources on an ethnic basis with a benefit to Indians. The provision generated immediate opposition and members of Congress argued that any subsistence preference "must not be based upon race." 124 Cong. Rec. 14,162 (1978) (Statement of Rep. John F.

Seiberling). The final version of ANILCA spoke only in terms of "rural residents." 16 U.S.C. §3101(c). The Indian Health Care Improvement Act tells a similar story. That statute gives Indians improved access to federally supported health care services. Once again, members of Congress raised concerns that the tribal preferences for Indians would present constitutional problems. Accordingly, Senator Coburn introduced an amendment stating that nothing in the Act would authorize "any racial preference in employment." 154 Cong. Rec. S987 (Feb. 13, 2008). Concerns were not limited to discrete pieces of legislation either. Various members of Congress thought the constitutional problems presented by such preferences were so severe that they introduced legislation specifically to combat them. Representative Curt Weldon, for example, argued laws that "grant special rights to Indians … are racial preference laws. Racial preference laws are fundamentally incompatible with the equal protection of the laws that is provided to all Americans by the Constitution. The Constitution simply does not tolerate racial preferences of any kind, for any reason." 146 Cong. Rec. E1864 (Oct. 19, 2000).

The executive branch has also voiced concerns over the constitutionality of racial preferences for Indians. During the debates over the Indian Child Welfare Act, a law that gives Indian tribes and families special preferences in child custody cases, the Department of Justice criticized the bill on the basis that it created a racial classification, warning that defining "Indian child" based on a "blood connection" "may constitute racial discrimination." H.R. Rep. No. 95-1386, at 39 (1978). The Department recommended "limiting the definition of Indian child" to avoid constitutional problems. *Id.* The Office of Legal Counsel has likewise consistently argued that racial preferences in favor of Indians are subject to strict scrutiny. Deputy Attorney General William Barr made the point in 1990, concluding that a preference depending "solely on possessing a certain percentage of Indian blood was an unconstitutional racial classification" because "strict scrutiny must apply to purely racial classifications, regardless of whether they favor Indians or any other racial group." Memorandum for Dick Thornburgh, *Re: Indian Racial Preferences* at 1 (O.L.C. Mar. 19, 1990). He was not the first. *See, e.g., Peyote*

21

*Exemption for Native American Church*, 5 Op. O.L.C. 403, 419 (1981) ("an exemption limited to American Indians might well be unconstitutional"). Nor was he the last. Just last year the Office of Legal Counsel confirmed that "preferential treatment for Indians" not "reasonably linked to the distinctive status of Indian political institutions would likely be reviewed under *Adarand*'s strict scrutiny standard," even where a provision applied via reference to membership in a federally recognized tribe. *Constitutionality of Race-Based Department of Education Programs*, 49 Op. O.L.C. __, at 9-14 (Dec. 2, 2025) (citing Memorandum for Andrew Fois, *Re: HHS Report on H.R. 1833, Tribal Self-Governance Amendments of 1997* at 3 (O.L.C. Oct. 30, 1997); Memorandum for Sheryl L. Walter, *Re: H.R. 1, No Child Left Behind Act (Elementary and Secondary Education Act of 1965 Reauthorization)* at 6-9 (O.L.C. Apr. 5, 2001)).

Even the judiciary has recognized *Mancari*'s infirmities. The Supreme Court has not upheld a tribal preference under *Mancari* in 40 years. That omission should not be surprising. For nearly the entire twentieth century, the Supreme Court confirmed and reaffirmed that all racial classifications are subject to strict scrutiny. *See supra* 17 & n.2. Each time it did so, the Court declined to discuss *Mancari*. And it never gave any indication that Indian racial classifications were exempt from the categorical rules the Court announced, affirmed, and reaffirmed. Then at the turn of the century the Supreme Court spoke. In *Rice v. Cayetano* the Court addressed *Mancari* directly when it confronted a Hawaii law granting a racial preference to Native Hawaiians in voting for trustees of a state agency. 528 U.S. at 499, 520.

