**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

|  |  |
|---|---|
| OXFORD CASINO HOTEL, BB DEVELOPMENT, LLC, and CHURCHILL DOWNS INCORPORATED, <br><br> Plaintiffs, <br><br> v. <br><br> MILTON F. CHAMPION, in his official capacity as Executive Director of the Maine Gambling Control Unit, <br><br> Defendant, <br><br> HOULTON BAND OF MALISEET INDIANS, MI'KMAQ NATION, PASSAMAQUODDY TRIBE, and PENOBSCOT NATION, <br><br> Intervenor-Defendants. | Case No. 1:26-cv-00046-LEW |

**DEFENDANT MILTON F. CHAMPION'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Oxford's opposition to Director Champion's motion for summary judgment rests largely on its flawed understanding of *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463 (1979), and the Settlement Acts[1] and its overstated reading of *KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1 (1st Cir. 2012). As explained herein, Oxford's interpretations are unsupported, and Maine's iGaming law violates neither the Equal Protection Clause nor the Interstate Commerce Clause. Accordingly, based on the undisputed summary

---

[1] As used herein, "Settlement Acts" has the same meaning noted in Director Champion's Motion for Summary Judgment ("MSJ"); this reply memorandum also uses the same abbreviations for the various acts comprising the Settlement Acts as in that motion. *See* MSJ at 2 & n.2.

judgment record, *see* ECF No. 41 (admitting for the purposes of summary judgment all of Defendants' Joint Supporting Statement of Material Facts), Director Champion is entitled to judgment on Oxford's Amended Complaint.[2]

## ARGUMENT

**I.      Director Champion is entitled to summary judgment on Oxford's Equal Protection claim.**

**A.      Maine's iGaming law is a political classification subject to rational basis review.**

As Director Champion has shown, federal and state laws that classify on the basis of a tribal government are political classifications, not racial classifications.  MSJ 13-16.  Oxford claims this position is foreclosed by "binding" precedent in *KG Urban Enterprises*, 693 F.3d 1,[3] and the Constitution itself.  Opp'n 8-9.  According to Oxford, Congress' plenary authority over Indian tribes permits only Congress to "enact legislation" or adopt policies "singling out tribal" nations and members.  Opp'n 9.  But the Supreme Court held long ago that the federal trust relationship does not prevent states from enacting laws that <u>protect</u> tribal rights, as long as those laws do not conflict with federal law or policy.  *See New York ex. Rel. Cutler v. Dibble*, 62 U.S. 366, 370-71 (1859).

Oxford is also wrong about *Morton v. Mancari*, 417 U.S. 535 (1974), and similar cases. *Mancari* did not conclude that the federal law can discriminate on the basis of race, but state law cannot; instead, *Mancari* rejected the notion that the employment preference at issue was "racial" at all.  417 U.S. at 553.  Indeed, *Mancari* explained that a tribe is <u>not</u> "a discrete racial group" at all, but a "quasi-sovereign tribal entit[y]." *Id.* at 554; *accord Yakima*, 439 U.S. at 501 (concluding

---

[2]  For purposes of this reply, Director Champion utilizes the same tagged phrases as in his summary judgment motion.

[3]  Oxford's other arguments about *KG Urban Enterprises* are addressed *infra*.

argument that "classifications based on tribal status" are "'suspect an untenable one"). That reasoning applies with greater force here, when the iGaming law preferences a tribal <u>government</u>, not any member of any race or any individuals of particular descent.

Director Champion's position finds further support from the Eighth Circuit's recent decision in *Nare v. Omaha Discovery Trust*, --- F.4th ----, 2026 WL 1813510 (8th Cir. Jun. 24, 2026). *Nare* affirmed the dismissal of a race-based challenge to a museum policy that granted free admission to members of federally recognized Indian tribes. *Id.* at *1, *3. The Eighth Circuit, relying on *Mancari*, agreed that plaintiffs had failed to state a claim "because tribal membership is a political, not racial, classification." *Nare*, 2026 WL 1813510 , at *2. The same is true here: the iGaming law constitutes a political, not racial, classification.