Hawaii defended its law by arguing *Mancari* established an exception to the general rule against racial classifications. But the Court explicitly rejected that argument. *Id.* at 518-20. Instead, the Court confirmed *Mancari* meant what it said—its holding was "*sui generis*" and thus limited to the unique context of the BIA; *Mancari* did not water down the rule that all racial classifications are subject to strict scrutiny. *Id.* at 519-20; *see also id.* at 535 (Stevens, J., dissenting). The cases since *Rice* have doubled down—confirming and reaffirming that all racial classifications are subject to strict scrutiny. *Gratz,*

22

539 U.S. at 274; *Parents Involved*, 551 U.S. at 720; *Fisher*, 570 U.S. at 303; *SFFA*, 600 U.S. at 206. The upshot is that *Mancari* cannot be squared with the last century of Supreme Court precedent on racial discrimination.

This inconsistency has been well-documented across the federal judiciary. Justice Stevens initially noted the tension between *Mancari* and the broader corpus of Supreme Court equal protection precedent in *Adarand*, which reiterated that "all racial classifications" are subject to strict scrutiny. 515 U.S. at 227. Justice Stevens dissented from that decision, arguing that the majority opinion "would view the special preferences that the National Government has provided to Native Americans since 1834 as comparable to" race discrimination. *Id.* at 244-45 (Stevens, J., dissenting) (citing *Mancari*, 417 U.S. at 541, 551-52, 553-54 & n.24).

Lower courts have also recognized that *Mancari* is an aberration from the Supreme Court's equal protection jurisprudence. For example, the Ninth Circuit has explained that "[i]f Justice Stevens is right about the logical implications of *Adarand*, *Mancari*'s days are numbered." *Williams*, 115 F.3d at 665. Justice Stevens was right. Nor is the Ninth Circuit alone. *See, e.g.*, *Brackeen v. Haaland*, 994 F.3d 249, 394 n.75 (5th Cir. 2021). Justice Kavanaugh likewise recognizes that racial preferences for Indians "raise significant questions under bedrock equal protection principles and [the Supreme] Court's precedents." *Brackeen*, 599 U.S. at 333-34 (Kavanaugh, J., concurring). And he recently noted that *SFFA* suggests a state statute allowing only Indians to "conduct certain off-reservation gaming operations" would raise "serious equal protection issues." *W. Flagler Assocs.*, 144 S. Ct. 10 (Kavanaugh, J., respecting the denial of application for stay).

* * *

In short, *Mancari*'s reasoning is questionable and internally inconsistent, and even its "limited exception" for a narrow subset of racial preferences runs headlong into a half-century of Supreme Court precedent holding "racial discrimination is invidious in all contexts." *SFFA*, 600 U.S. at 214

(cleaned up). Thus, its premise has since been questioned by every branch of government. Because its narrow holding does not apply to Maine (or any other state), *Mancari* does not bear on this case and is no obstacle to a ruling in favor of Plaintiffs. But if it did apply, *Mancari*'s pernicious reasoning should be limited to its facts, and in an appropriate case the Supreme Court should reconsider *Mancari* in its entirety. "Eliminating racial discrimination means eliminating all of it." *Id.* at 206.

## CONCLUSION

The court should deny the Defendants' motions for summary judgment and grant Plaintiffs judgment on the pleadings.

Dated: June 19, 2026

Respectfully submitted,

*/s/ Patrick Strawbridge*
Patrick Strawbridge (ME Bar #10024)
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02019
(703) 243-9423
patrick@consovoymccarthy.com

*Counsel for Amicus Curiae*

24

**CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2026, the foregoing document was filed electronically using the Court's CM/ECF system, which will send notification of this filing to all registered participants.

/s/ Patrick Strawbridge
Patrick Strawbridge

25