> **B.**     **Maine's iGaming law is permissible under *Yakima* and subject to rational basis review.**

Contrary to Oxford's claims, Maine's iGaming law is governed by rational basis review under *Yakima*. State laws affecting tribes, like the iGaming law, that are "enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians" are subject to rational basis review. *Yakima*, 439 U.S. at 501. The Settlement Acts, which set a different jurisdictional relationship between Maine and the Wabanaki Nations, are such jurisdictional laws.

As Director Champion explained in his motion, MSJ at 3-6, Maine's relationship with the Wabanaki Nations is nationally "unique." *See Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 787 (1st Cir. 1996). Through MICSA, the federal government authorized Maine to exercise jurisdiction over the Nations on a broad variety of issues. *See Great N. Paper, Inc. v. Penobscot Nation*, 770 A.2d 574, 584 (Me. 2001). The First Circuit has explained that MICSA "purposes to cover virtually the entire field of relationships between the State and the Indian tribes based there,"

*Passamaquoddy Tribe*, 75 F.3d at 788, and that "the Settlement Acts establish[] state authority that far exceeds what is normal for Indian tribes to which no such legislation applies." *Maine v. Johnson*, 498 F.3d 37, 42 (1st Cir. 2007).

The issue of tribal gaming, specifically, has been litigated in both state and federal court. The outcome of those cases is clear: at this time, gaming operated by the Wabanaki Nations can only be conducted in accordance with Maine state law *See id.* at 794 (concluding that the Indian Gaming Regulatory Act does not apply in Maine); *Penobscot Nation v. Stilphen*, 461 A.2d 478, 489-90 (Me. 1983) (concluding the Penobscot Nation's operation of a beano game on its reservation was not an "internal tribal matter" under § 6206(1) of MIA and thus was precluded by applicable state law). Thus, it is settled that the Settlement Acts provide the State of Maine with jurisdiction over all gaming conducted by the Nations. *See, e.g.*, 13-A M.R.S.A. §§ 314-A(1), (5) (Supp. 2026) (permitting the Maine Gambling Control Unit "to issue a license to operate high-stakes beano or high-stakes bingo to a federally recognized Indian tribe" to conduct beano games within the tribal lands of the respective tribe); 8 M.R.S.A. § 1207(2) (2026) (authorizing the Maine Gambling Control Unit to issue mobile sports wagering operator licenses to an applicant that is also "a federally recognized tribe in this State").

Oxford's arguments to the contrary are unpersuasive. **First**, Oxford repeatedly argues that *Yakima* requires an "express delegation" or an "explicit grant" over gaming in order for Maine's iGaming law to be valid. Opp'n at 9-10, 13-14. *Yakima*, however, imposes no such requirement. Oxford artificially narrows *Yakima* and inserts a requirement that the Supreme Court did not impose or apply.

The state law at issue in *Yakima*, Washington's "Chapter 36," was an assertion of state jurisdiction in Indian country enacted pursuant to Public Law 280. *Yakima*, 439 U.S. at 465-66. Public Law 280 authorized certain States without jurisdiction over "criminal offenses" and "civil

causes of action" or "both" in Indian country "to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof." *Id.* at 471 n.9 (quoting Pub. L. No. 280, § 7). Washington exercised that broad grant of jurisdictional authority by assuming partial jurisdiction over eight specified topics: "compulsory school attendance, public assistance, domestic relations, mental illness, juvenile delinquency, adoption proceedings, dependent children, and motor vehicles." *Yakima*, 439 U.S. at 475-76 & 465 n.1. None of these topic areas had been included in the authorizing text of Public Law 280, yet the Supreme Court had no trouble concluding that Chapter 36 was within the scope of the jurisdictional authorization provided. *Id.* at 499. The Court did not ask whether Congress had explicitly named each subject area that Chapter 36 addressed in Public Law 280— which it did not do. It instead looked at the broad authority provided and whether Chapter 36 was within the scope of that jurisdictional authority. *Id.* at 500-01.

Oxford's reliance on the fact that *Yakima* described Public Law 280 as granting "explicit authority" to Washington state is misplaced. Opp'n 12, 14. That description appears nowhere in the portion of decision that actually examines the scope of Public Law 280. If the "express delegation" rule that Oxford extrapolates from a single phrase were accurate, that key descriptor surely would appear more than once and in the *Yakima* Court's analysis of the scope of Public Law 280. Further, the Supreme Court used the "explicit authority" phrase to address the tribe's fundamental rights argument, <u>not</u> the type of claim Oxford makes here. *Id.* at 501. Regardless, Oxford points to no other case which applied the "express delegation" rule that Oxford claims *Yakima* created. Oxford's "rule" is of its own making.

**Second**, Oxford contends that the Settlement Acts are insufficient to meet *Yakima* based not only on its express delegation argument, but also on its flawed view of the Settlement Acts. Opp'n 13-16. As shown, *Yakima* imposed no such express delegation requirement, and so Oxford's

claims that the Settlement Acts "do not mention gaming at all" and that "there is no direct relationship between the Settlement [Acts] and the" iGaming law are entirely beside the point. Opp'n 13.

Oxford is also wrong about the scope of the State's jurisdiction pursuant to the Settlement Acts. While Oxford admits that "the Settlement Acts 'readjusted' the allocation of jurisdiction over the Tribes," it nevertheless claims that "*Yakima* cannot be applied here so broadly." Opp'n 16. Oxford neglects the breadth of the jurisdictional bargain in the Settlement Acts and cases interpreting that bargain—most notably *Passamaquoddy Tribe* and *Johnson*.

*Johnson* is instructive. At issue in *Johnson* was the authority of Maine to regulate discharge facilities under the Clean Water Act, including two facilities located on tribal land. 498 F.3d at 40-41. The EPA concluded the State could not regulate those two facilities because they were "internal tribal matters under section 6026(1) of MIA. 498 F.3d at 41. Although the Nations challenged the State's jurisdiction, *Johnson* affirmed the State's asserted "authority" to "regulate discharges into navigable waters" "as to both tribal and non-tribal land" based on the broad grant of jurisdiction provided in the Settlement Acts and, in particular, section 6204 of MIA.[4] 498 F.3d at 42, 45. That same broad grant of jurisdiction in the Settlement Acts likewise authorizes Maine to regulate gaming throughout the State, including gaming by the Nations. *Accord Penobscot Nation v. Georgia-Pac. Corp.*, 254 F.3d 317, 320 (1st Cir. 2001) ("[T]he State of Maine, as part of

---

[4] Section 6204 provides:

> Except as otherwise provided in this Act, all Indians, Indian nations, and tribes and bands of Indians in the State and any lands or other natural resources owned by them, held in trust for them by the United States or by any other person or entity shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person or lands or other natural resources therein.

MIA § 6204.

the settlement, obtained legal authority over the Tribes exceeding the usual state authority over native American tribes.").

Although Oxford argues that "Congress did not grant Maine explicit consent to restrict the sovereign power of the Tribes with respect to gaming," Opp'n 13, Congress "was fully cognizant of the Settlement Act[s] and apparently contemplated that [IGRA] would not in any way displace" the jurisdictional arrangement of MICSA. *Passamaquoddy Tribe*, 75 F.3d at 790-91. Thus, IGRA's legislative history explains that "nothing in [IGRA] will supersede any specific restriction or specific grant of Federal authority or jurisdiction to a State which may be encompassed in another Federal statute, including . . . the Ma[ine] Indian Claim[s] Settlement Act[.]" S. REP. NO. 446, 100th Congress, 2d Sess. 12 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3082.

**Third**, Oxford is flatly wrong that Maine's jurisdiction over gaming, including tribal gaming, is unlawful because "any derogation of tribal sovereignty . . . must be clearly indicated." Opp'n 17-18. *Johnson* forecloses that argument. There, the Nations argued "that their inherent sovereignty remains intact and therefore state regulatory power over their lands is exceedingly limited." *Johnson*, 498 F.3d at 42. The First Circuit reasoned, however, that the Nations' "premise [was] mistaken: the explicit language of the Settlement Acts establishes state authority that far exceeds what is normal for Indian tribes to which no such legislation applies." *Id.* Thus, derogation principles of federal Indian law do not apply here.

**Fourth**, the Settlement Acts do not abrogate or limit Congress's plenary authority with respect to the Nations. *See* Opp'n 14. MICSA provides that the Wabanaki Nations benefit from "the laws and regulations of the United States which are generally applicable to Indians, Indian nations, or tribes or bands of Indians or to lands owned by or held in trust for Indians, Indian nations, or tribes or bands of Indians shall be applicable in the State of Maine" unless those laws or regulations would affect or preempt Maine's jurisdiction. MICSA § 1725(h); *see also id.*

7

§ 1735(b). The Nations are also "eligible to receive all of the financial benefits which the United States provides to Indians, Indian nations, or tribes or bands of Indians to the same extent and subject to the same eligibility criteria generally applicable to other Indians, Indian nations or tribes or bands of Indians." MICSA § 1725(i); *see also* ABMSA §§ 6(a)-(b), 9(b).

Nor does Maine's broad jurisdiction preclude Congress from acting in a specific area to readjust the relationship between Maine and the Nations when it so chooses. Indeed, Congress did just that in 2022 when it amended the Indian Civil Rights Act to authorize the Nations to exercise "special Tribal criminal jurisdiction over all persons." 25 U.S.C.A. § 1304(b)(1) (Westlaw, current through Pub. L. No. 119-98). Congress may do so again in the future, but only as permitted by section 1735(b) of MICSA which "acts as a warning signal to later Congresses to stop, look, and listen before weakening the foundation on which the settlement between Maine and the Tribe rests." *Passamaquoddy Tribe*, 75 F.3d at 789.

**Fifth**, Oxford wrongly contends that the iGaming law is not in "harmony" with IGRA because it does follow IGRA's requirements. Opp'n 18. But Director Champion argued that the goals of the iGaming law were in "accord" and "harmony" with the Congressional <u>purposes</u>, MSJ 18, not with IGRA itself. *Compare* 25 U.S.C. § 2702(1), *with* 30 M.R.S.A. § 8001(1) (Supp. 2026).

      C.      **Contrary to Oxford's claims, *KG Urban* does not resolve or control this case.**

Oxford contends *KG Urban Enterprises* constitutes "binding" precedent from the First Circuit that this Court must follow, Opp'n 4, but that overstates what the First Circuit actually decided and its impact here.

"The doctrine of *stare decisis* renders the ruling of law in a case binding in future cases before the same court or other courts owing obedience to the decision." *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993). Although Oxford claims that *KG Urban Enterprises* "determine[ed]" that a state-created preference for a tribe was a racial classification for purposes

8

of equal protection, Opp'n at 3, the First Circuit actually *disclaimed* finally determining an issue that would determine the applicable standard of review.  The First Circuit "outlined" the parties' positions, but explained that "the law is far from clear, and both sides have weaknesses in their positions." *KG Urban Enterprises*, 693 F.3d at 25.  Despite expressing some "doubt[]" about the scope of *Mancari*, 417 U.S. 535, the First Circuit stopped short of resolving the standard that applies to state laws drawing tribal classifications that are not "enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians," *Yakima*, 439 U.S. at 501.  *KG Urban Enterprises*¸ 693 F.3d at 20-24.[5]  Thus, its analysis is not binding here because "[a] decision cannot create a precedent on an issue unless the issue was actually decided." *Confederacion Hipica de P.R., Inc. v. Confederacion de Jinetes Puertorriquenos, Inc.*, 30 F.4th 306, 315 (1st Cir. 2022) (citing *Gately*, 2 F.3d at 1226).  *Cf.* Opp'n at 4-5 (suggesting Maine must overcome application of doctrine of *stare decisis* by presenting "authority unmistakably casting [*KG Urban Enterprises*] into disrepute").

Moreover, Oxford is wrong that the preliminary procedural posture of *KG Urban Enterprises* has no effect on the weight it should be afforded.  The First Circuit *denied* preliminary relief to the plaintiff in *KG Urban Enterprises*, while allowing their complaint to move forward.  But "conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes," not final determinations. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991).  "Thus, it is implicit that a party losing the battle on likelihood of success may nonetheless win the war at a succeeding trial on the merits." *A.M. Capen's Co. v. Am. Trading & Prod. Corp.*, 202 F.3d 469, 473 (1st Cir. 2000) (quotation marks omitted).  Similarly, at summary judgment a plaintiff can no longer rest on allegations, but must

---

[5] Notably, *KG Urban Enterprises* confirmed that the *Yakima* rationale "states a sound argument where it applies," as it does here.  693 F.3d at 20.

set forth its evidence by affidavit or other evidence.  *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  In other words, the posture of this matter as compared to *KG Urban Enterprises* does matter.

### D. The iGaming law passes rational basis review, as Oxford concedes.

In its brief, "Oxford concedes that if rational-basis scrutiny applied to the" iGaming law, "it would clear that threshold."  Opp'n 19.  Direct Champion agrees, as Oxford has not "demonstrate[ed] that there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals."  *Wine and Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 53-54 (1st Cir. 2005) (internal quotation marks and citations omitted).  Because the summary judgment record is undisputed, *see* ECF No. 41, Director Champion is entitled to summary judgment.

Oxford's policy arguments against rational basis review do not move the needle.  Opp'n 19-20.  Rational basis review is still effective at ferreting out "irrational prejudice," even when the classification used by a law or policy is not a suspect classification.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447-48 (1985).  *See also Lawrence v. Texas*, 539 U.S. 558, 578-79 (2003) (concluding a state law that banned certain same-sex sexual acts furthered "no legitimate state interest"); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest").

## II. Director Champion is entitled to summary judgment on Oxford's Commerce Clause claim.

### A. Oxford has not demonstrated its standing for purposes of summary judgment.

Article III standing contains three elements: 1) "injury in fact" that is "concrete and particularized and" "actual or imminent"; 2) "the injury has to be fairly traceable to the challenged action of the defendant"; and 3) "it must be likely, as opposed to merely speculative, that the injury

10

will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (cleaned up). Oxford, as "the party invoking federal jurisdiction bears the burden of establishing standing." *Courtemanche v. Noble*, 177 F.4th 60, 64–65 (1st Cir. 2026) (cleaned up).

Oxford claims that it has standing because it has alleged injury from the iGaming law in its Amended Complaint. Opp'n 21. But mere allegations of injury at summary judgment are insufficient. "In response to a summary judgment motion," Oxford "can no longer rest on" "mere allegations," "but must "set forth" by affidavit or other evidence "specific facts,"" to establish the elements of standing. *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)); *see also* L.R. 56. Although Oxford admitted all of Defendants' statements of material facts, *see* ECF No. 41, it provided no additional statements of material fact in accordance with L.R. 56(c)(2)—even when its standing was challenged on the Dormant Commerce Clause claim. MSJ 24-27. Because the elements of standing are "indispensable" parts of Oxford's claim, the Court can grant summary judgment to Director Champion on this basis alone.[6] *Lujan*, 504 U.S. at 561.

**B.      Oxford has not demonstrated the traceability requirement of Article III standing or prudential standing.**

Regardless, although Oxford Casino asserts that "it has plainly alleged injury," Opp'n 21, Director Champion's standing argument was directed towards the traceability element of standing—not injury. Traceability under the Dormant Commerce Clause looks to whether the "plaintiffs have presented evidence that each of the challenged provisions impedes their ability to [participate] in interstate commerce." *Freeman v. Corzine*, 629 F.3d 146, 155 (3d Cir. 2010).

---

[6] Oxford did not include any facts to supports it Equal Protection claim either. But Director Champion did not challenge Oxford's standing on that claim.

11

Here, Oxford does not contest that the iGaming law treats all businesses exactly the same when it comes to iGaming operator licenses.[7] The law permits the Wabanaki Nations to apply for a license, but precludes all others from doing so regardless of their residency, geographic location, or organizational structure. 8 M.R.S. § 1406(2). Thus, the geographic location of Oxford is not traceable to its alleged injury—its inability to participate in internet gaming in Maine.

Although Oxford attempts to limit the holding of *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1 (1st Cir. 2007), it is directly on point here. Opp'n 21. "The injuries of which the plaintiffs complain arise in consequence of [Maine]'s [exclusion of business entities], not in consequence of [any] residency requirements." *Id.* at 12. Oxford's reliance on *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 183 (1st Cir. 1999), is also misplaced because the restriction at issue there was fairly traceable to the plaintiff's injury, i.e., if the exclusivity provision were lifted, the plaintiff's injury would cease. *Cf. C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 386 (1994).

Oxford's hypotheticals about the imposition of two allegedly unconstitutional requirements in the iGaming law are unpersuasive. Opp'n 22-23. Its racial discrimination hypotheticals are obviously unlawful, whereas the iGaming law's tribal government classification is lawful, as shown *supra* at 2-8. And its hypothetical regarding a law requiring "all fishing rods must be purchased at" an L.L. Bean proxy is at odds with *Wine & Spirits*. Because Oxford's alleged injuries "would continue to exist even if the [legislation] were cured" of the alleged discrimination of which they complain, *Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 662 (7th Cir. 2015), Oxford cannot meet the traceability requirement for Article III standing.

---

[7] There is no residency or other limitation on what types of individuals or entities may apply for the other types of licenses related to internet gaming, i.e., a management services license, supplier license, or occupational license. 8 M.R.S. §§ 1407-09.

Oxford presents no argument whatsoever in response to Director Champions' argument that its Dormant Commerce Clause claim does not "fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (quotation marks omitted). MSJ 26-27. As Director Champion argued, Oxford's alleged injuries are not tied to "a barrier imposed on interstate commerce." *City of Los Angeles v. Cnty. of Kern*, 581 F.3d 841, 848 (9th Cir. 2009).

**C.      Oxford's Dormant Commerce Clause claim fails on the merits.**

Oxford's attempts to salvage its Dormant Commerce Clause claim on the merits fare no better. Oxford first attacks Director Champion's argument that Oxford is not similarly situated to the Wabanaki Nations as without "traction in Dormant Commerce Clause jurisprudence." Opp'n 23. Oxford fails to address, however, the Director's primary argument: laws benefiting governments "do not discriminate against interstate commerce for purposes of the dormant Commerce Clause." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007).

Oxford tries to limit *United Haulers* applicability here because the iGaming law "does not establish a public facility providing a traditional public service." Opp'n 24. *United Haulers*, however, is far more expansive than Oxford claims. *United Haulers* specifically called out the differences between governments and private enterprises: "Unlike private enterprise, government is vested with the responsibility of protecting the health, safety, and welfare of its citizens." 550 U.S. at 342. Accordingly, the *United Haulers* court declined to treat "public and private entities the same under the dormant Commerce Clause." *Id.* To do so would be to interfere with democratic processes to choose "whether government or the private sector" should undertake various activities. *Id.* at 344.

13

Here, Maine's Legislature chose to authorize tribal governments to engage in iGaming, which choice does not violate the dormant Commerce Clause. Further, Oxford's claim that gaming is not a traditional governmental function is belied by the fact that the State of Maine has operated a lottery, a form of gaming, for more than fifty years. *See* P.L. 1973, ch. 570 (eff. Oct. 3, 1973) (establishing a state-run lottery in Maine).

Oxford's focus on the "in this state" language of section 1406(2) of the iGaming law is similarly unpersuasive. Opp'n 24. *United Haulers* again provides the answer: laws that favor governments, but "treat in-state private business interests exactly the same as out-of-state ones, do not 'discriminate against interstate commerce' for purposes of the dormant Commerce Clause." 550 U.S. at 345.

Finally, Oxford makes no attempt to contradict the record evidence demonstrating how the iGaming law passes the test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), which weighs local public interests against effects on interstate commerce. Opp'n 26, 27. *See Ass'n To Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40, 61 (1st Cir. 2025). The First Circuit's decision in *Northeast Patients Group v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022), is of no help to Oxford because that case neither addressed a state law favoring government, nor applied the *Pike* balancing test. Instead, *Northeast Patients Group* was decided on whether there was an illegal interstate marijuana market. Oxford does not challenge legally or factually the State's analysis that all activities under the iGaming law can only occur within the State of Maine and thus do not burden interstate commerce under *Pike*. Opp'n at 26.

## CONCLUSION

For the reasons set forth above and in his motion for summary judgment, Director Champion requests that summary judgment be entered in his favor on all counts of Plaintiffs' Amended Complaint.

14

DATED:  June 26, 2026

Respectfully submitted,

AARON M. FREY
Attorney General, State of Maine

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
kimberly.patwardhan@maine.gov

Office of the Maine Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2026, I electronically filed this document and any attachments with the Clerk of the Court using the CM/ECF system and that the same will be sent electronically to registered participants as identified in the CM/ECF electronic filing system for this matter.

DATED:  June 26, 2026

/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta ME  04333-0006
Tel.  (207) 626-8570
Fax (207) 287-3145
kimberly.patwardhan@maine.gov

16